SEALED RECORD

```
 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF MICHIGAN
 2                           SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4              Plaintiff,
                                          HON. JONATHAN J.C. GREY
 5
        v.                                No. 22-20504
 6
      AWS MOHAMMED NASER,
 7
                Defendant.
 8    _____/

 9
                      MOTION HEARING - SEALED RECORD
10
         BEFORE UNITED STATES DISTRICT JUDGE JONATHAN J.C. GREY
11              Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
12                      Detroit, Michigan

13                     Monday, June 5, 2023
                            3:10 p.m.
14
      APPEARANCES:
15
         For the Plaintiff:        SAIMA S. MOHSIN
16                                 U.S. Attorney's Office
                                   211 West Fort Street
17                                 Suite 2001
                                   Detroit, Michigan  48226
18                                 (313) 226-9100

19                                 DMITRIY SLAVIN
                                   Department of Justice
20                                 Counterterrorism Section
                                   950 Pennsylvania Avenue NW
21                                 Suite 7600
                                   Washington, D.C.  20530
22                                 (202) 616-2846

23    (Appearances continued)

24           To Obtain Certified Transcript, Contact:
            Leann S. Lizza, CSR-3746, RPR, CRR, RMR, CRC, RDR
25                          (313) 234-2608
```

SEALED RECORD

SEALED RECORD

```
 1    APPEARANCES (Continued):

 2       For the Defendant:           JAMES R. GEROMETTA
                                       AMANDA N. BASHI
 3                                     Federal Community Defender
                                       613 Abbott Street
 4                                     Fifth Floor
                                       Detroit, Michigan  48226
 5                                     (313) 967-5555

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 | **TABLE OF CONTENTS**

2 | Motion Hearing                                               Page

3 |   **Defendant's motion to dismiss re IAD violation**      5

4 |     Argument by Mr. Gerometta                             5

5 |     Argument by Ms. Mohsin                                9

6 |     Motion denied                                        10

7 |   **Government's motion to amend protective order**      10

8 |     Argument by Mr. Slavin                               10

9 |     Argument by Mr. Gerometta                            15

10 |     Further argument by Mr. Slavin                      23

11 |     Motion taken under advisement                       26

12 |

13 |

14 | Exhibits:                                            Received

15 |   (None offered.)

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

SEALED RECORD

```
 1                                    June 5, 2023
 2                                    Detroit, Michigan
 3                         -    -    -
 4       (Court, Counsel and Defendant present; 3:10 p.m.)
 5            THE COURT CLERK:  All rise.  The United States
 6   District Court for the Eastern District of Michigan is now in
 7   session; the Honorable Jonathan J.C. Grey presiding.  You may
 8   be seated.
 9            The Court now calls Case Number 22-CR-20601, United
10   States of America versus Aws Mohammed Naser.
11            Will counsel please place their appearances for the
12   record starting with the government.
13            MS. MOHSIN:  Yes.  Good afternoon, Your Honor.  I
14   believe the Case Number is 22-20504?
15            THE COURT CLERK:  That's correct.  That's correct.
16            MS. MOHSIN:  Just making sure.
17            Saima Mohsin, Assistant United States Attorney,
18   appearing on behalf of the United States.  To my right is
19   Dmitriy Slavin.  He is a trial attorney with the Department of
20   Justice's National Security Division.
21            THE COURT:  Good afternoon.
22            MR. SLAVIN:  Good afternoon, Your Honor.
23            THE COURT:  Thank you.
24            MR. GEROMETTA:  James Gerometta and Amanda Bashi on
25   behalf of Aws Naser who is present to my left, Your Honor.
```

1       THE COURT:  Good afternoon to you all as well.

2       MS. BASHI:  Good afternoon.

3       THE COURT:  Thank you.  And I just want to say thank

4  you to counsel and all parties for their patience today.  The

5  Court was delayed due to another court matter, but I appreciate

6  counsel for standing by and being prepared to proceed.

7       And so this is a hearing on the government's motion to

8  amend the existing protective order, and you all may be seated.

9  And so I have received the -- both the motion, the response, as

10  well as the reply from the United States in the latter

11  instance, but if there are additional items that you would like

12  to present at argument, you may.

