## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                    Case No. 22-20504

v.                             HON. JONATHAN J.C. GREY

AWS MOHAMMED NASER,

      Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION
## TO SUPPRESS STATEMENTS (ECF No. 137)

## I.    INTRODUCTION

Defendant Aws Naser moves the Court to suppress statements he made to Federal Bureau of Investigation ("FBI") officers on January 4, 2013. (ECF No. 137.) Naser contends that FBI Agents failed to notify him of his *Miranda* rights in violation of the Fifth Amendment prior to interrogation. He further asserts that he invoked his right to an attorney. The government filed a response (ECF No. 144), and Naser did not reply. On September 5, 2024, the Court held a hearing on the motion, after which the parties were given an opportunity to file supplemental briefs regarding the motion. Naser  declined to further brief the motion in his

supplemental brief (ECF No. 189), but the government addressed the motion in its supplemental brief. (ECF No. 190.) For the reasons that follow, the motion is **DENIED**.

## II.   BACKGROUND

A grand jury charged Naser in count one of the second superseding indictment with attempting to provide material support and resources to a foreign terrorist organization, and in count two with possessing a destructive device as a felon. (*See* ECF No. 162.) By 2013, the FBI had surveilled Naser for several years after an incident on the Henry Ford Community College campus in 2011, where allegedly he preached "Jihad rhetoric" in Arabic.

On January 4, 2013, Bloomfield Township Police Department ("BTPD") officers arrested Naser for an alleged armed robbery. At the BTPD, Detective Mark Davis met Naser in a square-shaped room furnished with sofas and chairs. Naser–uncuffed–sat across from Davis. The recorded interrogation began at 08:17:00 a.m.[1]

---

[1] The government refers to the interaction as an "interview," but for the reasons stated below, the Court considers the interaction an interrogation.

Davis handed Naser the complaint which charged Naser with armed robbery, and Davis also handed Naser a written copy of his *Miranda* rights. Naser read his Miranda rights aloud and told Detective Davis: "Okay, well, you don't have to waste your time asking any questions. I'm gonna remain silent and you guys can call my lawyer, alright, Ms. Masri, and uh we'll see how this goes." (ECF No. 144, Ex. 1, at 08:20:04).

Davis told Naser, "Alright, **well you have a right to do so** and I'm not passing judgment on you because you do or don't invoke your rights. You have your rights just like I'd have my rights if I was sitting in your seat." (*Id.* at 08:20:20 (emphasis added).) At that point, unprompted, Naser proceeded to explain his conduct during the alleged armed robbery. (*Id.* at 08:20:20–08:21:04.) Naser then asked Davis numerous questions about the FBI, including what they were searching for at Naser's home, whether the FBI had finished conducting the search, and whether the BTPD was working with the FBI. Davis answered Naser's questions for nearly 20 minutes before ending the conversation and escorting Naser—who remained uncuffed and unrestrained—to a cell. As they walked out of the room, Davis told Naser, "Hey, no hard

feelings" and Naser replied, "Listen man, I don't have anything against you." (*Id.* at 08:38:33.)

At some point thereafter, BTPD officers returned to Naser's cell and told Naser that FBI agents had come to talk to him. In his brief, Naser claims that he informed the BTPD that he did not want to speak with the FBI agents (ECF No. 137, PageID.1296), but FBI Special Agent Adam Christensen testified under oath at the suppression hearing that Davis "told us Mr. Naser wanted to talk to the FBI." (ECF No. 185, PageID.2071.) BTPD officers brought Naser to the same room where he had been interrogated by Davis approximately 90 minutes earlier. Christensen and his partner (Jason Tresh) then interrogated Naser.[2]

The entire interaction between Naser and the FBI agents took place while Naser was in custody at the BTPD and unable to leave the BTPD. The FBI began talking to Naser about 10:00 a.m., roughly four hours after the search warrant was executed at Naser's house at 6:00 a.m., when the search party shattered the back glass door as Naser was at the

---

[2] Both Christensen and Tresh had talked with Naser on January 12, 2012, and Christensen and another agent later spoke with Naser on November 13, 2012, each time at Naser's home. Naser was never in handcuffs or otherwise restrained on those two occasions, and those interviews were conducted after Naser agreed to speak with agents.

front door with firearms pointed at him. Christensen was present for the search, but he had little involvement in the search and was not part of the entry or arrest team. (*Id.* at PageID.2086.)

