UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                CRIMINAL NO. 22-CR-20504

v.                                  HON. JONATHAN J.C. GREY

AWS MOHAMMED NASER,

        Defendant.

---

**REPLY ON GOVERNMENT'S MOTION IN LIMINE TO ADMIT DEMONSTRATIVE VIDEO OF EXPLOSIVE DEVICE DETONATION**

---

The Superseding Indictment alleges that Defendant Aws Naser was building a bomb in an attempt to provide material support to ISIS. Naser counters that the Government is making up a bomb plot from a collection of benign objects that any juror is likely to have in the house. The Government must convince a lay jury with no training in constructing explosives that this set of seemingly benign objects, when combined with a video Naser possessed from the Ibn Taymiyyah Media Center (ITMC), was a readily assembleable bomb that would have fulfilled ISIS's marching orders to conduct attacks in the United States. As the old

proverb says, "seeing is believing." The proffered videos are relevant and highly probative of both counts. They were made in a manner to minimize undue prejudice. They should be admitted.

In his response, Naser argues that these videos would only be admissible if the FBI experts who conducted the demonstration put their lives at risk to make them. Naser says they needed to have used nail polish remover (98% acetone) instead of pure acetone (99.99%). (R. 220 at 4). As the Government experts will testify, either one will create a bomb, but the former is more likely to blow up its maker in construction than the latter. He complains that the replica did not use glass pickle jars (Id. at 5), which risked sending deadly shards of glass flying across the lab space in a premature detonation. He even complains that they created the devices in a controlled laboratory environment. (Id.) Under Naser's view of the law, the only proper way to conduct the demonstration was to endanger a neighborhood by building his bomb in a cluttered urban basement lab, complete with roommates upstairs for accuracy.

Naser also misstates evidence—again. He notes the FBI expert did not use "18 copper BBs and 2 hunting pellets as the projectile." (Id.). In stating those numbers, he conflates what was tested in the lab as opposed

to what was found in the search of Naser's home and car. While only a sample of projectiles were tested by a metallurgy expert, the FBI found approximately 1,500 BBs and 250 hunting pellets during the October 30, 2017 search.[1] (*See* Sealed Exhibit 1 at 14–16[2]).

Contrary to Naser's claims, FBI experts do not need to risk their lives to create a trial demonstrative. The replica need only be "conducted under conditions substantially similar to those of the event." *United States v. Metzger*, 778 F.2d 1195, 1204 (6th Cir. 1985). The court in *United States v. Abdulmuttallab* did not require the replica explosive device to be put in someone's underpants and worn for days. EDMI 10-20005, ECF No. 104, PgID.619. Here, the FBI was replicating the explosive recipe found in the ITMC video. Naser's proposed standard is unworkable.

As the Government experts will testify, the bomb in the videos is functionally equivalent to the bomb Naser could have built, following the

---

[1] All of the BBs and pellets were found inside Naser's vehicle on October 30, 2017.

[2] The exhibit to this motion is being filed under seal in accordance with this Court's Protective Order (R. 18) as a sensitive discovery document. The exhibit must remain sealed because it contains expert discussion of a method used to construct explosives. Its public release would be dangerous.

video's instructions and using the components he possessed, if he were not disrupted by the October 2017 search and arrest. They will testify that the differences in materials and procedures they used affected only the likelihood of a premature detonation that would have injured them. It did not substantially affect the device's construction or explosive potential.

Naser's household products were those needed to construct the bomb. Had he been given the time to assemble the destructive device, the impurities in those household products made it more likely that he would have prematurely blown up himself, his house, and his roommates. But even a premature detonation would have made no difference to the charged crimes. A failed attempt to provide material support to ISIS is still an attempt barred by 18 U.S.C. § 2339B. And a bomb that explodes in construction is still a destructive device that a felon is not permitted to possess under 18 U.S.C. § 922(g)(1).

Naser also tries a sleight of hand by comparing the FBI's work with what Naser had, then using that comparison to claim that "what Naser had in his possession is materially different from what the ITMC instructions dictate." (R. 220 at 7). But the ITMC video uses almost

identical household materials to the ones that Naser possessed. Unlike the FBI, the ITMC did not care whether the people watching its video prematurely blew themselves up. It was focused instead on materials that were easy to acquire, like the ones Naser had. There was only one difference in ingredients: the ITMC video used hydrochloric acid, while Naser used sulfuric acid. These acids are functionally equivalent catalysts that speed up the necessary chemical reaction, but do not become part of the TATP explosive that is formed. The reaction would happen without either of them (though it would take much longer). The remaining differences are miniscule. Both the ITMC video and Naser had hydrogen peroxide (concentrated past the amount from a typical 3% off-the-shelf bottle), acetone, a strong acid, a graduated container, a syringe, a cutting implement (a hand saw instead of scissors), a binding agent (a glue gun instead of epoxy), medical gloves, coffee filters, glass jars, and BBs. (Sealed Exhibit 1 at 36-42). Naser had obtained the construction materials listed in the instructions.

