UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                    CR. NO. 22-20504

v.                                      Hon. Jonathan J.C. Grey

AWS NASER,

                    Defendant.

_____/

## AWS NASER'S RENEWED MOTION FOR

## JUDGMENT OF ACQUITTAL AND MOTION FOR A NEW TRIAL

Aws Naser, through his attorneys, moves this Honorable Court to enter a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). In the alternative, he requests that the Court grant a new trial pursuant to Federal Rule of Criminal Procedure 33. In support of this motion, Mr. Naser relies on the accompanying brief.

1

## BRIEF IN SUPPORT OF AWS NASER'S MOTION FOR JUDGMENT OF ACQUITTAL OR A NEW TRIAL

A jury convicted Naser of each of the three counts in the third superseding indictment. Naser now asks this Court to review the jury's verdicts and set them aside. In the alternative he asks that the Court grant a new trial. Federal Rule of Criminal Procedure 29(c) provides that a defendant may move for judgment of acquittal within 14 days of a jury's verdict. Federal Rule of Criminal Procedure 33(b)(2) contains an identical timeline.[1]

For this Court's evaluation of Naser's motion for a judgment of acquittal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Burris*, 999 F.3d 973, 976 (6th Cir. 2021).

"Sufficiency review … fulfills a solemn role, guaranteeing that no person is criminally convicted, and thereby deprived of liberty, without due process of law. It ensures that criminal convictions are supported by sufficient evidence, because anything less undermines the integrity of the judicial process." *United States v. Ferguson*, 65 F.4th 806, 808 (6th Cir. 2023) (internal citations omitted). Meanwhile, motions for a new trial may be granted whenever "the interest of justice so requires." Fed. R. Crim. P. 33(a).

---

[1] Here, the parties stipulated to provide Naser an additional two weeks to file the instant brief pursuant to Federal Rule of Criminal Procedure 35(b).

# ARGUMENT

## I. The government failed to introduce sufficient evidence to sustain a conviction for Count One.

The jury found Naser guilty in Count One of attempting to provide material support and resources to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1). In addition to the essential elements of that offense, because the conviction is for an attempt, the government must have also proved that Naser took a "substantial step" towards the commission of that offense. *United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005); *Ferguson*, 65 F.4th at 811.

The Sixth Circuit distills § 2339B(a)(1) into four elements: (1) intent to commit the crime of providing material support or resources to ISIS; (2) intent to provide defendant's self or others to work under the direction and control of ISIS; (3) knowledge that ISIS was designated as an FTO; and (4) the completion of an overt act which was a substantial step towards committing the crime. *United States v. Alebbini*, 979 F.3d 537, 546 (6th Cir. 2020).

### A. The evidence does not support the finding that Naser attempted to provide Dennison as personnel to ISIS.

Naser did not provide or attempt to provide Russell Dennison as personnel to ISIS. Instead, the evidence supports a finding that (1) Dennison acted independently of Naser, and (2) Dennison joined a designated FTO *after* his relationship with Naser effectively ended. The government thus did not meet its burden for Count One with the Dennison-as-personnel theory.

3

When Dennison expressed interest in moving to the Middle East to build a life there, Naser told Dennison he had family in Iraq and was planning to visit them soon. (ECF 329, Christensen, PageID.5433-5434). Naser offered to bring Dennison with him. (*Id.*). Naser met up with Dennison in Erbil, Iraq, where Naser's family lives, in February 2012. (ECF 329, Banach, PageID.5386). Dennison stayed with/near Naser and his family for approximately two months. (*Id.*). By April 18, 2012, Dennison was in Amman, Jordan. (ECF 327, Wood, PageID.4900). There is no evidence that Naser and Dennison ever saw each other again after they parted ways in the spring of 2012 in Erbil. Instead, Naser traveled to Baghdad without Dennison to visit more of his family. (ECF 329, Banach, PageID.5386). Then, Naser returned to the United States on August 4, 2012. (ECF 328, Shermetaro, PageID.5125). Naser's Iraqi passport shows only that he traveled to Erbil, Iraq and the United States. (ECF 328, Shermetaro, PageID.5163). There is no evidence Naser did anything but vacation and visit family in Iraq in 2012.

Dennison set upon the path to joining an FTO long before he ever had a conversation with Naser. The FBI had evidence of Dennison radicalizing people in the past. (ECF 329, Waters, PageID.5351). But not Naser. Before the two traveled together, there is no evidence that Dennison raised the issue of traveling for jihad – generally, or to join a specific organization. While Dennison and Naser were in Iraq, Dennison told Naser that he (Dennison) wanted to join the "Islamic Fighters." (ECF 329, Christensen, PageID.5435). There is no evidence suggesting Naser encouraged these choices by

4

Dennison. Instead, there is evidence Naser discouraged Dennison from pursuing this path. Naser told Dennison to stay in Erbil, get a job, and build a life there. (*Id.* at 5442).

