UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,             CRIMINAL NO. 22-CR-20504

v.                              HON. JONATHAN J.C. GREY

AWS MOHAMMED NASER,        **FILED UNDER SEAL**

              Defendant.

---

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR ACQUITTAL OR NEW TRIAL

---

After fifteen days of testimony, Defendant Aws Naser was convicted by a jury of all three counts charged in the third superseding indictment: two counts of attempting to provide material support to a foreign terrorist organization (FTO), namely the Islamic States of Iraq and al-Sham (ISIS), and one count of being a felon in possession of destructive device. Over the course of the trial, the evidence demonstrated beyond a reasonable doubt that Naser attempted to provide material support to ISIS in 2012-2013 and again in 2016-2017 and unlawfully possessed a destructive device. The evidence painted a clear picture of a man dedicated to ISIS's canons, objectives, and goals—to building an Islamic Caliphate through violent jihad—who worked hard to find a way to live

out these ideals. The jury's verdict is the only proper response to the evidence presented and should not be disturbed.

The government faced a high burden at trial—proving its case beyond a reasonable doubt. Now that the jury has reached its verdict, it is Naser who "must satisfy a demanding standard." *United States v. Brooks*, 987 F.3d 593, 601 (6th Cir. 2021). The Court cannot "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006) (internal citations and quotations omitted). "Moreover, circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Robinson*, 99 F.4th 344, 353–54 (6th Cir. 2024) (cleaned up). "[G]iven that the district court must view the evidence in the light most favorable to the government, a defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Emmons*, 8 F.4th 454, 478 (6th Cir. 2021) (cleaned up).

The burden for a new trial based on the manifest weight of the evidence is not much lighter. Such a motion is granted only "in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (cleaned up). While a court considering such a motion "must scrutinize the record and ensure that a miscarriage of justice did not occur," it must also "respect the role of the jury

and ensure that evidence-supported convictions are upheld." *United States v. Burks*, 974 F.3d 622, 625 (6th Cir. 2020) (cleaned up).

Naser cannot meet this burden on any of the counts.

I.    Count 1: Material Support to ISIS (2012-2013)

The jury convicted Naser of attempting to provide material support to ISIS in 2012 and 2013. "Attempt is to be construed in a broad and all inclusive manner." *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999). A "substantial step consist[s] of objective acts that mark the defendant's conduct as criminal in nature." *Id*. In reviewing an attempt conviction, courts evaluate "whether any reasonable person could find that the acts committed would corroborate the firmness of a defendant's criminal intent, assuming that the defendant did, in fact, intend to commit the crime." *Id*.

As the Second Circuit has explained, "an attempt to provide [material support] focuses on his efforts to supply, a distinction that necessarily informs an assessment of what conduct will manifest a substantial step towards the charged objective." *United States v. Farhane*, 634 F.3d 127, 148 (2d Cir. 2011). "The material support statute criminalizes a range of conduct that may not be harmful in itself but that may assist, even indirectly, organizations committed to pursuing acts of devastating harm. Thus, . . . the very focus of the material support statute is 'preventative' in that it 'criminalizes not terrorist attacks

3

themselves, but aid that makes the attacks more likely to occur.'" *Id.* (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010)). Accordingly, "a substantial step towards the provision of material support need not be planned to culminate in actual terrorist harm, but only in support—even benign support—for an organization committed to such harm." *Id.*

Courts have found substantial steps toward providing material support to a foreign terrorist organization from someone who swore an oath to an FTO, promised to be on call to treat wounded members, and provided his contact information to a law enforcement officer professing to be an FTO member. *Id.* at 149. The Sixth Circuit held that traveling to the airport to fly to Turkey, even without having pledged an oath to ISIS or made any ISIS contacts, is enough. *United States v. Alebbini*, 979 F.3d 537, 548 (6th Cir. 2020). The Fifth Circuit has determined that substantial steps toward committing material support include being an active leader on a pro-ISIS channel, recruiting volunteers to travel to join ISIS, and inciting and counseling users to commit attacks in other countries. *United States v. Rahim*, 860 Fed. App'x 47, 54 (5th Cir. 2021).

There was sufficient evidence to convict Naser of attempting to provide material support to ISIS in 2012-2013. Testimony showed that Naser attempted to provide that support in three ways: by helping Russell Dennison get to Syria, by attempting to travel through Erbil in November 2012, and by

attempting to travel through Beirut in January 2013. Although proof of just one of these three is sufficient to support the jury's verdict, the Government proved all three.

