UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                       Case No. 22-20504

v.                            HON. JONATHAN J.C. GREY

AWS MOHAMMED NASER,

     Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION PURSUANT TO FED. R. CRIM. P. 29 AND 33 (ECF No. 370)

## I.    INTRODUCTION

On June 3, 2025, following a 15-day trial and less than six hours of deliberation, a jury returned a guilty verdict against Defendant Aws Mohammed Naser on all three charges in the Third Superseding Indictment: (1) attempting to provide material support and resources to a foreign terrorist organization in 2012 and 2013, in violation of 18 U.S.C. § 2339B(a)(1) (Count One); (2) attempting to provide material support and resources to a foreign terrorist organization between March 2016 and October 30, 2017, in violation of 18 U.S.C. § 2339B(a)(1) (Count Two); and (3) felon in possession of a destructive device, in violation of 18 U.S.C. § 922(g)(1) (Count Three). (ECF No. 359.)

Naser filed a timely motion for judgment of acquittal and new trial pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively. (ECF No. 370.) The government filed a response, to which Naser replied. (*See* ECF Nos. 376, 377.) For the following reasons, the Court **DENIES** the entire motion.

## II.   LEGAL STANDARDS

### A.   Rule 29 Motion for Judgment of Acquittal

In evaluating a motion for judgment of acquittal pursuant to Rule 29, a district court must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements for the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Caseer*, 399 F.3d 828, 839–840 (6th Cir. 2005). "[G]iven that the district court must view the evidence in the light most favorable to the government, a defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Emmons*, 8 F.4th  478 (6th Cir. 2021) (cleaned up); *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007). A court is bound to make all reasonable inferences and credibility choices in support of the jury's

verdict. *Id.* at 669–670; *United States v. Callahan,* 801 F.3d 606, 616 (6th Cir. 2015). A strong presumption exists in favor of sustaining a jury conviction. *United States v. Peters,* 15 F.3d 540, 544 (6th Cir. 1994). The question is merely one of legal sufficiency; the court does not substitute its judgment for that of the jury, independently weigh the evidence, or judge the credibility of trial witnesses. *United States v. Ramirez,* 635 F.3d 249, 255–256 (6th Cir. 2011). A conviction is reversed "only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Blakeney,* 942 F.2d 1001, 1010 (6th Cir. 1991).

## B. Rule 33 Motion for New Trial

Pursuant to Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "A motion for a new trial can be premised on the argument that the verdict was against the manifest weight of the evidence" or on a "substantial legal error," *Callahan,* 801 F.3d at 616, or when there is an "extraordinary circumstance" such that the evidence weighs "heavily against the verdict." *United States v. Hughes,* 505 F.3d 578, 593 (6th Cir. 2007) (citations omitted).

Where the jury's verdict contradicts the manifest weight of the evidence, Rule 33 allows district courts to grant a new trial to the defendant. *See, e.g., United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). "When considering a motion for a new trial [based on the weight of the evidence], the district court may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Lewis*, 521 F. App'x 530, 532 (6th Cir. 2013).

The Court is entitled to "credit [a defendant's] innocent explanations for [his] actions over the sinister interpretation posited by the government." *United States v. Souder*, 436 F. App'x 280, 292 (4th Cir. 2011). In fact, "it is precisely this kind of credibility determination that is the trial court's call to make on a motion for a new trial." *Id.*

## III.  ANALYSIS

### A.  Rule 29

#### 1.  *Count One*

For counts one and two, the Sixth Circuit has held that:

> To establish attempt under § 2339B(a)(1), the Government ha[s] to prove four elements: (1) that [defendant] intended to commit the crime of providing material support or resources to ISIS; (2) that he intended to provide himself to ISIS to work under its direction and control; (3) that he knew ISIS was a designated foreign terrorist organization or had engaged in

terrorist activity; and (4) that he did some overt act which was a substantial step toward committing the crime. Transcript of Verdict Proceedings, R. 112, PageID 2453; *see United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005).