13       MR. GEROMETTA:  Your Honor, before we start, Mr. Naser

14  asked me to put something on record, and I thought I'd do it

15  now before the government gets going if it's okay with the

16  Court.

17       MR. SLAVIN:  Okay.

18       MR. GEROMETTA:  Thank you.  My apologies.

19       Your Honor, Mr. Naser has some concerns in this case,

20  and we went over this a little bit last time.  We were talking

21  about scheduling, and I think it will come up when we talk

22  about whether this should be a complex case or not, but this is

23  a case where Mr. Naser is five years into a parole violation at

24  the Michigan Department of Corrections.  He was brought over on

25  a writ which interrupted his programming there, and he hasn't

 1   been able to finish that programming.  He's been here for about

 2   seven or eight months now.  And he's concerned about that.  The

 3   interstate agreement against detainers gives a presumptive

 4   six-months timeframe to try cases.  That might be 120 days,

 5   Your Honor.  I can double check that.  But regardless, we are

 6   over that presumptive timeframe when he's brought over on a

 7   writ.

 8           And, again, this goes to the government's request for

 9   a complex case designation.  In the time he's been here we've

10   received some discovery.  There's more discovery waiting.  We

11   just, Miss Bashi and I, looked at some more discovery that

12   hasn't been released pending the resolution of the protective

13   order.  There have been two judicial recusals in this case,

14   which is extraordinary, as I'm sure everyone in this court

15   agrees with.  It's unusual to get one, much less two.

16           And Mr. Naser has some real concerns about the pace of

17   this case.  He's asked me to reiterate his rights under the

18   interstate agreement on detainers, that there really hasn't

19   been a sufficient finding in this case, that it should -- the

20   120-day timeframe should be exceeded.  We still don't have full

21   discovery.  To the extent that there have been these recusals

22   and there have been judges familiar with the cases who set some

23   aggressive -- you know, Judge Borman in particular had set a

24   more aggressive timeline in this case.  Mr. Naser has asked me

25   to indicate he would waive whatever conflict there was that

1   caused -- you know, the last recusal was by Judge Hood, so I

2   guess that's the one I'll address, that would cause Judge Hood

3   to recuse herself.  For the record, he is reasserting his IAD

4   rights.

5           THE COURT:  Wait.  Just so I understand, you're saying

6   he would waive whatever issue caused recusal?

7           MR. GEROMETTA:  He would, Your Honor, yes.

8           THE COURT:  Well, we don't know what caused the

9   recusal, so there may not necessarily be anything for him to

10  waive.  And once the recusal is done, I have no way of knowing

11  what happened or why.  I know that the case is mine.

12          MR. GEROMETTA:  I understand that, Your Honor.  Much

13  like the upcoming FISA litigation where I'm shooting in the

14  dark a little bit, I'm shooting in the dark here too.  And, you

15  know, I can understand Mr. Naser's concerns and why he's

16  frustrated by this entire thing.

17          THE COURT:  Just so I understand, Mr. Gerometta, are

18  you making a motion?

19          MR. GEROMETTA:  I guess -- so this -- Mr. Naser and I

20  discussed this this afternoon before we came up.  You know, I'm

21  not sure there is a mechanism to make a motion, to waive the

22  recusal, to waive -- I don't know if there was a conflict and

23  we were asked to waive it, we could waive it, but when we don't

24  know the reason for the recusal, it's hard to make a motion

25  when I don't know that reason.

SEALED RECORD

1    THE COURT:  Okay.

2    MR. GEROMETTA:  And I'm not even sure how to

3 investigate that reason.

4    THE COURT:  And I don't think that there is a

5 mechanism to investigate the reason for another judge making --

6 deciding to recuse themselves from the case.  So separate and

7 apart from that, the IAD issue, are you making a motion regards

8 to that?  And just to specify for purposes of the record, part

9 of your concern is that Mr. Naser is not in state custody, he's

10 been brought over to federal custody and that time has been

11 extended repeatedly.  And so your concern is that he's missing

12 out on programming that he had begun in state custody.  Is that

13 correct?

14    MR. GEROMETTA:  Yes, Your Honor.  Because it puts him

15 in a really difficult position to either stay here and work

16 with us, to expedite this case, or to go back and get that

17 state programming.  And if I could have one moment, please,

18 Your Honor.

19    THE COURT:  You may.

20    (Attorney/client conference.)