Christensen testified that he understood from Davis that Davis "had read [Naser] his Miranda rights and . . . that [Naser] had waived them" (*id.*), although Christensen did not include this in his January 7, 2013 report. (*Id.* at PageID.2083.) There is an FBI Form FD-302 for the FBI's interrogation of Naser at the BTPD on January 4, 2013 (ECF No. 139), but the FBI did not make an audio or video recording of the interrogation. (ECF No. 185, PageID.2073.) Christensen acknowledged that the FBI did not give Naser any *Miranda* warnings or present Naser with the FBI Form FD-395 "Advice of Rights" to sign. (*Id.* at PageID.2078–2079.) The government claims the agents advised Naser that: (a) the same *Miranda* warnings given to him by Davis applied to their interrogation; (b) he did not have to talk to them; and (c) he could leave at any time to go back to his cell at the BTPD. (*Id.* at PageID.2076, 2079.) Christensen testified that Naser stated: he did not want his attorney, and he was talking against his attorney's advice. (*Id.* at PageID.2077.)

5

Christensen testified that they told Naser that the FBI wanted to talk to him, "and he seemed to want to talk to us. He asked us – started asking us questions about the search warrant." (*Id.* at PageID.2087.) The FBI agents asked Naser about numerous topics, including cash withdrawals of proceeds from Naser's sale of a family property in Minnesota (the FBI was investigating Naser for structuring financial transactions), Naser's travels, and Naser's knowledge of an individual named Russell Dennison (the FBI was investigating Dennison for material support for terrorism). (*Id.* at PageID.2088.) The FBI did not ask Naser about the alleged armed robbery. (*Id.* at PageID.2079.) The government argues that Naser not only agreed to speak with agents, but Naser wanted to tell them about these events to show how much he figured out about their investigations. (*Id.* at PageID.2077.)

## II.   LEGAL STANDARD

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. To protect this privilege, law enforcement officers are required to inform a person of his right to remain silent before subjecting him to a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467–

468 (1966). "In practice, this places a burden upon state and federal officers to ensure that a suspect in custody is 'adequately and effectively apprised of his rights' and to honor those rights when exercised unless they have been waived." *United States v. Saylor*, 705 F. App'x 369, 372 (6th Cir. 2017) (quoting *Miranda*, 384 U.S. at 467). The *Miranda* requirements arise when an individual is both: (1) in custody; and (2) being interrogated. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003).

The government must prove the defendant "voluntarily, knowingly, and intelligently waived his rights to silence and counsel," *United States v. Bentley*, 726 F.2d 1124, 1128 (6th Cir. 1984), by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986). "This means the government must establish that it was more likely than not that a defendant was read his *Miranda* rights and acknowledged that he had a right to remain silent." *United States v. Spaulding*, 446 F. Supp. 2d 789, 800 (N.D. Ohio 2006).

 "Any statement given freely and voluntarily without any compelling influences is . . . admissible in evidence." *Miranda*, 384 U.S. at 478. To be a valid waiver, the court must find that, in the totality of

the circumstances, the waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal citations omitted).

In evaluating the totality of the circumstances to assess whether a confession is voluntary, the Court must consider, "(1) police coercion; (2) duration of the interrogation; (3) location of the interrogation; (4) the defendant's maturity; (5) the defendant's educational background; (6) the defendant's physical condition and mental health; (7) and whether the defendant was informed of his or her *Miranda* rights." *Spaulding*, 446 F. Supp. 2d at 800 (citing *Withrow v. Williams*, 507 U.S. 680, 693 (1993)).