Naser having less-than-full containers of acetone and hydrogen peroxide is not material. Indeed, Naser having such containers is a key part of the Government's case. To make TATP, hydrogen peroxide needs

5

to be concentrated by having water boiled off—the ITMC video instructs to reduce it to a tenth of its starting size—so it is naturally going to end up smaller than the quantity purchased. And Naser had discussed with an ISIS contact that he had successfully made a detonator, which would have used some of those ingredients. Acetone and hydrogen peroxide are the easiest items from the IMTC video to replenish and are sold at every pharmacy and convenience store. The need to get more changes nothing.

Naser borrows from entirely irrelevant segments of the law to throw up standards the Government does not need to meet. He argues the Government must meet the test of the admissibility of recreations of an accident in personal injury cases. (R. 220 at 2). *See Burchfield v. CSK Transp. Inc.*, 636 F.3d 1330, 1334 (6th Cir. 2011). But this video is not a recreation of something that happened. Nor is it an experiment. It is a demonstration of expert testimony. Naser's cases regarding recreations of actual events is inapplicable here. His reliance on a paragraph-long string cite of re-enactment cases is misplaced.

Naser argues that "what the FBI video shows is, at best, a replication of the ITMC video's purported final product." (R. 220 at 6–7). The "at best" is unnecessary—that's exactly what the video shows. And it is

6

highly probative. The ITMC video is not a random video the FBI found online. It is a video that Naser sought, obtained, and began to follow. The jury will want to know whether the result of following the video would be a functional bomb. The video proves that it does. That probative value cannot be downplayed.

The Government was careful to ensure that the video would not be unduly prejudicial. Contrary to how Naser was building the bomb, the video was not done in an urban setting. The ITMC video instructs the viewer to place the bomb in a confined place like a bus. The demonstrative video instead places it in an open field. Instead of the blast and flying BBs impacting human bodies, they are hitting metal sheets. Compared to what jurors are exposed to routinely in the media, movies, and video games, the demonstrative video is tame.

Nor is the video cumulative. Seeing a visual depiction is entirely different from hearing testimony. In Naser's view, a murder weapon need not be admitted if an agent can testify as to seeing it. Testimony from highly educated experts who are used to speaking in scientific jargon can be like a foreign language to a lay jury. The video makes the result of their work clear.

Any risk of confusion is due to Naser's sleights of hand and misrepresentations. There is no risk of the jury mistakenly believing that the explosion depicted in the video was one that Naser set off, or that the device the FBI exploded in 2023 was one that Naser had assembled in 2017. The experts clearly set out the great similarities and minor differences between the ITMC video and what Naser possessed in their reports, (Sealed Exhibit 1 at 36-42), and will testify to their safety adjustments in creating the demonstration. The testimony on that point will be clear.

Each of these claimed issues—confusion, cumulativeness, and prejudice—must substantially outweigh the probative value of the video. Fed. R. Evid. 403. "The test is strongly weighted toward admission." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018). The probative value of showing the legitimacy of the ITMC video is so high that Naser would have needed to provide much more to outweigh it.

The video is a carefully made demonstration of expert testimony about the items Naser had and the ITMC video he was following. Nothing more. It will aid the jury to understand high-level expert testimony. It is admissible.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that the Court grant its motion to admit video demonstrations of the replica explosive devices and their detonation at trial to prove counts one and two of the second superseding indictment.

JULIE A. BECK
ACTING UNITED STATES ATTORNEY


/s/ Saima Mohsin
Saima Mohsin
Jerome Gorgon
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, MI 48226
Saima.Mohsin@usdoj.gov
Jerome.Gorgon@usdoj.gov
(313) 226-9100


/s/ Dmitriy Slavin
Dmitriy Slavin
Trial Attorney
National Security Division
Department of Justice
Dmitriy.Slavin@usdoj.gov
(202) 616-2846

Dated: March 5, 2025

## INDEX OF EXHIBITS

<u>Sealed Exhibit 1</u>: FBI Laboratory Report

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the parties of record.

*/s/Dmitriy Slavin*
DMITRIY SLAVIN
Trial Attorney

Date: March 5, 2025