There is no evidence showing Dennison joined an FTO during his time with Naser in Iraq, or before Naser returned to the United States in August 2012. There is substantial evidence to the contrary. Dennison traveled to Jordan in April 2012 after leaving Iraq. (ECF 327, Wood, PageID.4902). Dennison had trouble with Jordanian intelligence services and sought assistance from someone else entirely – one of his online contacts that he met independently of Naser: Mohammad Mohyeldeen. (*Id.* at 4902-03). Dennison sought advice from Mohyeldeen about where he should travel to in May and June of 2012. (*Id.* at 4903). Dennison and Mohyeldeen then convened in person and were detained in Jordan in July 2012 by Jordanian Intelligence Services. (*Id.* at 4907-08). Dennison was in London by the end of July 2012. (*Id.* at 4908). In August 2012, Dennison was in Lebanon, where he traveled after being detained for 45 more days by Jordanian authorities. (*Id.* at 4909). By the time Naser was back in the United States, Dennison was still asking Mohyeldeen for advice on where to travel and who he should connect to. (*Id.*) Dennison did not turn to Naser for this information. As Dennison had done before he befriended Naser, he independently pursued his own path. The government's "Dennison as personnel" theory for Count One is unsupported by the evidence.

The government argued that Naser's mere mention of Sheikh Omar Bakri to Dennison was sufficient to support his conviction. (ECF 368, PageID.8678.) In June

or July of 2012, Naser told Dennison that he should try to learn Islam from Sheikh Omar Bakri. (ECF 329, Christensen, PageID.5433). Bakri was a public and prominent figure online. (ECF 328, Shermetaro, PageID.5149-50). Naser did not personally connect them. (*Id.* at 5444). Nor was there evidence that Naser had personal contact with Bakri, (*Id.* at 5443), or any communication at all. (ECF 328, Shermetaro, PageID.5150). There is no evidence Naser's recommendation of Bakri to Dennison went beyond encouraging Dennison to essentially look Bakri up online.

**B. The government has not proven beyond a reasonable doubt that Naser intended to provide himself as personnel for a specific FTO, let alone the FTO charged in the indictment (ISIS). The Court can grant Naser's motion as to Count One on this element alone.**

The government seeks to meet its burden for the specific FTO intent element for Count One in part through Naser's communication with Dennison after they parted ways in Iraq. However, this evidence is insufficient for both the November 2012 and January 2013 travel attempts. There is insufficient evidence to conclude Naser had knowledge of the specific group Dennison joined before his November 2012 travel attempt. By the January 2013 travel attempt, Naser and Dennison's relationship was over. The government's use of Dennison's possible membership to prove Naser's specific intent is even more tenuous, and thus legally insufficient, for the January 2013 attempt.

   *i.*   *November 2012 attempted travel*

In September 2012, the FBI believed Dennison was in Syria and had "very likely hooked up with a terrorist organization in Syria." (ECF 328, Waters, PageID.5298-99). The phrase "very likely" does not rise to the level of proof required for the government to meet its burden, especially where the FBI fails to identify which specific FTO they believed Dennison to be associated with. Even so, Al-Nusra was not designated an FTO until November 20, 2012.

Even if the jury believed Naser's travel attempt in November 2012 was for the purpose of joining Dennison, these facts are not legally sufficient to satisfy the specific FTO intent element of § 2339B. Naser's travel attempt on November 07, 2012 pre-dates Al-Nusra's designation as an FTO by the Secretary of State on November 20, 2012. (Court's Order on Government's Motion for Judicial Notice). 18 U.S.C. § 2339B(g)(6) requires the organization to be designated as a terrorist organization under section 219 of the Immigration and Nationality Act. Someone who materially supports a group that is not designated cannot be found to have violated § 2339(B)(a)(1). Additionally, there is no evidence that Naser knew where to meet Dennison or who he would be joining. Therefore, Naser's November 7, 2012 travel attempt should be excluded from the substantial step analysis for Count One as a matter of law.

### ii.   *January 2013 attempted travel*

By January, Naser and Dennison's relationship had ceased. Communication stopped between Naser and Dennison in mid-to-late October 2012. (ECF 329, Banach, PageID.5387). Naser believed Dennison was working with the FBI to entrap him on

terrorism charges. (ECF 329, Christensen, PageID.5438). In fact, the FBI became aware of a draft YouTube video Naser created to out Dennison on December 31, 2012 – days *before* his second travel attempt. (*Id.* at 5441). Naser posted this video on January 3, 2013, the day after his second travel attempt. (*Id.* at 5440). Naser's online searches of Dennison between December 31, 2012 and January 04, 2013, (*See* ECF 335, Wood, PageID.5756), were tied to Naser's creation of his Youtube video, rather than any attempt to get in touch with Dennison. There is no evidence supporting the conclusion Naser's relationship with Dennison continued after mid-October 2012. Rather, there is evidence to the contrary. Dennison sent two messages to Naser at the end of 2012; Naser ignored both. (*Id.*, PageID.5756, 5804.) Evidence of Dennison's associations to prove the specific FTO element of § 2339B(a)(1) is therefore even more tenuous for the January 2013 travel attempt than it was for the November 2012 travel attempt.