### a. Provision of Dennison

First, Naser attempted to help Dennison get to Syria to join Al Nusrah Front. Naser claims that "Dennison set upon the path to joining an FTO long before he ever had a conversation with Naser." (R. 370: Motion, PageID 8809). He is correct. It was Naser and Dennison's pre-existing desire to perform Hijrah and be "true Muslims" (aka Mujahid fighters) that brought them together on YouTube in the first place. Naser's YouTube page stated "Jihad for the Sake of Allah is all i Want in this life. And if i Get Martydom, ill Ask Allah if i can go Back and do it Agian." (sic) (R. 325: Wood (Tr.), PageID 4524 and Exhibit 4-1). His "Occupation" was listed as "Full Time Mujhd A.K.A Slave of Allah" and his "Companies" as "Mujahdeen Sniper." (Id.) Naser said on YouTube that he was "making hijra insha allah" because "these kuffar won't even let anyone give dawah in public." (R. 325: Wood (Tr.), PageID 4538 and Exhibit 4-5). Dennison, in turn, told Naser that it was "time to move on soon" to a place that has "truly Islamic brothers" and not just "regular people Muslim by name." (R. 325: Wood (Tr.), PageID 4539 and Exhibit 4-23). Naser noted that the two were "on the Same Level on just about every hing (sic)." Id. It stretches credulity to suggest that Dennison would see this page, connect with

Naser precisely because of these identical views, travel to, stay with, and then travel overseas together, but never discuss a long-held desire to join an FTO.

Naser and Dennison were very careful of law enforcement spying, belying Naser's claim that his plans for Dennison involved peaceful work and study. On the phone, they talked about Dennison's phone being tapped. (R. 325: Wood (Tr.), PageID 4593). Beyond the unspoken obvious of what they could discern from each other's online YouTube content, it's no surprise that they saved details of Dennison's plans for in-person conversation during a six-hour walk on a 15-degree windchill winter day. (Id. at PageID 4617–18).

Naser's actions speak much louder than his carefully weighed words. On January 5, 2012, Naser purchased SR googles, a red dot sight, a waterproof/fog-proof spotting scope with a tripod, and a Bushnell night vision monocular. (Id. at PageID 4605). He returned them a month later, at a financial loss of $55, after Sami Osmakac's arrest brought closer scrutiny on Dennison. (Id. at PageID 4608–09). Someone traveling on vacation, to visit family, and to set an online friend up with a comfortable job teaching English or working at the airport does not need tools used to safely shoot others at long distances at night.

It is not surprising, then, that the jury concluded that Naser and Dennison traveled to Iraq intending to join an FTO. And when they arrived, Dennison set about doing so. Per a recommendation from Thomas Welle, or "al narweeg",

6

Dennison reached out to Mohyeldeen Mohammed. He told Mohammad that he was in Iraq "with a good brother" and hoped Mohammed could be "helpful to us" to "know which places are good" and "meet some good Muslim brothers." (Id. at PageID 4631). Dennison's words demonstrate that he was asking for them both. (Id. at PageID 4632). Naser would later contact Mohammad in a similar way, demonstrating that these were not secret communications that Dennison was hiding from Naser. (R. 327: Wood (Tr.), PageID 4901).

Dennison and Naser were not able to join an FTO in Iraq. So, Dennison kept looking, traveling to Egypt, Jordan, and Lebanon. His travel path and conduct suggested that he was on his way to Syria to fight. (R. 327: Hopper (Tr.), PageID 5012—13). He spent some time with Mohyeldeen Mohammed in Jordan, but they were separated after they were arrested by Jordanian authorities and, by the time Dennison arrived in Lebanon, it appeared that Mohammad had returned to Norway. (Id. at PageID 4908). Dennison contacted Mohammad for help with contacts in Lebanon. But Mohammad did not respond for five days. (Id.). By the time he did, Dennison had already joined "the brothers" in "a wild place." (Id. at PageID 4910).

Mohammad did not make the connection Dennison needed to get from Lebanon to Syria. Naser did. Naser eventually admitted that he told Dennison to meet Sheikh Omar Bakri, a Salafi jihadist known for smuggling fighters into Syria from Lebanon, who was living in Tripoli, Lebanon at the time. (R. 335:

Wood (Tr.), PageID 5750; R. 327: Shermetaro (Tr.), PageID 5054). The FBI never obtained that conversation, so it is unknown what exactly Naser said or what other efforts he made to put Dennison in touch with Bakri. (Id.). But notably, ███████████████████████████████████████████

██████████████████████████████. (R. 329 [Sealed]: Banach (Tr.), PageID 5392). ████████████████████████████████████████████.