*United States v. Alebbini*, 979 F.3d 537, 546 (6th Cir. 2020) (holding that evidence that defendant was at the airport to fly to Turkey, even without having pledged an oath to ISIS or made any ISIS contacts, is sufficient to establish a substantial step for purposes of § 2339B(a)(1)); (*see also* ECF No. 357, PageID.8539–8545.) A substantial step is one that a defendant commits that "would corroborate the firmness of a defendant's criminal intent." *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999). As set forth in the jury instructions, "[t]he defendant's conduct must go beyond mere preparation and must strongly confirm that he intended to provide material support or resources to a foreign terrorist organization, namely, ISIS." (ECF No. 357, PageID.8544–8545.)

As to count one, Naser argues that the government failed to introduce sufficient evidence to sustain a conviction for Naser's alleged attempt to: (a) provide Dennison as personnel to ISIS; (b) travel in November 2012; and (c) travel in January 2013. He also renews his argument that the government has not established that 18 U.S.C. § 3286(b) applies—and, therefore, such conduct is time-barred—because

the government did not prove that Naser's alleged overt acts prior to 2014 created a foreseeable risk of harm.

In a pre-trial order (ECF No. 253), the Court addressed the viability of the charges in count one for purposes of determining whether the charges in count one were time-barred. Regarding Naser's alleged November 2012 and January 2013 attempts to board an airplane to travel to Syria to fight for ISIS, the Court stated:

> Nevertheless, the Court concludes that a reasonable juror could find that Naser's actions, specifically the two attempts to board airplanes to Turkey and Lebanon in November 2012 and January 2013, respectively, constituted substantial steps toward completion of the offense, such that there was a foreseeable risk of death or serious bodily injury to another person.

(*Id.* at PageID.3153 (footnote omitted).) At trial, the government introduced considerable evidence regarding Naser's attempts to travel to Syria to fight for al Qa'ida and/or ISIS, beginning in September or October 2012 and continuing through early January 2013.[1]

---

[1] The parties also dispute whether the government sufficiently established that Naser attempted to provide Dennison as personnel to support to a terrorist organization. However, it is undisputed that the Court only needs to find that the government established one form of attempt to provide support to a terrorist organization in order to uphold the conviction for count one. As discussed herein, the Court finds that the government met its burden with respect to Naser's other two attempts, i.e., his attempts to travel in November 2012 and January 2013. Accordingly, the Court does not analyze whether the government met its burden with respect to Naser attempting

### a.   November 7, 2012

First, in support of Naser's November 7, 2012 attempt to travel to Iraq and Syria through Turkey, the government introduced evidence: (1) of how Naser and Dennison met, their interactions in January 2012 (including Dennison's visit to Naser's home and their six-hour walk outside on a day the windchill was 15 degrees Fahrenheit); (2) that Naser and Dennison met up in Iraq, spent time with Naser's family and traveled together in Iraq; and (3) of continued communications between Naser and Dennison after Naser returned to Michigan in late August 2012, which communications continued through December 31, 2012.

Second, Naser watched ISIS propaganda videos and researched weapons on a daily basis between October 18, 2012 and November 4, 2012 (ECF No. 328, PageID.5126–5133; ECF No. 329, PagedID.5472–5473.) Naser researched many items, including a Bushnell scope, knives, sword canes, and other weapons. (ECF No. 327, PageID.5078–5089;

Third, on October 24, 2012, Naser purchased the "Cold Steel Heavy Duty Sword Cane." (ECF No. 327, PageID.5087.) Fourth, on October 31,

---

to provide Dennison as personnel to a terrorist organization. The Court also notes that the Dennison attempt theory was not clearly alleged in the Third Superseding Indictment.

2012, Naser purchased a one-way airline ticket to Erbil, Iraq, connecting through Turkey, scheduled to depart Detroit Metro Airport on November 7, 2012. (ECF No. 328, PageID.5139.)