21    MR. GEROMETTA:  So, Your Honor, he's in a -- he's got

22 a difficult choice, really impossible choice, to return there

23 and get programming or to stay here and really assist us in

24 preparing for trial, and I think that's a choice -- that's what

25 the IAD is meant to avoid with that 120-day maximum.  And

SEALED RECORD

1    because of that, I would make an oral motion to dismiss based

2    on IAD violation.  I understand the Court may want me to

3    supplement or to file an official written motion, but I raise

4    that issue now before we get started on everything.

5            THE COURT:  Thank you.

6            MR. GEROMETTA:  Thank you.

7            THE COURT:  Counsel, would you like to respond?  And

8    I'll just direct you -- I don't need a response regarding

9    recusal.

10            MS. MOHSIN:  Thank you, Your Honor.

11            I just want to acknowledge for the record that the

12    government agrees; it is extraordinary for one, let alone two,

13    judges to recuse themselves.  We don't have any idea why that

14    occurred.

15            As far as the IADA is concerned, the defendant waived

16    his IADA rights, then he withdrew that waiver, the government

17    was asked not to return him to state custody.  We have honored

18    that request.  We will return him to state custody should he

19    have any reason to do so or if he requests that.  But as far as

20    the government is concerned, there has been no violation of his

21    speedy trial rights here either under the Speedy Trial Act or

22    constitutionally.

23            As the Court is aware, a motion for complex case

24    designation was filed in this case sometime ago.  That motion

25    is still pending, as is the government's motion for amending

1   the protective order.

2       So I don't believe that there is any sig -- any time

3   that has been charged to the government with respect to speedy

4   trial at this point because we have been in some sort of motion

5   practice pretty much from the inception of the case.

6       THE COURT:  Thank you.

7       I believe that that is an accurate statement of the

8   law, and so on that basis I'm going to deny the motion.  You

9   certainly have leave, Mr. Gerometta, if you deem it reasonable

10  and warranted, to file a motion, and the Court will address a

11  written motion.  And I'll just state, Miss Mohsin actually very

12  clearly said if -- having a little bit of brain fog here -- if

13  Mr. Naser wants to go back to state custody, that the

14  government is happy to have him go back to state custody.  So

15  there may not be any opposition to that.  I would just urge you

16  consult and confer with counsel for the United States.

17      So we will move on to the purpose of today's hearing

18  which is the motion to amend the protective order.  And

19  Miss Mohsin or Mr. Slavin, you may approach the lectern.

20      MR. SLAVIN:  Thank you, Your Honor.  That is loud.

21      When we began this case, we talked with the defense

22  about the need for a protective order, and counsel on both

23  sides agreed to a stipulated protective order.  Judge Borman

24  found good cause to enter into this protective order, and it

25  was entered back in the fall.  Actually in December, early

SEALED RECORD

1    December.

2         Soon after that, Mr. Naser began having phone calls

3    with a journalist who, in the past, has done a podcast that

4    featured a lot of information from Mr. Naser.  In fact, almost

5    the entire episode of this podcast was dedicated to Mr. Naser

6    and the things that he had told him.  The journalist told

7    Mr. Naser in their conversations that he had read the

8    protective order, that it was not a violation of the protective

9    order for Mr. Naser to summarize the information in his

10   discovery and provide that information to the reporter.  They

11   agreed to have his brother provide some of the discovery

12   information.  The journalist tasked Mr. Naser with looking at

13   the discovery to get him certain things, and they discussed

14   doing a documentary on Mr. Naser's case, on the investigation,

15   with the goal of shining a light on the work the FBI does on

16   terrorism cases and what they consider to be improper ways that

17   the FBI pursues terrorism cases.

18        THE COURT:  Mr. Slavin, have you identified specific

19   minutes and seconds in Exhibits 3 and 4 that you submitted to

20   the Court that specifically would show he was distributing

21   information in violation of the December 12th, 2022, protective

22   order?

23        MR. SLAVIN:  So he was not -- having reviewed the

24   language of the protective order, what he was distributing was

25   marked as general discovery.  In -- which that specific

SEALED RECORD

SEALED RECORD

1    document, talking about one specific document, that was a

2    sealed record from another court regarding a sealed case.  We

3    should have marked that as sensitive because it was sealed.