## III.  ANALYSIS

### A. Naser Was in Custody for *Miranda* Purposes

Naser contends that he was in custody for *Miranda* purposes when the FBI agents interrogated him at the BTPD, and he was not free to leave. The government appears to dispute that Naser was in custody and had to be apprised of his *Miranda* rights with respect to the interrogation by the FBI agents. The government argues:

Naser was in custody for Miranda purposes during the BTPD
conversation. But not necessarily for the FBI interview. The
interview took place after a break, giving the chance for the
shock of being arrested and brought to the police station and
questioned to subside. Naser was told he was free to terminate
the interview and leave the room at any time. He was not
handcuffed and demonstrated his comfort and familiarity
with the agents. While he would be returning to a jail cell and
not freedom if he chose to terminate the conversation, that
fact is not dispositive, as even imprisoned subjects are not
necessarily "in custody" for Miranda purposes. *Howes v.
Fields*, 565 U.S. 499, 508 (2012). As another Court in this
district has explained: "there is 'custody,' and then there is
'*Miranda* custody.'" *Holland v. Rivard*, 9 F. Supp. 3d 773, 784
(E.D. Mich. 2014). However, this Court need not decide
whether Naser was in custody for this interview as he
knowingly
and voluntarily waived his rights.

(ECF No. 144, PageID.1362 n.4.)

The Court finds that Naser was in custody for *Miranda* purposes at

the time he interacted with the FBI agents at the BTPD. For purposes of

*Miranda*, a person questioned by officers after being taken "into custody

or otherwise deprived of his freedom in any significant way" must be

warned of his *Miranda* rights. *Miranda*, 384 U.S. at 444. The interaction

took place the same day that BTPD officers and FBI agents searched

Naser's house, shattered his back glass door, and detained him at

gunpoint. BTPD officers arrested Naser and held him at their police

department. Naser remained in custody and could not freely leave the

BTPD at any time during his interaction with the FBI agents, nor would he be permitted to leave simply by talking—or not talking—to the FBI agents. So, even if Naser did not have to remain in the room with the FBI agents, he had to remain in custody at the police department. For the foregoing reasons, including that officers formally arrested Naser and there was a restraint on his freedom of movement, *see Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal citations omitted), the Court concludes that Naser was in "custody or otherwise deprived of his freedom in any significant way." *Miranda*, 384 U.S. at 444. Further, the Court finds that the FBI agents interrogated Naser when they questioned Naser about numerous topics, including cash withdrawals of proceeds from Naser's sale of a family property in Minnesota, Naser's travels, and Naser's knowledge of an individual named Russell Dennison. (*Id.* at PageID.2088.) Accordingly, the Court holds that Naser had a constitutional right to *Miranda* warnings before being interrogated by the FBI agents.

### B. FBI Agents Lawfully Interrogated Naser

Naser contends that the FBI agents did not advise him of his *Miranda* rights or obtain a waiver of those rights before they questioned

him. It is undisputed that the FBI agents did not read Naser any *Miranda* warnings or give him an FBI Form FD-395 to sign, but this is not a case where the FBI's failure to give Naser *Miranda* warnings prior to its agents' interrogation of Naser clearly violated Naser's rights. The Court must consider several events when determining whether the FBI violated Naser's rights when FBI agents interrogated him.

First, the video of Naser's meeting with Davis approximately 90–120 minutes before the FBI's interrogation of Naser began reflects that Davis handed Naser a piece of paper that contained the *Miranda* rights. Naser read the *Miranda* rights aloud. Naser's statement to Davis following Naser's reading of the *Miranda* rights, and Davis's response to Naser's statement, show that Davis provided Naser with the *Miranda* warnings. (*See* ECF No. 144, Ex. 1, at 08:20:04 (Naser: "Okay, well, you don't have to waste your time asking any questions. I'm gonna remain silent and you guys can call my lawyer, alright, Ms. Masri, and uh we'll see how this goes."); and 08:20:20 (Davis: "Alright, well you have a right to do so and I'm not passing judgment on you because you do or don't invoke your rights. You have your rights just like I'd have my rights if I was sitting in your seat.").)