### iii. The January 2, 2013 travel attempt does not satisfy the substantial step element of Count One. It is distinguishable from *Alebbini*.

The November 2012 travel attempt should not be considered in the substantial step analysis for Count One for the reasons already stated. This leaves only the January 2013 travel attempt for the substantial step element for Count One. A substantial step consists of "objective acts that mark the defendant's conduct as criminal in nature." *Alebbini*, 979 F.3d at 546 (quoting *United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005)) (internal quotation marks omitted). "A substantial step must be something more

than mere preparation." *Id.* (quoting *United States v. Bailey*, 228 F.3d 637, 640 (6th Cir. 2000)) (internal quotation marks and citation omitted).

In *Ferguson*, the Sixth Circuit provided clear guidance as to the substantial step analysis a district court must undertake in the context of a defendant's request to set aside a jury verdict. 65 F.4th at 812. The Court reiterated that any overt act "must *unequivocally* corroborate the firmness of a defendant's criminal intent to commit the offense . . . The purpose of the 'substantial step' requirement is to ensure against the danger of convicting for mere thoughts, desires, or motives." *Id.* (quoting *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999)). The Court further clarified:

> Two principles follow from the corroboration requirement. First, if a substantial step must corroborate or confirm the defendant's resolve to carry out his criminal plan, then the criminal plan must logically precede that substantial step. Second, because a defendant is charged with an attempt to commit a specific offense, and the requisite substantial step must corroborate the intent to commit the *specific offense*, the substantial step must be *toward* the specific offense and its elements. **It cannot be generically bad behavior or a separate crime**.

*Id.* at 813 (emphasis in original). Applying these principles, the *Ferguson* panel set aside the jury's verdict finding the defendant guilty of attempted kidnapping, despite the defendant's repeated verbal commitments to commit the offense, his visit to the planned scene of the kidnapping, and his participation in other preparatory activities and discussions. *Id.* at 814.

This Court is bound by *Ferguson* and the analysis there demands a similar conclusion here. In particular, the principles surrounding the unequivocal

corroboration requirement are instructive. Much of the evidence surrounding Naser's January 2013 travel was actually at odds with – not corroborative of – an intent to commit the material support offense. Naser's relationship with Dennison had ceased altogether by mid-October 2012. (ECF 329, Christensen, PageID.5438-39). Dennison continued to contact Naser, and Naser did not respond or engage. Naser believed *before* his January 2013 travel that Dennison was involved in an FBI plot to entrap him, and began creating a video on YouTube about it. (*Id.*)  Naser's online search activity included numerous destinations and the cost of living in those destinations, not searches for ISIS recruiters or how to survive days of walking through the desert. (ECF 335, PageID.5749-50.)  The government introduced no evidence that Naser had a weapon, cane sword, knife, or tactical gear – or anything other than $2,000 with him at the January 2, 2013 travel attempt. (*See e.g.* ECF 329, Weaver, PageID.5449-63.) The $2,000 was far below the $10,000 declaration requirement and entirely reasonable for a multi-week international trip (*Id.* at 5462.) Naser had recently come into around $18,000, (*Id.*, Christensen, PageID.5433-34), which he could have legally taken with him overseas. (*Id.*, Weaver, PageID.5462). The government suggested in very general terms that there are multiple ways for an individual to either bring or transfer cash from the United States outside of the United States. (ECF 329, Waters, PageID.5366). But

government agents admitted they searched for evidence that Naser made international money transfers and found none.[2] (ECF 351, PageID.8266.)

Taking all of this together, even viewing it in the light most favorable to the government, there is no evidence of mere preparation. Preparation would require Naser to communicate with someone in the FTO who would receive or shuttle him into service. Preparation would require that he know where to go and who to contact. None of that exists here. Rather, multiple witnesses confirmed that Naser "was angry that he was being surveilled, and he believed that there [were] government agents that were trying to entrap him." (ECF 329, Banach, PageID.5376). There is more evidence supporting the conclusion Naser was repeatedly attempting to get away from his surveilled and restricted life in the United States.

## C. The government did not prove – consistent with this Court's order and instruction – that § 3286(b) applies and that Naser's attempt to travel caused a foreseeable risk of bodily injury or death; Count One remains time barred.