(Id. at PageID 5392–93). █████████████████████████████

████████████████████████████████████████████████

███████████████████████████████. (R. 329 [Sealed]: Christensen (Tr.), PageID 5436, 5439). The jury could conclude from this evasion that Naser's discussion of Bakri was more nefarious than he claimed.

In sum, Naser attempted to assist Dennison's joining an FTO by helping him travel to and get situated in the Middle East and then by directing him to Omar Bakri, who successfully smuggled him into Syria where Dennison successfully joined Al Nusrah Front and later ISIS when the group rebranded. (R. 325: Wood (Tr.), PageID 4624; R. 335: Wood (Tr.), PageID 5756). This is more than a substantial step toward completing the crime of providing material support to a foreign terrorist organization.

b. Provision of Naser

The evidence that Naser intended to provide himself to ISIS in 2012-2013 is even stronger. On November 7, 2012, Naser arrived at Detroit's

international airport to board a flight to Iraq with a sword hidden in a cane, a
tactical knife, and a rifle scope in his baggage. (R. 328: Waters (Tr.), PageID
5308–5310, 5356). ███████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████. (R. 329 [Sealed]:
Rubin (Tr.), PageID 5472–73). ████████████████████████

████████████████████. (Id. At PageID 5473, 5488). The
preparation also included extensive research on weapons, viewing books,
reviews, and informational videos before he settled on the weapons he would
bring with him. (R. 327: Shermetaro (Tr.), PageID 5082–87).

All of this was done at Dennison's invitation. As discussed above, Naser and
Dennison knew they were being monitored by law enforcement and were
careful in their discussions. But the evidence proved that they knew the
information that filled in the gaps from their in-person dealings. Dennison's
first message to Naser after the latter's return to Michigan said he was "where
we talked about going," demonstrating that they had discussed going to Syria.
(Id. at PageID 5060). He referred to a gun as a "nice thing" and Naser knew
exactly what he meant. (Id. at PageID 5061). And he could refer to Omar Bakri
as simply "the sheikh" without ever needing to say his name. (Id. at PageID
5065–66). Naser and Dennison's previous conversations in Detroit and while
they were in the Middle East clearly included enough planning that Dennison

9

could feel comfortable talking vaguely, avoiding providing details to law enforcement, and knowing he would still be understood.

Naser does not reraise his trial argument that his attempt to travel in November 2012 was to visit his family. For good reason. Just as the Fifth Circuit found in *Rahim* that someone visiting family would not bring with them a substantial amount of cash and their birth certificate, 860 Fed. App'x at 54, a reasonable jury would not believe that someone visiting family would bring a disguised sword, a tactical knife, and a rifle scope.

Instead, Naser focuses on whether his travel was with the intent of joining a group that was designated as an FTO at the time of his travel. But he misreads the Federal Register in doing so. In November 2012, the Secretary of State amended the designation of al-Qa'ida in Iraq (AQI) to add Al-Nusrah Front, Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al Nusrah Front for the People of the Levant as *aliases*. Public Notice 8104, 77 Fed, Reg, 73732 (Dec. 11, 2012). In that designation, the Secretary of State found that AQI, which had been a designated FTO since 2004, uses those aliases. Id. AQI did not just begin to use those aliases the day of the finding, November 20, 2012, but had been using them for a long time. The Government does not move instantaneously. Indeed, as Hassan Hassan testified, AQI sent Abu Muhammad Al Jolani to Syria to be its branch there in 2011. (R. 324: Hassan

(Tr.), PageID 4356–57). Accordingly, the organization Naser was attempting to join was already designated on the day he attempted to travel.

And Naser knew it. While the FBI in September 2012 may not have been completely sure which group Dennison had joined up with, Naser had much better information than the FBI did. And it is his knowledge, not the FBIs, that matters. The FBI did not travel with Dennison through Iraq and discuss his plans to go to Syria, which Dennison's messages indicate Naser did. The FBI did not refer Dennison to Omar Bakri or even know that Bakri was Dennison's key to Syria until Naser told them in January 2013. Naser did.

Naser's video preferences before his November attempt to travel demonstrate his knowledge and intent. ██████████████████ ████████████████. (R. 329 [Sealed]: Rubin (Tr.) PageID 5472). At the time, the organizations were allied, and Al Nusrah was the only group aligned with them in Syria. (R. 324: Hassan (Tr.), PageID 4373). Even when Naser watched videos from non-designated groups, they were groups that were working with Al Nusrah in Syria. (R. 350: Rubin (Tr.), PageID 8013). This makes sense because Naser was committed to the cause that ISIS was pursuing. Naser's writings, communications, and watching habits all show his desire to work toward an Islamic caliphate through terrorism.