Fifth, on October 31, 2012, Naser purchased an HD helmet camera kit, SD card, and knife. ECF No. 328, PageID.5138–5139.) Sixth, on October 26, 2012 and November 2, 2012, Naser also viewed images of Dennison and Dennison's YouTube page. (ECF No. 328, PageID.5134, 5142.) Finally, on November 7, 2012, Naser arrived at Detroit Metro Airport and attempted to board a flight to Turkey with a cane sword, tactical knife, and rifle scope in his baggage. (ECF No. 328, PageID.5308–5310, 5356.)

Naser argues that the government did not establish that he intended to provide himself as personnel for a specific designated foreign terrorist organization ("FTO"), namely ISIS, and that the government did not establish which FTO he attempted to travel to support in November 2012. The Court disagrees.

First, as the Court previously discussed, 18 U.S.C. § 2339B(a)(1) does not require that the FTO be designated terrorist organization (see ECF No. 253, PageID.3129–3130), and the Court will not revisit that

determination here. *See also Alebbini*, 979 F.3d at 546 (the government had to prove that defendant "knew ISIS was a designated foreign terrorist organization or had engaged in terrorist activity"). Second, the Third Superseding Indictment does not allege that Naser attempted to provide material support to ISIS in 2012–2013; rather, it alleges that Naser attempted to provide support to al Qa'ida. At trial, the government introduced evidence that the U.S. Secretary of State had designated al Qa'ida as an FTO in 2004, and as of November 20, 2012, had formally amended the designation of al Qa'ida in Iraq to include Al-Nusrah Front (and other names) as aliases for al Qa'ida. *See* 77 Fed. Reg. 73732 (Dec. 11, 2012); (ECF No. 329, PageID.5504.) Government witnesses testified that Naser watched al Qa'ida and ISIS videos in the months before and after his attempted November 2012 travel, including a video viewed on October 21, 2012 with the "Al Nusra flag." (ECF No. 329, PageID.5477.)

Third, government witnesses testified that Al Nusrah Front was a group aligned with al Qa'ida and ISIS in Syria. (See ECF No. 324, PageID.4364, 4373; ECF No. 329, PageID.5498–5499, 5501; ECF No. 350, PageID.8013.) Even though the U.S. Secretary of State did not formally designate Al Nusrah Front as an alias of al Qa'ida until November 20,

9

2012, the government introduced evidence that Al Nusrah Front was operating as an FTO before Naser's attempted travel to Iraq and Syria through Turkey on November 7, 2012. (*See, e.g.,* ECF No. 324, 4357–4358, 4363 ("the jihadist groups in Syria" in 2012 "was al Qa'ida -- and Jabhat Al Nusra is the main group, yeah. Jabhat Al Nusra is the -- they just were the Nusra Front. N-U-S-R-A is also another name for Nusra Front."), 4364 ("Foreign fighters specifically, Nusra was the main -- the only group at the time seeking foreign fighters and working with foreign fighters.").)

Based on all that evidence, most significantly, Naser's efforts to travel to Iraq/Syria by going to the airport on November 7, 2012, i.e., the same activity that the *Alebbini* court held constituted a substantial step for purposes of § 2339B(a)(1) (although Naser also had weapons in his luggage), the Court concludes that a reasonable juror could find that Naser took a substantial step toward attempting to provide personnel and services to an FTO.

### b. January 2, 2013

In addition to Naser's conduct described above, the evidence at trial supported a finding that Naser kept taking steps to attempt to provide

personnel (including himself) and services to an FTO between November 7, 2012 and January 2, 2013.

First, Naser continued to watch propaganda videos (including graphically violent ISIS videos), researched weapons, and researched various ways to leave the United States, whether via airlines or other methods.

Second, on December 31, 2012, Naser purchased a bus ticket to Chicago and a one-way airline ticket from Chicago O'Hare Airport to Beirut, Lebanon. After taking the bus to Chicago and going to O'Hare Airport, Naser checked in for the flight.