4           THE COURT:  But you didn't.

5           MR. SLAVIN:  We did not.  So he did not improperly

6    distribute this information, which is a problem in itself

7    because it shows that the protective order is not sufficient to

8    cover the issues in this case.  Because information that is

9    general discovery which is still concerning this case, there's

10   no limit on him sharing that information with the media, and he

11   has made it his mission to share that information with the

12   media.

13          He has refused to sign any protective order, and so we

14   are certainly concerned that anything even more sensitive that

15   he sees is going to end up in the media.

16          THE COURT:  And specifically about his refusal to sign

17   a protective order, what would you have the Court do if he

18   continues to refuse to sign an agreement regarding

19   nondisclosure of materials?

20          MR. SLAVIN:  So what we had proposed is an amended

21   protective order.  That amended protective order limits his

22   access to even the general discovery; that would require him

23   to, first, sign a protective order in order to view it and then

24   to only view it in the presence of his attorneys so he does not

25   have the ability to publicize it and share with the media.

1          THE COURT:  So if he doesn't sign, what would you like

2    the Court to do?

3          MR. SLAVIN:  To enter this protective order where his

4    attorneys would have access to all of the discovery but he

5    would not himself be able to actually get his hands on the

6    documents.

7          THE COURT:  And specifically regarding the April 7,

8    2023, call, do you have a copy of that for the Court?

9          MR. SLAVIN:  We do, and we can submit the entire call

10   for the Court.  All the calls are recorded, so we could provide

11   recordings of each of these phone calls to the Court.

12         THE COURT:  I do think that that would be helpful, and

13   for that reason I may not be making a decision on this motion

14   today.

15         MR. SLAVIN:  Understood.

16         THE COURT:  You may proceed if you have anything that

17   you'd like to illuminate for the Court.

18         MR. SLAVIN:  Our focus is on both protecting future

19   investigations and any current investigations going on but also

20   ensuring that both sides get a fair trial in this case.

21         Some of the discovery is going to be inadmissible, as

22   is always the case, but if it's out there in the public because

23   it's shared in the media, then the potential jury pool could be

24   tainted with this information being out there.  This is a --

25   the journalist that he's been in contact with constantly has

 1  done multiple podcasts focusing on FBI investigations.  He

 2  himself has thousands of listeners, but he's also been featured

 3  on many other podcasts talking about law enforcement.  He's a

 4  frequent guest.  He's often quoted and sent in articles.  So he

 5  has a lot of reach and a lot of ability to publicize this case.

 6  And we're not asking for, you know, any kind of restriction on

 7  the media, but as, in fact, they say on their phone calls, if

 8  there's documents that make their way to the media, that gives

 9  a lot more credibility.  That gives a lot more oomph to

10  anything that they choose to put out, and it's things we may

11  not be able to address at trial because it may be inadmissible,

12  it may be hearsay, it may have to do with other cases and

13  things that would not be relevant or appropriate to bring up at

14  trial but the jury may already know if it's been widely

15  publicized in the media.

16         So that is a concern for us, ensuring that we don't

17  have a tainted jury pool but also protecting terrorism

18  investigations.  The discovery material is going to show not

19  just what -- things that Mr. Naser already knew but also how

20  the government knows those things.  So that's going to reveal

21  potential surveillance, that's going to, you know, reveal the

22  use of any sources, and that endangers ongoing as well as

23  potential future investigations.  So those are our two concerns

24  in this case: fair trial and protecting investigations.

25         THE COURT:  Thank you.  And the Court is certainly

1    sensitive to those concerns.  The balance is against the right

2    of access and certainly right of access for a defendant.  And

3    so I'm going to weigh, continue to weigh this request very

4    carefully.  But thank you.

5         MR. SLAVIN:  Thank you, Your Honor.

6         THE COURT:  Mr. Gerometta?

7         MR. GEROMETTA:  Thank you.

8         So, Your Honor, the government raises two concerns in

9    its request for an expanded protective order, and I'm going to

10   separate them because I think they're two very different

11   concerns that have two very different remedies.  The first is

12   the idea of the FBI's sources and means, I'll call them, the

13   need to protect ongoing and perhaps --

14        THE COURT:  Just try not to touch the base of the

15   microphone.