Second, Naser unambiguously invoked his right to silence and his right to counsel when he told Davis he was "gonna remain silent and you guys can call my lawyer, alright, Ms. Masri." *See, e.g., United States v. Potter*, 927 F.3d 446, 451 (6th Cir. 2019) (collecting cases deciding what statements were sufficiently or insufficiently ambiguous to trigger the right to counsel). The *Potter* court stated:

> We have, by contrast, found requests for an attorney unambiguous (triggering *Edwards*) when a suspect told the police that he wanted to be left alone "until I can see my attorney," *Tolliver v. Sheets*, 594 F.3d 900, 923 (6th Cir. 2010), or directed the police to "call his attorney's phone number," *Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2012). We have even reached that result when a person said "maybe I should talk to an attorney by the name of William Evans." *Abela v. Martin*, 380 F.3d 915, 926-27 (6th Cir. 2004), *abrogated on other grounds by Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010). Despite the "maybe" in this statement, we said that the surrounding circumstances—the suspect referred to a specific attorney, the suspect handed the officer the attorney's business card, and the officer said that he would call the attorney—turned what would otherwise be an equivocal request into an unambiguous one. *Id.* ...

*Potter*, 927 F.3d at 451. Davis's response to Naser's statement ("Alright, well you have a right to do so . . .") demonstrates Davis understood that, at that moment, Naser had invoked his right to remain silent and his right to counsel.

Third, based on the video of Davis's interaction with Naser (ECF No. ECF No. 144, Ex. 1), it is clear that, after invoking his right to remain silent and his right to counsel, Naser did not remain silent. Instead, without prompting or any questioning by Davis, Naser began talking and questioning Davis.

Fourth, according to Christensen, Davis "told us Mr. Naser wanted to talk to the FBI." (ECF No. 185, PageID.2071.) Fifth, Christensen testified that, before any FBI agents asked Naser any questions, the agents advised Naser that: (a) the same *Miranda* warnings given to Naser by Davis applied to their interrogation; (b) Naser did not have to talk to them; and (c) Naser could leave at any time to go back to his cell at the BTPD. (*Id.* at PageID.2076, 2079.) Christensen further testified that Naser stated that he: (a) did not want his attorney, and (b) was talking against his attorney's advice. (*Id.* at PageID.2077.)

The Court first must determine whether, when Naser chose to talk to Davis after invoking his right to silence and to counsel, Naser waived: (a) his right to remain silent, and/or (b) his right to counsel. The Supreme Court has held:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that

right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.[] We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) (footnote omitted).

The Court finds that Naser waived his right to remain silent when, immediately after doing so, he asked Davis questions for upwards of 20 minutes. The Court, however, finds that there is no indication that Naser waived his right to counsel when speaking to Davis. Davis did not testify, and the record does not reflect, that Naser ever stated that he was waiving his right to counsel or otherwise implicitly or explicitly indicate that he no longer wished to have BTPD speak to his attorney (who he identified by name). Moreover, Davis's failure to ask Naser any questions, even after Naser questioned Davis for upwards of 20 minutes, strongly supports a finding that Davis did not think that Naser waived his right to counsel. Accordingly, the Court holds that Naser did not waive his right to counsel when Naser asked Davis questions following Naser's invocation of his right to counsel.

The Court next considers the effect of Christensen's claim that Davis told Christensen that Naser had waived his *Miranda* rights. The Court finds that, to the extent Christensen relied on what Davis allegedly told Christensen, Christensen did so at Christensen's peril. In other words, to the extent that Naser had invoked his right to counsel when talking to Davis, the fact that Davis may have communicated to Christensen that Naser had waived his *Miranda* rights did not operate to constitute a waiver of Naser's *Miranda* rights, particularly Naser's right to counsel. Therefore, the Court finds that, when Christensen began speaking to Naser, Christensen was speaking to a person who had invoked his right to counsel. Thus, the Court turns its focus to Naser's interaction with FBI agents Christensen and Tresh.

The Court is not persuaded that the FBI agents independently advised Naser of his *Miranda* rights in a sufficient manner. First, based on FBI policy at the time, the interrogation was not recorded, even though the interrogation occurred in the same room that Davis's interrogation of Naser transpired. As a result, the Court has only Christensen's testimony as to what occurred. Second, if the FBI agents advised Naser as Christensen testified, Naser was told only that: (a) the

same *Miranda* warnings given to Naser by Davis applied to the FBI's interrogation; (b) Naser did not have to talk to the FBI; and (c) Naser could leave at any time to go back to his cell at the BTPD. (*Id.* at PageID.2076, 2079.) Such statements lacked certain of the warnings required by *Miranda*, including that: (a) any statements that Naser might make could be used against him; or (b) Naser had a right to an attorney.