Naser renews his statute of limitations arguments for Count One, now under Rule 29(c). (*See* ECF 253.) The government did not present sufficient evidence to find Naser's overt acts prior to 2014 created a foreseeable risk of death or serious bodily

---

[2] Contrast this to the facts in *Alebbini*, where the defendant made it very clear he was traveling overseas specifically to join ISIS, sent ISIS propaganda to friends and family members, and declared himself a terrorist and soldier. *Alebbini*, 979 F.3d at 542-43.

injury to another person. 18 U.S.C. § 3286(b). Therefore, Naser asks the Court to find § 3286(a) applies and deem Count One time barred.[3]

First, the government has not presented sufficient evidence at trial that Naser satisfied the substantial step requirement as to either travel attempt included in Count One. For reasons already discussed, there is reason to doubt Naser was traveling with the intention of providing himself as personnel. There is also no evidence to support Naser's intent to provide himself as personnel to any specific FTO, let alone the one charged. The causal chain of foreseeable risk discussed in *Pham* was not present here. *See United States v. Pham*, No. 12-cr-423, 2022 WL 993119, at *10 (S.D.N.Y. Apr. 1, 2022) (citing *United States v. Allen*, 51 F.3d 273 (Table), 1995 WL 140837, at **3-4 (6th Cir. 1995)). The government did not provide sufficient evidence to show what Naser intended to do if he had been able to travel, where he would go, or who he would associate with. In *Pham*, on the other hand, the causal chain was clear. Pham had created a destructive device, one he previously tested, and traveled to a location where he planned to carry out an attack. *Id*, at *9-10. There is no such clarity here.

It is not enough for the government to provide circumstantial evidence of Naser's purpose or intent. (ECF 253, Order, PageID.3137). At best, the government's evidence provides some reason to believe Naser considered traveling to meet up with

---

[3] After the Court's order denying Naser's motion (ECF 253, Order Denying Def. Motion to Strike Overt Acts), the government filed a Third Superseding Indictment separating Counts One and Two. (ECF 259, Third Superseding Indictment). The scope of Naser's SOL motion is now limited to the pre-2014 overt acts in Count One.

Dennison, and only for the November 2012 travel attempt. The communications between Naser and Dennison prior to the November 2012 travel attempt do not support anything beyond circumstantial *mens rea* evidence. There is no discussion of a group, a location, or planned next steps.

The government presented a former ISIS fighter, Al-Madioum, at trial presumably to support a finding that § 3286(b) applies, as well as to show Dennison eventually joined ISIS. Al-Madioum described his experiences joining and fighting for ISIS at length, but his testimony has no bearing on this case. He joined ISIS some time during or shortly after 2014, after ISIS was designated as an FTO. (ECF 328, Al-Madioum, PageID.5171). Naser was detained in MDOC custody by February 2013. As is true with Dennison, Al-Madioum's actions are not Naser's. The government cannot support a § 3286(b) finding on the actions of someone other than the defendant, nor sustain a conviction on them.

Naser relies on his discussion of the cases applying § 3286(b) in his original motion. (ECF 198, Def. Motion to Strike Overt Acts); (ECF 206, Def. Reply to Response). The government's evidence at trial has not bridged the substantial legal gap between Naser's conduct and the conduct where courts applied § 3286(b) in other cases. This Court found Naser's alleged conduct was not comparable to those cases in its previous ruling on this issue. (ECF 253, PageID.3150). The Court ultimately deferred the applicability of § 3286(b) to the jury, noting:

> The Court has not been presented with any evidence that a person being on the no-fly list guarantees that person cannot exit the United States in an array of ways. For example, it is possible that a person on the no-fly list may escape detection before boarding a plane that departs from a United States airport due to human error or by using an alternate passport. A person also might attempt to utilize some means other than a commercial flight.

(*Id.* at 3153-54). But the evidence at trial did not include even an allegation that Naser attempted any of those remote possibilities. In fact, the FBI was so confident that Naser would not be allowed to travel in January 2013, that they did not surveil him to/from/at the airport for that instance of his attempted travel. And they did not arrest him upon either attempt.

Now that the presentation of evidence has concluded, Naser asks this Court to find § 3286(a) applies as a matter of fact and law because Naser's actions (1) *could* not, and (2) *did* not create a foreseeable risk of death or serious bodily injury to another person prior to 2014.

Each of the above reasons presents an independent basis for which the Court should grant Naser's motion as to Count One.

## II. The government failed to introduce sufficient evidence to sustain a conviction for Count Two.

The government has failed to introduce sufficient evidence for the substantial step element of Count Two. Count Two turns on whether or not Naser planned to construct a destructive device in an attempt to carry out a terrorist attack for ISIS. (See ECF 259,

Third Superseding Indictment, PageID.3199-3205). The government has failed to present sufficient evidence that Naser took a substantial step beyond mere preparation.