There was only one group in Syria at the time that shared Naser's jihadi goals and was seeking foreign fighters—Al Nusrah. (R. 324: Hassan (Tr.),

PageID 4364). Only one group would welcome an American jihadi who spoke poor Arabic. (Id. at PageID 4374). While Naser had researched deeply into the jihadist world, he stood out in the Middle East because of his American upbringing and his poor Arabic. (R. 352: Al-Ogaidi (Tr.), PageID 8352). The only group that Naser could have planned to join was Al Nusrah, AQI and Al-Qai'da's representative in Syria. And based on his research, as well as his time spent with American soldiers who were fighting AQI in Fallujah (*see* R. 352: Watts (Tr.), PageID 8452 and 8465 – 66), Naser would have known that. It was therefore rational for the jury to conclude that the organization Naser wanted to join was Al Nusrah. It was the only rational conclusion based on the evidence.

Naser briefly mentions that there was no evidence he knew where to meet Dennison or who he would be joining. (R. 370: Br., PageID 8812). As discussed above, the two men were very careful in discussions law enforcement could intercept. Dennison revealing his exact location and group would make him an easy target for arrest or worse. ████████████████████████████ ████████████████████████████████████████████ ██████████████████ (R. 329 [Sealed]: Banach (Tr.), PageID 5387). It was reasonable for the jury to conclude that Naser would have reached out to Dennison after he safely arrived in the Middle East to get more detailed directions about how to meet him. Abdelhamid al-Madioum testified that he

did exactly that a few years later—arranged his transportation to join ISIS only after he safely departed the United States on a trip to visit family. (R. 328: al-Madioum (Tr.), PageID 5208). Once Naser arrived in Erbil, he would be safely out of the reach of American authorities and would have access to a car that was about to be sold for several thousand dollars, providing him all the funds Dennison had asked him to bring (R. 335: Wood (Tr.), PageID 5753–54). He would be just one last step away from joining Al Nusrah in Syria, having completed many substantial steps along the way.

Although Naser's relationship with Dennison may have been diminished by his inability to fly in November 2012, his desire to join Al Nusrah was not. Naser continued to watch the same propaganda videos daily, not taking a single day off until November 13, 2012, the day the FBI came to his house. (R. 329: Rubin (Tr.), PageID 5488). He ramped up his watching on New Years Eve, consuming multiple official ISIS propaganda videos featuring graphic violence that night and on New Years Day, right before his second travel attempt. (Id. at PageID 5492–94). He continued researching weapons. (R. 335: Wood (Tr.), PageID 5750–51). He researched other ways to get out of the country. (Id. at PageID 5746—48). And he purchased a ticket to Beirut, Lebanon. (Id. at PageID 5757).

███████████████████████████████████████████████

█████████████████████████████████████████████████. (R.

329 [Sealed]: Weaver (Tr.), PageID 5457. ████████████████████ ████████████████████████████████████████████████████████████ (Id. at PageID 5462). ████████████████████████████ ████████████████. (Id. at PageID 5457). He did not research any tourist sites or hotels there. (R. 335: Wood (Tr.), PageID 5809). The only thing he researched was a one-day car rental, beginning January 4, 2013, right after he arrived. (Id. at PageID 5749). The only reasonable conclusion is that Naser planned to drive up to Tripoli and follow Dennison's path across the border into Al Nusrah's waiting arms.

Naser made his video accusing Dennison of being an FBI agent on December 31, 2012. ████████████████████ (R. 329 [Sealed]: Christensen (Tr.), PageID 5440). He began to suspect Dennison on that date, after, by sheer coincidence, Dennison messaged him just a few hours after he booked his plane ticket. (R. 335: Wood (Tr.), PageID 5804—05). ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ (R. 329 [Sealed]: Christensen (Tr.), PageID 5440).

Naser's suspicions at this point don't matter. They did not stop him from attempting to fly to Beirut. And he was convicted of attempting to join Al Nusrah, not Dennison. Naser never believed that Dennison was an FBI agent who was fighting with Al Nusrah. ████████████████████████████

████████████████████████████████████████████ .

(Id. at PageID 5443). So, if Dennison was truly with Al Nusrah, Naser would see him when he joined up in Syria. If he was an FBI agent, he would simply not be there and Naser would join the true brothers in Al Nusrah by himself. With or without Dennison, he was on his way. Naser cutting off contact with Dennison does not show that he had abandoned his plans to join the FTO. On the contrary, it shows his determination to join regardless of what obstacles the FBI may put in his way. Indeed, Naser attempted to travel despite having watched a video explaining that the United States had forbidden joining Al Nusrah. (R. 324: Hassan (Tr.), PageID 4421).