Third, that Naser tried to fly to the Middle East again, this time on a one-way ticket to Beirut, allegedly for a two-week vacation about which he had not conducted any research, is further evidence that he was determined to get to the Middle East. Evidence that he: (1) had no plans to stay in Beirut; (2) had planned a one-day car rental for the day he arrived (January 4, 2013); and (3) did not have a ticket to get from Beirut to Iraq, where his family lived, established significant support for the government's contention that Naser was going to fight for an FTO in Iraq/Syria.

Naser's various and extensive efforts to get to Chicago and fly from Chicago to Beirut constitute evidence that Naser was undeterred from getting to the Middle East, even after being prevented from flying there on November 5, 2012.

Based on all the foregoing acts, in particular traveling to and checking in for his flight at the airport on January 2, 2013, the same activity that the *Alebbini* court held constituted a substantial step for purposes of § 2339B(a)(1), the Court concludes that a reasonable juror could find that Naser took a substantial step toward attempting to provide personnel and services to an FTO.

### c. Resolution

Critically, based on the foregoing evidence and as the Court previously suggested, a rational juror could have determined beyond a reasonable doubt that Naser's "two attempts to board airplanes to Turkey and Lebanon in November 2012 and January 2013, respectively, constituted substantial steps toward completion of the offense, such that there was a foreseeable risk of death or serious bodily injury to another person." (ECF No. 253, PageID.3153 (footnote omitted).) The Court reaffirms its conclusion that the government permissibly charged Naser

12

for his alleged conduct in 2012 and 2013, such that those charges are governed by 18 U.S.C. § 3286(b) and are not barred by the eight-year statute of limitations period in 18 U.S.C. § 3286(a). The Court further concludes that a reasonable juror could find, beyond a reasonable doubt, that Naser attempted to provide material support and resources to a foreign terrorist organization in 2012 and 2013, in violation of 18 U.S.C. § 2339B(a)(1). Naser's Rule 29 motion is **DENIED** as to count one.

### 2. *Count Two*

As to count two, Naser does not challenge that he intended to materially support ISIS in 2016 and 2017. Naser argues only that the government did not establish beyond a reasonable doubt that he took a substantial step toward constructing a destructive device. He asserts that the government had to show that he gathered the items needed, in the quantities required, and began to implement the instructions on the Ibn Taymiyyah Media Center ("ITMC") video he watched about building a TATP bomb.

Naser contends that the government failed to introduce evidence sufficient to show that he took any action beyond "mere preparation." *Alebbini*, 979 F.3d at 546. Naser asserts that it was mere preparation to

watch the ITMC video and possess common household items, together with "other items outside the home to make a destructive device." (ECF No. 370, PageID.8820.)

It is undisputed that Naser did not have all the materials identified in the ITMC video or the specified quantity of some items in that video. Naser also did not take all the steps to modify the household items recovered by the FBI. Since he did not possess certain items (e.g., ammonium nitrate), had not unpackaged certain items (e.g., Christmas lights), combined items, or made or attempted to make a detonator, as described in the ITMC video, Naser maintains that his actions did not progress beyond mere preparation.

The Court is not persuaded by Naser's argument and concludes that a reasonable juror could, beyond a reasonable doubt, find that Naser's actions constituted a substantial step, not mere preparation, toward providing material support and resources to a foreign terrorist organization.

First, Naser ignores the evidence that he is not the average person in possession of household materials. In the months before the search of Naser's home was conducted, he had next to his bed a written poem that

affirmed his support for ISIS, and he made a recording of himself saying it. (ECF No. 324, PageID.4423; ECF No. 335, PageID.5885.) He called himself a "soldier of the Caliphate." (ECF No. 324, PageID.4425; ECF No. 335, PageID.5885.) He conducted research on how to build explosives, including homemade bombs or fire bombs. (ECF No. 350, PageID.7998–7999, 8001–8002, 8057–8058.) He also was a member of the Mujahideen Secrets Channel Group, where members discussed and commented on making bombs for terror purposes. (ECF No. 336, PageID.6145, 6157–6158.) Further, he had Telegram and Paltalk accounts on which he discussed and researched explosives. (ECF No. 351, PageID.8218–8221, 8253, 8276.)