16        MR. GEROMETTA:  I'm sorry.

17        THE COURT:  Or the mic at all.  That one is sensitive.

18        MR. GEROMETTA:  I apologize.  I nudged it with my

19   paper.

20        THE COURT:  No problem.  It's very sensitive.  Please

21   continue.

22        MR. GEROMETTA:  So I'll call it the sources and

23   methods being the first concern.  And I think that's the

24   legitimate concern for a protective order here.  And the

25   original protective order was designed to separate discovery

1    that would reveal sources and methods and discovery that --

2    that wouldn't reveal those sources and methods.  Discovery that

3    wouldn't reveal that sort of thing was made general discovery,

4    and discovery that would potentially reveal sources and methods

5    was made sensitive discovery.

6         Now, it's my personal opinion that the government has

7    overused what should be in sensitive discovery.  You know,

8    looking at what's in the sensitive discovery, we have

9    defendant's bank records, defendant's credit report, a subpoena

10   to Bank of America, subpoena for Western Union and response,

11   these sorts of things.  Now, the fact that the government

12   subpoenas Bank of America, I guess, is a method of

13   investigation, but I don't really think it's a sort of -- I

14   think I'm just shaking this.

15        THE COURT:  It's okay.

16        MR. GEROMETTA:  I don't think it's a sort of method of

17   investigation that needs to be protected.  I don't think anyone

18   can or will do anything different or will be surprised to find

19   out that law enforcement uses investigative subpoenas to get

20   people's bank records or Western Union records.  I don't

21   understand why that is sensitive discovery.

22        But that aside, there are some things and there is

23   some information in here regarding search warrant affidavits

24   and that sort of thing that do in part, I will admit, talk

25   about sensitive sources and methods.  And those things, I

1   think, are appropriately under a protective order to stop them

2   from being disseminated out into the world and interfering with

3   ongoing or future investigations.  And that's what the purpose

4   of a protective order is.

5           The other thing that the government is concerned about

6   is they're concerned about taint of the jury pool, and I don't

7   think that's an appropriate use of a protective order.  When

8   you're talking about tainting the jury pool, what you're

9   actually talking about is a gag order.  If you're talking about

10  a gag order, the standard for that is, you know, is somebody

11  going to be making statements that they believe are going to be

12  published by the media that will influence the jury pool.

13          THE COURT:  Well, they've said yes.

14          MR. GEROMETTA:  Well, Your Honor, they've said that in

15  the past Mr. Aaronson has had podcasts and these sorts of

16  things that talk about what he believes is the manufacturing of

17  terrorism by the FBI, and they said he has thousands of

18  listeners and he's sometimes associated with other media, but

19  what they haven't pointed to is any sort of overwhelming press,

20  overwhelming deluge of information into this particular jury

21  pool that would make it impossible to select a jury.

22          THE COURT:  And their view is that this is why they're

23  requesting it, so it doesn't get to that point.

24          MR. GEROMETTA:  Well, Your Honor, I think they need to

25  show there's a possibility of it getting to that point, and I

SEALED RECORD

```
 1   don't see that at all.  First of all, Mr. Aaronson and
 2   Mr. Naser are talking about doing a documentary about his life
 3   and his experience, and that's totally appropriate.  There's
 4   been no talk about when that documentary is going to be
 5   published.  You know, they're also talking about generally the
 6   things that the FBI does to -- which in their belief
 7   manufacturers terrorism which unfairly targets Muslims.  And I
 8   think this is something, while Mr. Naser is going through this
 9   case, that he has a First Amendment right to talk about.  He
10   even has a First Amendment right to talk about it in
11   relationship to his case unless it's going to poison the jury
12   pool, that it's going to make it impossible to pick a fair and
13   impartial jury.
14        It's -- someone who's got a podcast with thousands of
15   listeners across the country I don't think so overwhelms this
16   jury pool that we can't through the voir dire exclude the two
17   people out of the 70 that we're going to bring in who may or
18   may not have heard of this case.  And when I say the two
19   people, I think I'm being generous to how many people on our
20   jury pool are going to have listened to Mr. Aaronson's podcast.