However, since Davis had given Naser, and Naser had recited, the *Miranda* rights less than two hours earlier, the Court finds that Naser had been advised of his *Miranda* rights adequately and timely that morning. As the government correctly argues, law enforcement officers do not need to restate *Miranda* warnings to a custodial defendant, as "courts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995). *See also United States v. White*, 68 F. App'x 535, 538 (6th Cir. 2003) (*Miranda* warnings given to accused at arrest were still valid three days later); *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (courts "have ruled that re-warning is not required simply because time has

elapsed"); *Berghuis v. Thompkins*, 560 U.S. 370; 387 (2010) (three-hour interrogation is not in itself sufficient to establish coercion). In this case, the FBI's interrogation of Naser began no more than two hours  after BPTD Detective Davis gave Naser the *Miranda* rights and 90 minutes after Davis concluded his interaction with Naser. The Court finds that relatively short timeframe did not require the FBI agents to restate the *Miranda* rights to Naser nor obtain from Naser a new or independent waiver of *Miranda* rights.

Notwithstanding that finding, because Naser had invoked—and not subsequently revoked or waived his—right to counsel when talking to Davis, the government still must establish that Naser waived his right to counsel before being interrogated by the FBI agents. And, because Tresh did not testify at the hearing and the FBI did not record Naser's interaction with the FBI agents, the Court again must make a decision based solely on the testimony of Christensen. As noted above, Christensen testified that, in response to the generalized *Miranda* references uttered by the FBI agents, Naser stated that he: (a) did not want his attorney, and (b) was talking against his attorney's advice.

There is no evidence that Christensen's testimony lacked credibility, and the Court accepts Christensen's testimony as a true representation of what Naser stated to FBI agents on January 4, 2013. The Court finds that Naser waived his right to counsel when he said he did not want his attorney and was talking against his attorney's advice. The fact that Naser had unequivocally communicated to Davis reflects that Naser understood his right to counsel and how to invoke that right. When speaking to the FBI agents, however, Naser not only did not invoke the right to counsel in any manner, he acknowledged that he was speaking to the FBI agents against his attorney's advice. Further, when he spoke with the FBI agents—and ultimately told the agents how much he had figured out about their investigation. Those statements are further evidence that Naser not only waived his right to remain silent but that he also waived his right to counsel.

The Court notes that there are no allegations that Naser was coerced or pressured to talk to law enforcement officers. Rather, based on Naser's discussion of the armed robbery charge with Davis, the questions Naser asked Davis related to the FBI, and Naser's desire to talk to the FBI agents about the things he had figured out, the Court finds that

Naser "evinced a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–1046 (1983) (a defendant's continued discussion about the acts of his case constitutes the reinitiation of questioning and is an implicit waiver of the right to silence); *United States v. Whaley*, 13 F.3d 963, 967 (6th Cir. 1994) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–485 (1981) ("an *Edwards* initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case," such that he waives his right to counsel).

Finally, to the extent Naser challenges the fact that the FBI asked about events other than the alleged armed robbery, there is no basis for excluding his answers. It is well-established law that, if a defendant waives his right to remain silent regarding one crime, he also waives his right to silence for any other crimes. *Colorado v. Spring*, 479 U.S. 564, 577 (1987) ("the failure of law enforcement officials to inform Spring of the subject matter of the interrogation could not affect Spring's decision to waive his Fifth Amendment privilege in a constitutionally significant manner" and "we hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to

determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.").

Accordingly, for all the reasons stated above, the Court holds that Naser's *Miranda* rights were not violated when the FBI interrogated him at the BTPD on January 4, 2013.

## IV.   CONCLUSION

Accordingly, and for the reasons stated above, **IT IS ORDERED** that Naser's motion to suppress statements (ECF No. 137) is **DENIED**.

**SO ORDERED.**

Dated: February 6, 2025             **s/Jonathan J.C. Grey**
                                    Jonathan J.C. Grey
                                    United States District Judge

## Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email on the Notice of Electronic Filing on February 6, 2025.

**s/ S. Osorio**
Sandra Osorio
Case Manager