It is mere preparation to watch an instructional TATP video. It is mere preparation, at best, to possess common household items that could be combined with other items outside the home to make a destructive device. Naser did not have all the items contained in the video; he did not have sufficient quantities of the household items in his possession that the video required; and he did not take steps to modify or assemble the household items recovered by the FBI. *See Alebbini*, 979 F.3d at 546 ("A substantial step must be something more than mere preparation.").

To go beyond mere preparation, the government needed to show Naser took steps to gather the items needed, in the quantities required, and then took some action to begin to implement the video's instructions. The government has not done so.

Naser had pool shock, but he did not have any incompatible fuel needed to cause a chemical reaction with the pool shock. (ECF 345, Rigopoulos, PageID.7079.) Naser had common household matches, but they were unmodified. (*Id.*, PageID.7084). Naser had Christmas lights, new and never removed from the box. (*Id.*, PageID.7088-89.) Naser had batteries, which were being used in household devices like remote controls. (*Id.* at PageID.7097.) Naser had hobby drones, all of which were unmodified. (*Id.* at PageID.7101-05.) Naser had chemicals like acetone contained in nail polish remover, a small amount of hydrogen peroxide, and battery acid. (*Id.*, Haug, PageID.6973.) But Naser did not have ammonium nitrate (*Id.* at PageID.7113.) There is no evidence these

15

items were being used beyond their typical household or hobby purpose. The government presented photos of one glass jar that was nested in another, though those jars were not seized or entered into evidence. (*Id.* at PageID.6983.) The government also presented evidence of a coffee filter found with measuring cup. (*Id.* at PageID.6967.) This alone is not sufficient to find Naser went beyond mere preparation, or to sustain a conviction for Count Two.

Importantly, the government's fallback theory for Naser's lack of hydrogen peroxide was that he could have made a detonator. First, there was no evidence Naser made or attempted to make a detonator. Second, a detonator is not a destructive device, as discussed further below.

The Court should grant Naser's motion as to Count Two.

## III. The government failed to introduce sufficient evidence to sustain a conviction on Count Three.

To sustain a conviction in Count Three under the "component theory," the government must show that Naser possessed "any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (i) or (ii) and from which a destructive device may be 'readily assembled.'" 18 U.S.C. § 921(a)(4). The government must show that the device was "readily convertible" to a destructive device. (ECF 357, Jury Instructions, PageID.8554.) Though the government need not prove each component was present, there must be sufficient evidence to show the part was commonly available, and Naser "could acquire

the missing part quickly and easily and incorporate the part into the device quickly and easily." (*Id.*).

Naser did not possess items that were readily convertible into a destructive device. He was missing multiple components, and what he did have would take considerable time and effort to convert into any working explosive. That too, the government did not show beyond a reasonable doubt that the components were intended for use as a weapon. To find the government's evidence sufficient on this count would stretch the meaning of § 921(a)(4) beyond its scope. Anyone who *could* acquire common household items would be guilty of possession of a destructive device.

First, Naser was missing several materials to manufacture a working destructive device. The government must, at minimum, prove that Naser could have "readily" created a device that is at least capable of exploding, even if not in the way he intended. *See United States v. Langan*, 263 F.3d 613, 625 (6th Cir. 2001); *United States v. Sheehan*, 838 F.3d 109, 119 (2d Cir. 2016). Here, of course, none of the items Naser possessed were found combined in a manner that constituted an explosive. The necessary units of a destructive device as identified by the Sixth Circuit are an explosive main charge, container, and method of initiation. *United States v. McNeil*, 106 Fed. App'x 294, 302 (6th Cir. 2004) (citing *Langan*, 263 F.3d at 626)). Naser lacked materials to create a significant explosive main charge; the ITMC video called for ammonium nitrate to combine with

the TATP, but Naser did not have any cold packs or fertilizer.[4] (ECF 345, Rigopoulos, PageID.7113-14.) Naser was also missing critical equipment to facilitate manufacture of a bomb, as he did not have a funnel, epoxy, scissors, or a source of heat or refrigeration in the basement. (*Id.*, Haug, PageID.6987; Rigopoulos, PageID.7106-09.)