Naser buying a one-way ticket to Beirut, with no plans to stay in the city on vacation (despite the lie he told CBP) and no onward ticket to see family in Iraq was a substantial step. Even discounting all the substantial steps Naser took before his November travel (such as buying weapons), Naser purchased a one-way ticket to Lebanon, planned a one-day car rental, bought a bus ticket to Chicago, got on that bus, traveled from the bus station in Chicago to O'Hare airport, checked in for the flight, and attempted to take the flight. Even his two gas station attacks right before his travel were a substantial step, whether as practice for the violence he planned to unleash in Syria, as a funding source, or both. Naser took at least as many steps as Alebbini did. *See* 979 F.3d at 547.

Naser focuses on the wrong thing when comparing his actions to Alebbini's. (R. 370: Br., PageID 8816 n. 2). He notes that Alebbini made clear that he was traveling overseas to join ISIS, sent ISIS propaganda to family and friends, and declared himself a terrorist and soldier. All those items were probative of Alebinni's intent. But intent and substantial step are two different inquiries. "The requirement does not mandate that the activity constituting a substantial step must be *sufficient* to prove that the defendant had the subjective, specific intent to commit a crime. The intent may need to be proven separately." *Bilderbeck*, 163 F.3d at 975. Naser's intent was proven throughout the trial by the videos he watched and the words he spoke. In his comparison to *Alebbini*, Naser compares substantial steps. And their substantial steps were nearly identical.

Naser notes that his steps could have innocent explanations—such as attempting to escape his surveilled and restricted life in the United States. But he did not feel so surveilled and restricted that he could not watch endless ISIS videos. Or buy tickets overseas and a bus ticket out of town. Or vandalize one gas station and rob another. Rather than hiding out because he was so oppressed by FBI surveillance, Naser toyed with and taunted the FBI informant. He asked the informant to give him $10,000 suggesting the money was for terrorism before sticking a camera in the informant's face for his big reveal that they would go to Rohingya Muslims instead. (R. 352: Banach (Tr.),

16

PageID 8393—97). He also drove recklessly to try to intimidate and frighten the informant on tape. (Id.). Far from feeling restricted or limited by the FBI, Naser appeared to relish his adversarial relationship with them.

But even if his innocent explanation were plausible, it does not matter at this stage. The jury did not buy it. "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *Robinson*, 99 F.4th at 353–54 (cleaned up). Naser's attempt to travel from Chicago to Beirut on a one-way ticket with no onward travel to Iraq and no plans in Beirut other than a one-day car rental corroborates his intent to cross the border into Syria to join Al Nusrah. That is enough.

c. <u>Naser's actions caused a foreseeable risk of bodily injury or death</u>

The jury unanimously found beyond a reasonable doubt that Naser's actions in Count 1 created a foreseeable risk of serious bodily injury or death to another person. (R. 359: Verdict, PageID 8586). This conclusion is supported by sufficient evidence. Naser did not plan to join an FTO to be a file clerk, a nurse, or a religious scholar. He wanted to be a soldier—a Mujahid and a sniper. (R. 325: Wood (Tr.), PageID 4524 and Exhibit 4-1). The items he attempted to bring with him demonstrate this intent: a sword, a knife, and a rifle scope. (R. 328: Waters (Tr.), PageID 5308–5310, 5356). The jury saw throughout the trial

what ISIS members do with those items. They kill. They behead hostages. That is what Naser would have done had he been allowed to board his flight.

Naser also demonstrated his plan to commit violence through his actions before attempting to board the January 2013 flight. He went to two gas stations, vandalized one with motor oil, and violently robbed a second. (R. 335: Wood (Tr.), PageID 5768—69). These are the hallmarks of someone practicing violence in advance of war. Naser was not traveling to join an FTO to preach jihad but to live it.

As the Government explained in its previous filing, (R. 204: Response, PageID 2501–02), for an inchoate crime, the Court must look at what would have happened had law enforcement not intervened. *United States v. Pham*, No. 12-cr-423, 2022 WL 993119, at *10 (S.D.N.Y. Apr. 1, 2022). Had Naser been allowed to board a plane in November 2012 or January 2013, he would have ended up in the same place as Dennison and, later, al-Madioum, shooting and killing for ISIS. In this case, the jury, following an instruction this Court designed, agreed.

Naser's suggestion that he could not have hurt anyone because he was on the no-fly list perverts the law. It seeks to punish the Government for protecting people. Naser points to no case that says law enforcement action to stop a crime from being completed insulates the defendant from prosecution for that crime. Avoiding that result is the entire point of inchoate crimes.