Second, it is undisputed that Naser viewed and downloaded the ITMC video on how to make a TATP bomb. Third, Naser had the three ingredients necessary to form TATP and cause an explosion: hydrogen peroxide, acetone, and sulfuric acid. (ECF No. 345, PageID.7017–7018, 7130–7131; ECF No. 346, PageID.7206, 7282.) Naser had many other materials, most notably glass jars, to make an explosive device with fragmentation (i.e., the explosion would cause shards of glass to shoot out at rapid velocities). (*See* ECF No. 345, PageID.7022; ECF No. 346,

15

pageID.7295–7297.)

Fourth, although he did not have all the materials necessary to make the TATP bomb in the ITMC video, he had almost all of them. In addition to the materials stated above, he had a coffee filter on a mason jar in the basement that was nowhere near a coffeemaker (ECF No. 343, PageID.6612), Christmas tree replacement bulbs in the coffee filter (*id.* at PageID.6613), countdown timer boxes (*id.*), and hunting pellets that did not fit his BB gun (ECF No. 350, PageID.8071). The Christmas lights could be used to initiate an explosion. (ECF No. 345, PageID.7025.) As FBI Special Agent Stephen Haug testified, the area "looked like an improvised explosive lab." (*Id.* at PageID.6984.)

As the government argues, the Sixth Circuit "does not require showing possession of all commonly available materials when determining whether a destructive device could have been readily assembled." *United States v. Crocker*, 260 F. App'x 794, 797 (6th Cir. 2008) (missing scotch tape did not preclude conviction); *United States v. Langan*, 263 F.3d 613, 626 (6th Cir. 2001) (missing pliers did not preclude conviction).

Although the items missing in *Crocker* and *Langan* are different

(and fewer) than the items Naser argues were not in his basement (a funnel, epoxy, scissors, and heat or refrigeration), a reasonable juror could still conclude that Naser could have readily assembled a bomb or explosive device, even if not the TATP bomb constructed in the ITMC video Naser viewed and downloaded. As the government argued, the funnel could easily be purchased at a local store. The functional equivalents of epoxy (a glue gun) and scissors (a hand saw) were in the basement. Alternatively, each of those items could easily have been purchased at a local store, just as the funnel could be. Further, Naser had access to heat and refrigeration in his kitchen, if necessary, which was one flight of stairs from the items in the basement.

The Court would come to the same conclusion even if Naser is correct that the evidence in this case revealed that he needed much more than "a piece of scotch tape" to build, step-by-step, the TATP bomb in the ITMC video. *Id.* at 797–798. In this case, the government did not have the burden to establish, and the jury was not required to find, that the destructive device was the TATP bomb described in the ITMC video. The jury was only required to find that Naser possessed a destructive device, as defined in the statute and the jury instructions. The statute provides:

(4) **The term "destructive device" means—(A) any explosive, incendiary, or poison gas— (i) bomb**, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge of more than one-quarter ounce, (v) mine, or (vi) device similar to any of the devices described in the preceding clauses; (B) any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; **and (C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A)** or (B) **and from which a destructive device may be readily assembled**.

18 U.S.C. § 921(a)(4). And, as set forth in the jury instructions,

(E) The law does not require that the destructive device operate as intended. **It is sufficient for the government to show that the device was "readily convertible" to a destructive device**. The term 'readily' means quickly and easily: The combination of parts possessed by the defendant must be capable of being assembled into a functional device within a short period of time and with little difficulty—measures that may depend on the expertise of the defendant constructing the device.