21        You know, I just tried a terrorism case with someone
22   who was arrested in Syria and brought back here.  No one on our
23   jury had heard of him.  I mean these are sensational
24   allegations.  No one had heard of him.  Now, that doesn't mean
25   that you should never be worried about pretrial publicity in
```

1    this case, but I just don't see it here at this time.  And it

2    certainly should not be addressed through a protective order.

3    It should be addressed through a gag order, and the government

4    has not moved for a gag order in this case.  I think the

5    protective order is the wrong mechanism.

6         Their protective order means that Mr. Naser can't have

7    his discovery and go through it and look at it.  That means

8    either myself or Miss Bashi or an investigator from my office

9    has to sit with him and go through it, that he can't look at

10   it -- and I don't want to say at his leisure because that's the

11   wrong, really, term.  Makes it sound relaxed.  But as I'm sure

12   the Court knows from being back in practice, when you prepare

13   for a case, you don't look at stuff one time, and it doesn't

14   always make sense.  You look at stuff and something hits you

15   and you go back, pull your binder --

16        THE COURT:  I do the same.  I do the same now.

17        MR. GEROMETTA:  Okay.  So, you know, it's not all this

18   one time through or two times through or you go through it in

19   order.  It takes a long time.

20        THE COURT:  Let me --

21        MR. GEROMETTA:  He's going to lose that ability.

22        THE COURT:  Let me ask you this though, because I know

23   you're talking about the publicity and the limiting effect it

24   might have if this amended request is granted, but he hasn't

25   signed the agreement not to disclose materials that were

1   already subject to the 2022 protective order.  Why has he not

2   signed that agreement?

3           MR. GEROMETTA:  Your Honor, he hasn't signed that

4   agreement for two reasons.  Number one is he feels that it's

5   being interpreted overbroad by the government, which is I think

6   something that we -- if we believe that have an affirmative

7   duty to litigate, to ask things be removed from the protective

8   order, first thing we should do is talk to the government about

9   it obviously before we come to the Court.  I'm sure the Court

10  does not want to get back into handling discovery disputes now

11  that it's left a lot of that behind.  But, you know, I think

12  that's one reason, and the other reason is because of this idea

13  that now everything's going to be under the protective order.

14  We neglected to have him sign it.  That was, you know, my

15  fault.  But and then when we talked to him about it, we had

16  already gone to the idea that maybe everything was going to be

17  under the protective order and he drew the line there.

18          So I think what the Court could do, what I'd like the

19  Court to do is to keep the current protective order and just

20  say, Mr. Naser, until you sign that protective order, you're

21  just going to get the general discovery, and there's another

22  batch of discovery to be delivered and it contains a fair

23  amount of protected discovery but a lot of general discovery

24  for him to go through.

25          THE COURT:  And is it your contention that he is going

1    to sign the agreement?

2          MR. GEROMETTA:  Well, Your Honor, I would like to have

3    some more time to sit down and talk to him about it, but I'd

4    also like him to start going through the rest of the general

5    discovery at this time so that we can -- there's now general

6    discovery to keep him busy for a while, so that we can get this

7    case moving forward.

8          THE COURT:  And I'll just tell you, I think that this

9    is slightly far afield from the motion, but I've heard you

10   express a concern about the timing of this case and potential

11   delays in going to trial, but Mr. Naser not sitting with you

12   and reviewing the discovery could harm his ability to prepare

13   for trial in a timely and an efficient way.  So I'm also

14   thinking about that, that he may be delaying his own trial.

15         MR. GEROMETTA:  I understand that, Your Honor, and I

16   think if we could get -- if the Court would keep the protective

17   order status quo, for lack of a better word --

18         THE COURT:  And just hope that he would sign the

19   agreement?

20         MR. GEROMETTA:  Your Honor, if I sit down with him and

21   we go through much of the general discovery in the next week or

22   two, I would hope that he would at that point with a little

23   more time, with he and I, sign the protective order at that

24   point.  And if not, you know, it is -- the Court asked what the

25   government, what are they supposed to do if he just refuses to

SEALED RECORD

1  sign a protective order, and that I don't have an answer for.