Nor could Naser have manufactured the materials in evidence into a destructive device "quickly and easily." To effectively cook TATP, he would have to wash the acetone-peroxide multiple times—that too, using less-than-effective flat-bottom coffee filters and without a funnel. (*Id.*, PageID.7109-11.) Notably, the ITMC video also called for the chemical mixture to rest in an ice bath, then sit in the sun for at least a day. (ECF 348, Barrow, PageID.7521-23.) Next, according to the government's witnesses, the only means for Naser to create an explosive charge with the materials he actually *possessed* would have been to use the holiday lights and powder from the matches. To do so, though, Naser would have had to "meticulously" clip the heads off hundreds of match heads to release the powdered tips. (ECF 345, Rigopoulos, PageID.7026, 7082.) Then, he would have to dismantle the string of holiday lights by removing the glass from each light, cutting the wires from the string, and stripping them to expose a portion of them. (*Id.*, PageID.7053.) Finally, to create a device capable of fragmentation, Naser had only

---

[4] In the absence of any evidence of an explosive charge, the government argued that Naser could have used a $CO_2$ cartridge from his BB gun to create a type of detonator called a "cricket explosive" with a small amount of TATP. However, there was no evidence that Naser knew what a cricket explosive is, or attempted to manufacture one. The only people at trial who evinced knowledge of a cricket were the government's explosive experts. (*See* ECF 345, Rigopoulos, PageID.7051-52, 85-88; ECF 348, Barrow, PageID.7534.)

the BBs, which were in his car – not near any of the other items in his basement. He would need to fit the metal balls between glass jars nested inside each other. (*Id.*, PageID.7067.) Finally, there was no testimony that those jars (which were not recovered or measured) would hold enough match heads to create an explosive charge.

So, while the government offered testimony that Naser could manufacture TATP in a matter of "hours" (albeit only 9 to 13 grams – unless, per the government, he went to CVS for more hydrogen peroxide and then went about concentrating it), converting the components into an actual destructive device would take longer than that. (*See* ECF 346, Barrow, PageID.7340.) No government witness testified as to how much time. Surely, though, this cannot be the type of quick and easy conversion encompassed by the component theory. Naser was not just lacking a piece of Scotch tape, *cf. United States v. Crocker*, 260 F. App'x 794, 797-98 (6th Cir. 2008); *Sheehan*, 838 F.3d at 125, or batteries, *cf. United States v. McNeil*, 106 Fed App'x 294, 302 (6th Cir. 2004); *United States v. Kirkland*, 909 F.4d 1049, 1053 (9th Cir. 2018). He had to do more than connect a few wires or a power source. *Cf. McNeil*, 106 Fed. App'x at 302; *Langan*, 263 F.3d at 626; *United States v. Turczyk*, 1992 WL 102499, at *3, (6th Cir. 1992). Rather, converting the items Naser possessed into a functional destructive device would have been a lengthy process that required precision, expertise, and additional materials. In other words, what Naser possessed was not readily convertible into a destructive device.

The completely unprepared and disassembled state of Naser's materials lies in stark contrast to component theory cases previously reviewed by the Sixth Circuit.

19

Other defendants convicted under the theory possessed almost-complete devices, such as:

- A segment of pipe that could be filled with gun powder and attached to a fuse in minutes. *United States v. Pearce*, 86 Fed. App'x 919, 920 (6th Cir. 2004)

- A black lunchbox containing a plastic pipe covered with wires and filled with explosive smokeless powder. *Langan*, 263 F.3d at 617.

- An empty hand grenade and section of galvanized pipe found near black powder and a hobby fuse. *Crocker*, 260 Fed. App'x at 797.

Those cases all involve an identifiable, standalone destructive device in the process of assembly, with one or two missing components. Here, there is no device to speak of at all.

There was also evidence that casted reasonable doubt on whether the components in Naser's possession were intended for use as a weapon. *See United States v. Kennedy*, 578 F. App'x 582, 591 (6th Cir. 2014) ("What [a defendant] sought to build is relevant to the device that was actually produced."). Naser purchased battery acid—a different type of acid than what the ITMC video called for—before he ever viewed the video. (ECF 351, Wood, PageID.8274.) He also allowed individuals including his roommate into the basement. (*Id.*, Michael Talia, PageID.8291-96.) And for all the government's arguments based on Naser's online conversation about a detonator, a detonator is not a destructive device. As Barrow testified, a device that initiates an

20

explosive charge is not itself a destructive device. (ECF 346, Barrow, PageID.7305.) Without this evidence of intent to create an explosive, the physical appearance of the items in Naser's basement was innocuous. The most the government can point to is the physical proximity of certain household items and the coffee filter in the jar. That cannot be enough to infer Naser intended to convert a hodgepodge of household items into a weapon.

For the foregoing reasons, the Court should grant Naser's motion as to Count Three.

## IV.    A new trial is warranted under Federal Rule of Criminal Procedure 33.

Federal Rule of Criminal Procedure 33 permits the district court to "vacate any judgement and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

It is "widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). As explained in *Munoz*, a "substantial legal error" that justifies granting such motion, includes one "of sufficient magnitude to require reversal on appeal," or one where the "substantial rights of the defendant have been jeopardized by errors or omissions." *Id.*

A trial court should also grant a motion for new trial when the verdict is against the "manifest weight" of the evidence. *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018) (quoting *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007)).