18

"Especially when the offenses at issue are serious allegations of terrorism, 'dangerous persons may be apprehended at an earlier stage without immunizing them from attempt liability.'" *Id.* (citing *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003) and *United States v. Jackson*, 560 F.2d 112, 120 (2d Cir. 1977)). If Congress intended 18 U.S.C. § 3286(b) not to apply to crimes foiled by law enforcement before injury occurred, it would have carved those crimes out or left out death or injury that was merely "reasonably foreseeable," thus limiting the provision to actual harm. It did not do that.

## II.    Count 2: Material Support to ISIS (2016-2017)

Naser does not now challenge his intent to materially support ISIS in 2016 and 2017. He claims only that he did not take a substantial step towards doing so. He took more than one step—he walked a mile toward his goal.

A substantial step is an act the defendant commits that "would corroborate the firmness of a defendant's criminal intent." *Bilderbeck*, 163 F.3d at 975. As the Second Circuit explained in *Farhane*, "substantial-step analysis necessarily begins with a proper understanding of the crime being attempted." 634 F.3d at 147. In this case, Naser attempted to provide material support to ISIS in the form of personnel (himself) and services (bombmaking). A "substantial step towards the provision of material support need not be

19

planned to culminate in actual terrorist harm, but only in support—even benign support—for an organization committed to such harm." *Id.* at 148.

Naser took many such steps. For instance, he pledged himself to ISIS. He wrote a poem on index cards that affirmed his allegiance to the Islamic State and called that support unwavering. (R. 335: Wright (Tr.), PageID 5885; R. 324: Hassan (Tr.), PageID 4423.) He called himself a soldier of the Caliphate." (R. 335: Wright (Tr.), PageID 5885; R. 324: Hassan (Tr.), PageID 4425.) He possessed the official ISIS pledge or bayat. (R. 342: Hassan (Tr.), PageID 4426–28.) ███████████████████████████████. (R. 343 [Sealed]: Vaughan (Tr.), PageID 6504). He recorded himself saying it and then ran that recording through a voice-changer app. (R. 350: Yauk (Tr.), PageID 7908—10).

The crime of provision of material support is complete when the defendant, knowing that ISIS is a designated foreign terrorist organization, intentionally provides himself to ISIS to work under its direction and control. *See Alebbini*, 979 F.3d at 546. Pledging oneself to ISIS is a substantial step toward completing that crime. By pledging himself repeatedly to ISIS, including during his participation in pro-ISIS forums Naser "physically produced the very personnel to be provided as material support for the terrorist organization: himself." *Farhane*, 634 F.3d at 149. Granted, unlike Farhane, Naser's producing himself was not literally in a physical location, but in an online forum. But, just like Farhane, "his purpose in swearing *bayat* was to

formalize his promise to work . . . under the organization's direction and control. That is most certainly evidence of a crime: the charged crime of attempting to provide material support to terrorism in the form of personnel." *Id*. at 150.

But Naser did more than just show up online. He collected information on how to build explosives. He collected tools that he would use to build the explosive—including pool shock (R. 345: Rigopoulos (Tr.), PageID 7019), all the ingredients needed to create tri-acetone tri-peroxide (TATP) (Id. at PageID 7017—18), a fusing system (Id. at PageID 7025—26), and shrapnel (Id. at PageID 7115). ███████████████████████████████. (R. 343 [Sealed]: Bronson (Tr.), PageID 6541). ████████████████████ ██████████████████. (R. 343 [Sealed]: Davidson (Tr.), PageID 6612). █████████████████████████████████ █████████████████. (R. 346 [Sealed]: Parrott (Tr.), PageID 7193—94; R. 352: Shermetaro (Tr.), PageID 8480). He even built a detonator. (R. 351: Wood (Tr.), PageID 8218). All of these are substantial steps toward providing himself as personnel and providing bombmaking services.

Naser suggests, without any legal support, that all these steps are mere "preparation." But each of these steps took significant time, effort and planning. Before getting to these substantial steps, Naser had to find the Telegram channels where these instructions were provided, join them, study

21

up on the instructions, find where the ingredients could be purchased, and go out and purchase them. Then he had to set up his workshop in his basement and evict his wife so he could work there in peace. All of this takes a lot more work than merely buying a ticket and showing up at an airport, but that has frequently been considered a substantial step in material support cases. *See Alebbini*, 979 F.3d at 547–48.

III.   Count Three: Felon in Possession of a Destructive Device

The jury correctly found that Naser possessed the components of a destructive device. He had all three ingredients needed to create TATP: acetone, hydrogen peroxide, and a strong acid. He had a container prepared to insert it into, and that same container was set up to be fit with shrapnel. And he had multiple potential methods of initiation. This satisfies the requirements of 18 U.S.C. § 921(a)(4)(C).