(F) **The defendant does not have to possess every component necessary to render a partially constructed device capable of detonating**. If the defendant lacks a part necessary to render the device functional, the "readily assembled" element can still be met so long as the defendant could acquire the missing part quickly and easily, the part is commonly available, and so long as the defendant could incorporate the part into the device quickly and easily.

18

(*See also* ECF No. 357, PageID.8554–8555 (emphasis added).)

For the reasons discussed above, the Court finds that the materials Naser possessed, together with his other actions—including repeatedly talking about and researching bombs and explosives—constituted sufficient evidence to establish beyond a reasonable doubt that he possessed those materials to build a bomb, a/k/a a destructive device. All that evidence also suffices to show, and enables a rational juror to find, beyond a reasonable doubt that Naser took a substantial step toward providing material support to ISIS in 2016 and 2017. Accordingly, the Court **DENIES** Naser's Rule 29 motion with respect to count two.

### 3.    *Count Three*

As Naser argues, the government charged Naser with felon in possession of a destructive device, not attempted possession. And, it is undisputed that Naser did not possess every item necessary to construct the TATP bomb in accord with the ITMC video. However, as discussed above with respect to count two, the law does not require that the bomb is complete or even that a defendant possesses every part necessary to complete the bomb.

For the same reasons as analyzed in count two, including Naser's

repeated discussions and research regarding bombs and the materials Naser possessed, the government presented sufficient evidence from which a rational jury could find beyond a reasonable doubt that he was in possession of a destructive device. As FBI Special Agent Christopher Rogopoulos testified:

> Once [Naser] made the TATP, all he had to do was "take one of [the] Christmas lights, . . . tap the glass off the individual Christmas light and cut the wires, but [] make sure the filament, the little thin wire that's inside that light, remains intact." (R. 345: Rigopoulos (Tr.), PageID 7025). Then "add power or electricity to this Christmas light . . . it heats up, it's generating heat" and because "TATP is extremely sensitive to heat," it will explode. (*Id.*). This process would take only a few minutes. The matchheads would be an alternative initiation mechanism but would take longer to prepare. (*Id.* at PageID 7026).

(*See* ECF No. 376, PageID.9570–9571 (citing ECF No. 345, PageID.7026).) Accordingly, the Court **DENIES** Naser's Rule 29 motion as to count three.

### 4.    *Conclusion*

Having considered all the evidence in a light most favorable to the government, the Court concludes that "a rational trier of fact could have found the essential elements for the crime beyond a reasonable doubt" with respect to each of counts one, two, and three. *Jackson v. Virginia,*

443 U.S. at 319. Therefore, Naser's Rule 29 motion for judgment of acquittal is **DENIED**.

### B.     Rule 33

A district court can reverse a jury verdict if it is against the manifest weight of the evidence, *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018), and the district court "disagrees with the jury's resolution of conflicting evidence." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1988). The district court can, in essence, act as a thirteenth juror and assess the credibility and weight of the evidence to ensure that there is not a miscarriage of justice. *Lewis*, 521 F. App'x at 532. Then, if the evidence "weighs heavily against the verdict," it can order a new trial. *United States v. Bowen*, 938 F.3d 790, 796 (6th Cir. 2019); *Hughes*, 505 F.3d at 593; *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988).

### 1.     *Government's Closing Argument*

Naser first argues that, during rebuttal, the government attorney's reference to families of beheadings victims was prejudicial misconduct. In his closing argument, Naser's counsel stated, in part:

> Let's even look at the knives he had.
>
> This is this really scary looking KA-BAR knife. And I don't know if the judge will let you take it back there. He

might, you know, make a court security officer go back with you, but I want you to take a look at it. It looks really scary, but the handle is hollow plastic. I bet if I hit it hard enough, I could break it. The top unscrews, and it's hollow. This part up here also unscrews, and it's hollow.