2  And that's -- and I think as his attorney, I just need to sit

3  with him and tell him, look, we've got to get this but part of

4  that is going through the rest of the discovery and building

5  some trust between Mr. Naser and I which is, as I'm sure the

6  Court's aware, an ongoing business.

7       THE COURT:  Well, I can tell you that the Court would

8  certainly not be inclined to order the government to produce

9  sensitive materials specifically for his review if he won't

10  even sign this agreement.

11      MR. GEROMETTA:  I understand that, Your Honor, and

12  that's why at this time I'm not requesting that.

13      THE DEFENDANT:  Come here.

14      MR. GEROMETTA:  Could I have one moment, please?

15   (Attorney/client conference.)

16      MR. GEROMETTA:  Thank you, Your Honor.

17      You know, as far as the delay goes, I know the Court

18  was -- I promise I'm not touching this.  As far as the Court --

19  the delay goes, as I'm sure the Court knows, we're eight months

20  in and the delay is one of Mr. Naser's, you know, big issues.

21  If we could get this general discovery, you know, I'm confident

22  when we take a look at everything that we will work out the

23  sensitive discovery portion and get this case moving and the

24  delay in this case will not be Mr. Naser's fault, that before

25  we're through the general discovery, we'll work out the

SEALED RECORD

1   sensitive discovery issue.

2           THE COURT:  Well, I'll just say on the record, it

3   doesn't appear that Mr. Naser's ready for trial if trial were

4   to be ordered right now within a short period of time.  Even

5   with what's been produced, he hasn't gone through it, so I'm

6   just, again, noting that.

7           MR. GEROMETTA:  Your Honor, we have been through

8   everything that's been disclosed to Mr. Naser.  There's a -- we

9   haven't been through the last batch which hasn't been

10  disclosed.  It's been disclosed to us at the U.S. Attorneys'

11  Office, but it hasn't been given to us.  When he gets it, he's

12  very diligent and we have staffed this case to move it as quick

13  as possible.

14          THE COURT:  Thank you.

15          MR. GEROMETTA:  Thank you, Your Honor.

16          THE COURT:  Mr. Slavin, this is your motion, and so

17  you'll have the last word if there are any other matters you'd

18  like to bring to the Court's attention having heard

19  Mr. Gerometta's response to your argument.

20          MR. SLAVIN:  Thank you, Your Honor.  I just want to

21  respond to one thing which is the question of the proper

22  remedy.  And the defense suggests that for the pretrial

23  publicity concern the proper remedy would be a gag order.  We

24  don't want to go that far.  We want to respect the defendant's

25  First Amendment rights.  We want to respect the media's rights.

1  And we don't want, even though the Court can -- you know,

2  there's a balancing side that, you know, case law says there's

3  infringements that can be made on that right to protect a

4  trial.  We don't want to go any further than is necessary.  And

5  that's why we think a protective order is a good solution

6  because if the defendant and this reporter want to complain

7  about the FBI's treatment of Muslims, they're free to do that,

8  but they don't have the ability to say the documents in this

9  case, specifically the discovery documents in this case, the

10 FBI's own documents, say X, Y, and Z and that proves that the

11 FBI's targeting Muslims, because we have no way -- it's going

12 to be a one-sided story.  It's going to have that credibility

13 because they'll be able to say documents support it, and we may

14 not be able to counter that because the documents they're

15 talking about may be hearsay, may be inadmissible for other

16 reasons.  And so that's our concern.

17         And this case did attract media attention when it was

18 indicted.  It was covered by -- it was in AP, CNN, ABC, Fox,

19 all of the major outlets.  So that concern is there.  And we

20 think rather than any kind of gag order, a protective order

21 that just says you could talk but you're not going to have the

22 ability to say "Let me give you these documents or read from

23 them to you that prove my point" is the right middle ground

24 without infringing on anybody's freedoms.

25         The other thing, the sensitive -- this general

1    dispute, we are happy to sit down with the defense and hash

2    out, you know, which documents are general, which documents are

3    sensitive without involving the Court.  I'm sure that we can

4    reach compromises and reach agreements on those things.  But if

5    we're at the point where we know that any document that is

6    marked general discovery is going to immediately be handed over

7    or eventually be handed over to the media, we're going to be

8    extra careful with those documents because they may contain,

9    even if it's bank account information, they may contain bank

10   account information of people other than the defendant.