21

The Court's role is broader when deciding a motion for a new trial compared to a motion for acquittal under Rule 29. When considering a motion for a new trial based upon the weight of the evidence, district courts can consider the credibility of the witnesses and the weight of the evidence to ensure that there is not a miscarriage of justice. *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (internal citations omitted).

### A. The Government's statement in closing argument referencing the families of beheading victims in connection with Mr. Naser's collection of knives was prejudicial misconduct designed to play on the jury's fear.

The Government's closing argument referencing the families of beheading victims was improper in that, rather than relying on the evidence in the case to secure a conviction, the Government sought to play on the jury's prejudices and fears.

On April 3, 2025, Aws Naser filed a motion to exclude media depicting graphic violence. The subject of this motion was numerous videos of graphic violence perpetrated by combatants in Syria's civil war. These videos included multiple beheadings by ISIS and other FTOs. Defendant's motion argued that the introduction of these videos would have little if any probative value and that "the videos and images of ISIS violence serve primarily to inflame the jury on an emotional level." Further, "[w]hatever probative value the government may argue, it is substantially outweighed by the risk that the jury will use this evidence to imagine Naser engaging in violent terrorist acts with which he is not charged." ECF 240, Defendant's Motion to Exclude

Media Depicting Graphic Violence, PageID 3051. The Court denied this motion. ECF 333, Order Regarding Various Outstanding Motions, PageID5724-5725.

During the trial, the Government used these images in the prejudicial manner that Defendant's motion predicted. Defendant's closing argument focused on the lack of evidence that Mr. Naser did anything other than engage in mere talk about terrorism. In their rebuttal argument, the Government referenced the families of the people who were beheaded:

> So you've heard a lot from Mr. Gerometta. The defendant has an excuse for everything that he did. In fact, if you believe Mr. Gerometta, all he did was talk. All of this was meaningless. The knife with the plastic handle can't do any harm. What about this knife? [Displaying.] With the brass knuckles? What about this knife? [Displaying.] What about this Cold Steel knife? [Displaying.] Look at the weight of this knife, if the Court allows you the opportunity. What about this knife? [Displaying.]
>
> Now, you guys have seen beheading videos. You watched them. The same videos the defendant watched, only he watched a lot more than what we showed in court. And he watched the videos that weren't blurred. He watched the videos in their full glory. And you can ask the families of the people who were beheaded whether this is a joke –

(ECF No. 368, Closing Argument Rebuttal, PageID.8780-8781.)

Defendant objected to this reference. The Court overruled the objection. *Id.* at PageID.8781.

The Government's invitation for the jury to handle the knives and feel their weight in connection with their reference to beheading videos served only one purpose: to invoke a sense of fear from the jury.

23

In the Sixth Circuit, courts review claims of prosecutorial misconduct in closing arguments under a two-step analysis. First, a court must determine whether the statement was improper; then it must decide whether or not it was flagrant. *United States v. Tarwater*, 308 F.3d 494, 510-11 (6th Cir. 2002).

Tarwater provided four factors for courts to look at to determine if the misconduct was flagrant:

> 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused.

*United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002)

If the statement was improper but not flagrant, the Sixth Circuit has enumerated a three-part test to determine if a new trial is warranted. *United States v. Bess*, 5933 F.2d 749, 753-57 (6th Cir. 1979). Under *Bess*, a conviction is reversed for prosecutorial misconduct in closing argument when "(1) proof of defendant's guilt is not overwhelming, and (2) defense counsel objected, and (3) the trial court failed to cure the error with an admonishment to the jury." *United States v. Carroll,* 26 F.3d 1380, 1385-86 (6th Cir.1994).

Remarks made by a prosecuting attorney that are "wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice" are improper. *Viereck v. United States*, 318 U.S. 236, 247 (1943)

24

In *United States v. Ayala-Garcia*, 574 F.3d 5 (1st Cir. 2009), the First Circuit, in a gun and drug prosecution, confronted remarks similar to those in this case. In that case, the prosecution commented on the size of the bullets recovered in the case, and it urged the jury to take them back to the jury room and look at them. It also commented that there were 31 bullets and 31 lives were saved by their seizure. *Ayala-Garcia*, 574 F.3d at 17.

The First Circuit had "no difficulty concluding that portions of the prosecutor's remarks crossed the bounds of proper argument." *Id.* "Invoking the thirty-one bullets in that way, while also urging the jurors to consider their size, could have served no purpose other than to inflame the jury's passions by depicting the defendants as dangerous men who needed to be put away for a long time." *Id.*

This Court should likewise have no difficulty concluding that the prosecution's remarks in closing argument crossed the line. Mr. Naser was not charged with beheading, and he had nothing to do with the beheadings in the videos. References to the size of the knives he possessed, along with a reference to the families of the victims in the videos, served no purpose except to impart fear in the jury. Fear that Mr. Naser would, if not convicted, commit an atrocity similar to the beheadings in the video.