The Government experts sufficiently explained how Naser's items could be readily converted to a destructive device. Retired FBI explosives and hazardous device examiner Christopher Rigopoulos took the jury through the scene. He pointed out the glass jars Naser had in his bomb lab, which could be used as a main charge container. (R. 345: Rigopoulos (Tr.), PageID 7022). He explained how the Christmas lights that Naser had right next to his TATP ingredients could initiate the explosion. (Id. at PageID 7025). He talked about

all the tools there to build the bomb including glue sticks, graduated syringes, switches, wires, a glue gun, and gloves. (Id. at PageID 7027—32). He also talked about the three ingredients Naser had that could be combined to form TATP: hydrogen peroxide, acetone, and sulfuric acid. (Id. at PageID 7117).

███████████████████████████████████████████████████████████

██████████████████████. (R. 346 [Sealed]: Barrow (Tr.), PageID 7282). ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████. (R. 345: Parrott (Tr.), PageID 7130—32); R. 346 [Sealed]: Parrott (Tr.), PageID 7202—06). ███████████████████████

█████████████████████. (R. 346 [Sealed]: Parrott (Tr.), PageID 7206).

Naser revisits the same arguments that fell flat with the jury. He complains that Naser did not have any cold packs or fertilizer to make an acetone peroxide – ammonium nitrate (APAN) bomb. While Naser could have intended to make an APAN bomb with a TATP detonator, a TATP bomb is a destructive device itself.

He complains that "he did not have a funnel, epoxy, scissors, or a source of heat or refrigeration in the basement." (R. 370: Motion, PageID 8823). But he had functional equivalents of epoxy (a glue gun) and scissors (a hand saw). There is no legal requirement that he use the exact same tools as in the video he watched. While no funnel was found in the basement, the Sixth Circuit

"does not require showing possession of all commonly available materials when determining whether a destructive device could have been readily assembled." *United States v. Crocker*, 260 F. App'x 794, 797 (6th Cir. 2008). The Circuit has held that missing scotch tape was not fatal. *Id*. Nor was missing pliers. *United States v. Langan*, 263 F.3d 613, 626 (6th Cir. 2001). A funnel falls into the same category of tools. Naser could have had a funnel in a cabinet in his kitchen[1], could have picked one up quickly from a store down the street, or could have used an alternative funneling mechanism as many home bakers do. His argument that he did not have heat or refrigeration in the basement is nonsensical. He had full access to his own kitchen and can point to no cases that say he had to be able to construct the device without going upstairs.

Naser could have constructed a complete destructive device, and not just the explosive TATP, in a few hours. Once he made the TATP, all he had to do was "take one of [the] Christmas lights, . . . tap the glass off the individual Christmas light and cut the wires, but [] make sure the filament, the little thin wire that's inside that light, remains intact." (R. 345: Rigopoulos (Tr.), PageID 7025). Then "add power or electricity to this Christmas light . . . it heats up, it's generating heat" and because "TATP is extremely sensitive to heat," it will explode. (Id.). This process would take only a few minutes. The matchheads

---

1. The FBI would not have noticed anything suspicious about a funnel in the kitchen to pick it up during the search.

would be an alternative initiation mechanism but would take longer to prepare. (Id. at PageID 7026).

Fragmentation is not required to make a bomb—it just makes the bomb more deadly. Naser could have gone to his car to get the BBs and hunting pellets and filled his already nestled jars with them in mere minutes. But he did not need to do so to meet the definition of a destructive device. Naser acts like going up to his kitchen or out to his car would require epic journeys that would take hours. He had free reign of his own house and car, and only one tenant who did not ask many questions. In addition, the glass main charge containers Naser planned to use already provided fragmentation. ████

████████████████████████████████████████████

████████████████████████. (R. 346 [Sealed]: Barrow (Tr.), PageID 7295—97).

Finally, Naser clearly intended to weaponize the device. He watched scores of videos about explosives made by terrorist organizations. He was a long-time member of a Telegram channel whose entire purpose was building bombs to maim, kill, and destroy. (R. 336: Vaughan (Tr.), PageID 6135). He bought hunting pellets that did not fit in his BB gun and thus were meant for fragmentation. (R. 350: Shermetaro (Tr.), PageID 8071).