Now, I don't know, gentlemen, who you are close to my age if you watched Rambo, and Rambo had the knife with all the stuff in it. And if you were a hick like I was growing up, you had to have one of these Rambo knives.

You could put the matches in it. It came with, like, a saw and little things you could saw down trees and build your shelter. It had a compass where this hollow spot right here goes. This isn't a real Mujahideen terrorist knife. It's cheap plastic. It's Mujahideen Cosplay.

(ECF No. 368, PageID.8765–8766.)

In rebuttal, the government's attorney stated:

So you've heard a lot from Mr. Gerometta. The defendant has an excuse for everything that he did. In fact, if you believe Mr. Gerometta, all he did was talk. All of this was meaningless. The knife with the plastic handle can't do any harm. What about this knife? [Displaying.] With the brass knuckles? What about this knife? [Displaying.] What about this Cold Steel knife? [Displaying.] Look at the weight of this knife, if the Court allows you the opportunity. What about this knife? [Displaying.]

Now, you guys have seen beheading videos. You watched them. The same videos the defendant watched, only he watched a lot more than what we showed in court. And he watched the videos that weren't blurred. He watched the videos in their full glory. **And you can ask the families of the people who were beheaded whether this is a joke** –

(ECF No. 368, PageID.8780-8781 (emphasis added).) Naser objected to the last sentence, and the Court overruled the objection. (*Id.* at PageID.8781.) In his motion for new trial, Naser claims that the only purpose for the government's reference to the families of the people who were beheaded was "to invoke a sense of fear from the jury." (ECF No. 370, PageID.8828.)

The Court does not find that the government attorney's statement was improper. First, the Court previously denied Naser's motion to preclude the government from introducing as evidence several videos viewed by Naser that depicted beheadings, finding that its probative value was not substantially outweighed by the danger of unfair prejudice. F. R. Evid. 403. Naser's post-trial arguments do not persuade the Court that its ruling was erroneous. Multiple beheading videos were admitted and viewed by the jury in some fashion during the government's case-in-chief; however, they were not replayed in conjunction with government counsel's contested remark.

Second, beheadings were a topic throughout trial. The discussion of beheadings began only minutes into the government's opening statement. (*See* ECF No. 317, PageID.3996, 3998.) During the

government's case-in-chief, there was extensive testimony about, as well as the introduction and viewing of several videos and pictures showing, beheadings; importantly, as multiple witnesses testified, most of the videos and pictures came from Naser's devices. (*See, e.g.,* ECF No. 323, PageID.4178, 4182, 4193, 4214 (general discussion of beheadings preceded the government playing a video in which there is a beheading); ECF No. 325, PageID.4633; ECF No. 328, PageID.5183; ECF 329, PageID.5467–5479 ("videos and images [Naser] viewed on his . . . devices . . . between October 18th, 2012 and January 4th, 2013" (*id.* at PageID.5467), which videos and images depicted several beheadings, including "a very graphic video of Nick Berg, who is an American citizen. He gets beheaded." (*id.* at PageID.5478); ECF No. 336, PageID.6039, 6109; ECF No. 350, PageID.8005 ("Let's talk about some of the other media that [Naser] possessed"), 8020–8021, 8035–8036, 8041, 8043; ECF No. 351, PageID.8183–8184, 8192).) As such, beheadings were a topic throughout trial because Naser regularly viewed them during the 2012–2013 and 2016–2017 time periods. This is not a case where horrific acts of an FTO were shown in the absence of a connection to Naser's actions.

Third, a limited number of videos and pictures showing beheadings

and/or the seconds leading up to and/or following such beheadings were introduced as trial exhibits. *See, e.g.,* Trial Exhibits 5-2.1–5-2.281 ("videos and images [Naser] viewed on his . . . devices . . . between October 18th, 2012 and January 4th, 2013," which included beheadings (ECF No. 329, PageID.5467)); 11-1 ("This coward is a beheader" and ""I am prettier when I behead." (ECF No. 351, PageID.8192.); 16-4 (slide 35); and 17-141, 17-142, 18-38, and 18-80  ("Let's talk about some of the other media that [Naser] possessed") (ECF No. 350, PageID.8005)).