11        THE COURT:  But what would make that any different

12   than a garden variety white collar fraud case that a person

13   could choose to receive their basic documents in discovery and

14   do an interview based upon those documents and share those

15   documents?

16        MR. SLAVIN:  In those cases, generally those documents

17   themselves are not being handed over to the media.  If they --

18        THE COURT:  But they could be.

19        MR. SLAVIN:  I think if you -- if I had a white collar

20   case where arose -- where the same issues arose, I would be

21   considering a protective order or at least redacting, you know,

22   bank account information, you know, taking more steps in that

23   discovery as well to protect that information because things

24   like tax information, financial information, bank account

25   numbers, those, you know, while they don't reveal sensitive law

**SEALED RECORD**

 1   enforcement methods, are still sensitive information that needs

 2   to be more carefully dealt with and protected.  And so if we

 3   think that that information's going to be -- immediately go to

 4   media, we're going to be a little more careful in it and we

 5   will err -- that's why we have been erring towards, well, let's

 6   be careful with this.  And we're happy to have those

 7   negotiations, but we have a lot more comfort that we're

 8   protecting, you know, private information, financial

 9   information with a -- if we know that it's not going to be

10   immediately handed over to the media.

11            THE COURT:  Thank you.

12            MR. SLAVIN:  Thank you, Your Honor.

13            THE COURT:  I'm not going to issue a ruling today

14   because I do want to review the other -- I believe it was a

15   call.  So as soon as I receive that and review it, the Court

16   will issue an order shortly thereafter.

17            MR. SLAVIN:  Your Honor, do you only want the

18   April 7th calls or all of the calls that we mentioned in our

19   motion?

20            THE COURT:  The April 7th call.

21            MR. SLAVIN:  Understood.  Thank you.

22            THE COURT:  Thank you.

23            So this matter will remain pending, and I will take it

24   under advisement once I have received the April 7th call.  So

25   it remains open until I've received that call.

**SEALED RECORD**

SEALED RECORD

1          I will also stay tuned to see if there are further

2     motions filed, and I am aware that the other motion regarding

3     designation of the case remains outstanding.  The Court will be

4     issuing an order on that.

5          Is there anything further for the Court's

6     consideration today?

7          MS. MOHSIN:  Nothing further from the government at

8     this time.  Thank you, Judge.

9          THE COURT:  Thank you.

10         Mr. Gerometta?

11         MR. GEROMETTA:  Your Honor, I may request the Court

12    listen to one of those other calls, but I want to relisten to

13    it myself before I waste your time asking you to review a

14    second call for context.

15         THE COURT:  Okay.  If you're going to request the

16    Court listen to it and it's already been mentioned, you can

17    simply just alert the Court --

18         MR. GEROMETTA:  Okay.

19         THE COURT:  -- and either you or counsel for the

20    government may provide it to the Court.

21         MR. GEROMETTA:  Okay.  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         And I will just direct you to do that no later than

24    one week from today.

25         MR. GEROMETTA:  Will do.  Thank you.

SEALED RECORD

SEALED RECORD

1          THE COURT:  Thank you.

2          That will be all for purposes of today's hearing.

3   Court is adjourned.  Thank you.

4          MR. GEROMETTA:  Thank you, Your Honor.

5          MS. MOHSIN:  Thank you, Your Honor.

6        (Proceedings concluded, 3:47 p.m. )

7                    -   -   -

8              CERTIFICATION OF REPORTER

9

10    I, Leann S. Lizza, do hereby certify that the above-entitled

11  matter was taken before me at the time and place hereinbefore

12  set forth; that the proceedings were duly recorded by me

13  stenographically and reduced to computer transcription; that

14  this is a true, full and correct transcript of my stenographic

15  notes so taken; and that I am not related to, nor of counsel to

16  either party, nor interested in the event of this cause.

17

18

19  S/Leann S. Lizza                              8-2-2023

20  Leann S. Lizza, CSR-3746, RPR, CRR, RMR, RDR    Date

21

22

23

24

25

SEALED RECORD