This Court can find that the statements about the size of the knifes and the victims' families were flagrant under *Tarwater* and warrant reversal. First, the statements prejudiced Mr. Naser because they had the intended effect of making the jury fear Mr. Naser and what he might do if he were acquitted.

25

Second, while the statements about the knives and the beheading victims' familes occurred only once, it occurred in rebuttal. Improper comments made in rebuttal are especially troubling because the defense cannot rebut them, and they are "the last words spoken to the jury by the trial attorneys." *Ayala-Garcia*, 574 F.3d at 20 (*citing United States v. Manning,* 23 F.3d 570, 574 (1st Cir. 1994)).

Third, it is clear that the statements were deliberately placed before the jury at the beginning of the rebuttal to change the tone in the courtroom. The prosecution deliberately undermined the defense argument that Mr. Naser was engaged in mujahideen activities only in his fantasies by making the jury fear the consequences if they acquitted Mr. Naser. Again, this argument, based on fear of the defendant rather than the strength of the evidence, is improper.

Fourth, as argued in sections I–III, the evidence against Mr. Naser was not strong. Even if this Court finds that the evidence was sufficient for a reasonable jury to convict Mr. Naser, the evidence was not so strong that the Court can ignore the Government's misconduct in closing argument.

Finally, even if the Court declines to find that the misconduct was flagrant, a new trial is still warranted under *Bess.* As noted above, even if the evidence against Mr. Naser is sufficient to survive a challenge under Rule 29, it is not so strong that the Court can say with confidence that the jury would not have reached a different result but for the Government's terrifying allusion to Mr. Naser's knives being used in

beheadings. As required by *Bess*, there was a contemporaneous objection to the misconduct, and the Court declined to give a curative instruction.

Aws Naser mounted a vigorous defense to the charges against him. However, the Government's rebuttal, deliberately designed to make the jury fear the potential consequences of acquitting him, made it impossible for him to receive a fair and just verdict. He should be granted a new trial.

**B. The jury's verdict went against the great weight of the evidence and, even if it finds sufficient evidence to convict, the Court should grant a new trial.**

Sections I-III above detail why there is insufficient evidence to support Mr. Naser's convictions. However, even if the Court finds that a reasonable juror could have convicted Mr. Naser, it should still grant a new trial based on the weight of the evidence under Federal Rule of Criminal Procedure Rule 33.

> A Motion for Acquittal and a Motion for New Trial based on the ground that the verdict is against the great weight of the evidence are governed by very different standards. The Motion for New Trial involves a much broader standard of review than a Motion for Acquittal. A verdict may well be against the great weight of the evidence, but, nevertheless, be substantial enough to permit reasonable jurors to draw an inference of guilt. In a Motion for New Trial, the trial judge can consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror.

*Robinson v. United States*, 638 F.Supp.2d 764, 776 (E.D.Mich. 2009) (quoting *United States v. Turner,* 490 F.Supp. 583, 593 (E.D.Mich.1979)).

Even if this Court believes that the Government has overcome their burden and that a judgment of acquittal under Rule 29 is not justified, it retains the discretion to grant a motion for a new trial under Rule 33.

Sitting as a thirteenth juror and consistent with the arguments in Sections I-III, this Court can find substantial doubt that Mr. Naser intended to help Mr. Dennison joint ISIS, that he did not intend to join a specific organization in Syria, that his attempted travel caused a foreseeable risk of bodily injury or death, that he planned to build a destructive device, and/or that any device he was planning on building could not be readily assembled as required by the statute.

In sitting as a thirteenth juror, this Court has the ability to order a new trial when it has doubts that the verdict rendered by the jury was just and appropriate and it should do so in this case.

## CONCLUSION

The Court should set aside the jury's verdict and enter a judgment of acquittal because the evidence, even viewed in the light most favorable to the government, failed to satisfy all the elements of the crimes charged. As to Count One, the government has also failed to present sufficient evidence to prevent it from being time barred under §3286(a).

In the alternative, the Court should enter order a new trial based both on the prosecution's misconduct in closing argument and the weight of the evidence against Mr. Naser.

Respectfully Submitted,

s/ James R. Gerometta
**Law Office of James R. Gerometta**
27 E. Flint St., Suite 2
Lake Orion, MI 48362
313-530-9505

**FEDERAL COMMUNITY DEFENDER**

s/ Amanda N. Bashi
AMANDA N. BASHI
RIYAH BASHA
Attorneys for Mr. Naser
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5845
E-mail: amanda_bashi@fd.org

Dated: July 1, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the parties of record.

Signed,

s/ Amanda Bashi

Dated: July 1, 2025