Naser suggests that his buying sulfuric acid before he watched the ITMC video (which calls for hydrochloric acid) meant he did not intend to create

TATP. But he watched other materials on how to create explosive devices, such as "Attack Them O' Monotheist" before he found the ITMC video. (R. 336: Vaughan (Tr.), PageID 6157). Through those videos, he could have learned that sulfuric acid is better for creating explosives than hydrochloric acid because it is more concentrated. (R. 345: Parrott (Tr.), PageID 7145). And whether or not a detonator is itself an explosive device, his building one goes a long way toward demonstrating his intent to construct a bomb. As his friend and explosives teacher Abouhamzaatounsi told him, a detonator without an explosive device "will not do too much for you." (R. 351: Wood (Tr.), PageID 8218). By the time the FBI searched his bomb lab, Naser was working on the next step. In his own words: "something powerful." (Id.)

The amount of TATP Naser could have made did not matter either. ███ ████████████████████████████████████████████████. (R. 346 [Sealed]: Parrott (Tr.), PageID 7206, 7253—54). But regardless, the Sixth Circuit does not require the government to specify the amount of explosive to conclude that a device is destructive. *Crocker*, 260 F. App'x at 798.

This case is right in line *Crocker*. Crocker had hobby fuse, black powder, an empty hand grenade hull, and galvanized pipe that could have been assembled once he acquired tape to plug the hole at the grenade's base or the end of the pipe. *Id.* at 797. His assembly would have required similar work to Naser's: grabbing one household object, using the hobby fuse to put together an

electrical method for causing the explosive to detonate, and then assembling everything together. Naser identifies no case where the need to put together the components in his possession was fatal to the charge.

IV.    Motion for a New Trial

Over fifteen days of testimony, there were few objections. Across three and a half hours of closing, Naser takes issue with just one sentence—a direct and appropriate response to his own counsel's comments. This was a clean trial and the jury's verdict was in line with the mountain of evidence they saw. Naser is not entitled to a new trial.

Naser complains about the Government discussing the knives in the case during rebuttal. But the knives were admitted in evidence. And it was his counsel who first engaged in extended commentary on the size and quality of the knives. He began by inviting the jury to "look at the knives he had." (R. 368: Gerometta (Tr.), PageID 8765). He told the jury: "I want you to take a look at it" suggesting it is hollow and "I bet if I hit it hard enough, I could break it." (Id. at PageID 8766). Counsel mocked the knife, calling it a "Rambo" knife that a child might have while fantasizing about being a solider. (Id. at PageID 8765—66). He ridiculed Naser, suggesting his client would not do anything in real life because he was all talk, and told the jury: "[t]his isn't a real Mujahideen terrorist knife. It's cheap plastic. It's Mujahideen Cosplay." (Id. at

PageID 8765—67). The Government was entitled to respond to that claim by pointing out that the knives were sharp and that the weapons were not "a joke." (Id. at PageID 8781). Likewise, it was in defense closing that families were first brought up. The defense ended its closing by telling the jury the defendant was "someone's son, and he's someone's father." (Id. at PageID 8778). The Government's statement was also a direct response to this invitation to the jury to consider families. This also explains the timing, as the challenged statement is just two pages behind that defense comment in the transcript. (Id. at PageID 8781). The Government's statement was appropriate as it was tied to the evidence in this case—the knives and videos—and a brief and direct response to defense arguments.

But the comment did not matter, regardless. The jury never asked to see the knives. They did not ask to see the videos. They never made a comparison of the knives Naser had with the ones in the videos. Their verdict was based on fifteen days of testimony, not one sentence three hours into closings.

Naser gives no independent reason for the verdict being against the manifest weight of the evidence. He does not, for instance, suggest that the Court should find any witnesses that the jury believed to have been incredible. That alone means this case is not one of the extraordinary circumstances that would merit this rare relief. *United States v. Hughes*, 505 F.3d 578, 593 (6th

Cir. 2007). For the reasons explained for each count above, the Court should

deny this motion as well.

## **CONCLUSION**

For the reasons set forth above, the United States respectfully requests that

the Court deny Naser's motion and uphold the jury's considered verdict.


JEROME F. GORGON, JR.
UNITED STATES ATTORNEY


*/s/ Saima Mohsin*
Saima S. Mohsin
First Assistant United States Attorney
*/s/Hank Moon*
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Saima.Mohsin@usdoj.gov
Hank.Moon@usdoj.gov
(313) 226-9100


*/s/ Dmitriy Slavin*
Dmitriy Slavin
Trial Attorney
National Security Division
Department of Justice
Dmitriy.Slavin@usdoj.gov
(202) 616-2846


Dated: July 29, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system and electronically mailed a copy to the parties of record.

<u>*/s/ Saima Mohsin*</u>
Saima Mohsin
First Assistant United States Attorney

Date: July 29, 2025