Fourth, although the "families of the people who were beheaded" comment was made in rebuttal, the Court considers the comment with the context of both parties' closing arguments. An attorney for the government  made the comment in rebuttal, and only after Naser's attorney suggested in his closing that a knife handle was hollow and cheap plastic, like a "Rambo" knife that boys had growing up that is probably breakable if struck hard enough, all for "Mujahideen Cosplay." (*See* ECF No. 368, pageID.8765–8766.) Fifth, as the government notes, Naser's counsel first raised the issue of family when stating that Naser was "someone's son, and he's someone's father." (*Id.* at PageID.8778.) That statement was uttered only minutes before the government

25

attorney's remark about the families of beheading victims.

Finally, the government introduced evidence that Naser, while on Paltalk under the username MuslimX1 (ECF No. 351, PageID.8190), in response to being told "You are a coward," stated, "This coward is a beheader." (*Id.* at PageID.8192.) MuslimX1 then "sends emojis of two knives" right after that statement. (*Id.*) MuslimX1 further stated in the same chat, "I am prettier when I behead." (*Id.*) MuslimiX1 also commented to another Paltalk user the same day, "How many Rafidi I have beheaded," followed two lines later by two knife emojis. (*Id.* at PageID.8194.) As such, although Naser is not accused of committing beheadings, he claimed to at least one person that he had beheaded someone and at least implied to another person that he had beheaded two "Rafidi."[2] (*Id.*)

For all these reasons, the Court is not persuaded that the government's comment about asking the families of the beheading victims whether the videos were jokes was improper or, even if improper, a basis for granting a new trial pursuant to Rule 33.

---

[2] According to testimony, "Rafidi" is a "derogatory term for Shiites." (*Id.*)

### 2.    *Great Weight of the Evidence*

Naser first suggests that his positions discussed above demonstrate with respect to his Rule 29 motion and the government's alleged misconduct why there is insufficient evidence to support his convictions. For the same reasons that the Court denied his arguments on those positions, the Court finds that his positions, even taken in the aggregate, do not establish a basis for granting a new trial pursuant to Rule 33.

Naser next argues that the Court should find substantial doubt that: (1) he intended to help Dennison join ISIS; (2) he intended to join a specific organization in Syria; (3) his attempted travel created a foreseeable risk of bodily injury or death; (4) he planned to build a destructive device, and/or (5) any device he was planning to build. Those conclusory statements, however, constitute Naser's entire argument as to why the great weight of the evidence does not support the jury's verdict. He does not cite any evidence in the record or offer any explanation why the Court should have substantial doubt that the verdict was against the great weight of the evidence.

Therefore, the Court is not persuaded that it should have doubts that the verdict rendered by the jury was just and appropriate.

27

### 3. Resolution

The undersigned has: (a) presided over the trial; (b) accounted for all the evidence admitted; (c) considered the credibility of each of the witnesses and the weight of the evidence; and (d) reviewed applicable portions of the transcripts and the parties' briefs and arguments therein. Having done so, the Court concludes that the jury reasonably resolved the conflicting evidence. For the reasons stated above, the Court finds that a rational jury could have concluded beyond a reasonable doubt that Naser was guilty of each of the three crimes with which he was charged. Accordingly, for all the reasons stated above, Naser's Rule 33 motion for new trial is **DENIED**.

## IV. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Naser's motion for judgment of acquittal and a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33 (ECF No. 370) is **DENIED**.

**SO ORDERED**.

<u>**s/Jonathan J.C. Grey**</u>
JONATHAN J.C. GREY
Dated: February 28, 2026         United States District Judge

28

## Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 28, 2026.

<u>s/</u> **S. Osorio**
Sandra Osorio
Case Manager