UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                    CR. NO. 22-20504

v.                                Hon. Jonathan C. Grey

AWS MOHAMMED NASER,

        Defendant.

---

## AWS NASER'S SENTENCING MEMORANDUM

---

Aws Naser's alleged offenses have been over for nearly a decade. The Court is in a unique sentencing position; it heard many days of trial testimony about Mr. Naser's words and actions in 2011, 2012, 2016 and 2017, but there has been an intervening nine custodial years between those alleged actions and this sentencing. In evaluating the appropriate sentence here, he asks the Court to consider not only the intervening decade and the person he is today, but also his actual conduct from back then, not merely his alleged thoughts or speech. Even if a term of incarceration is appropriate, how long is "sufficient but not greater than necessary" to achieve congress' sentencing objectives? A sentence of 120 months, with credit for Naser's time spent in custody, will suffice.

1

## I. Naser's History and Characteristics

### a. *From Iraq, through Jordan, to Upstate New York*

*That day in 2001 caused a chain of tragedies — for the nearly 3,000 people who perished during the attacks in New York, at the Pentagon and in Pennsylvania; for the young men and women who died serving their country in the wars that followed; and for Muslims, and those perceived as Muslim, who became targets of hate. . . . "Before that, you were just like a random person, like everyone else, . . . And then, after 9/11, you go out, and people look at you like you're a terrorist."[1]*

Aws Naser's life began in the middle east. (PSR ¶ 72.) He was born and lived in a small town outside Baghdad, Iraq. His family lived in a multi-generational home, with both his immediate family and his aunts, uncles, cousins and grandparents. (Id.) He recalls they were poor but felt loved and cared for surrounded by family. (Id.) Aws has fond memories of childhood days spent with his cousins who were more like siblings, and aunts and uncles who treated him as their own.

In his formative adolescent years, Aws' father sought to move the family to Canada. At first, they moved to Jordan. (Id.) But they stayed only a couple of years before moving across the world to upstate New York. In the course of their journey,

---

[1] Muslim youth in America: A generation shadowed by the aftermath of 9/11, Los Angeles Times (Sep. 3, 2021), available at https://www.latimes.com/california/story/2021-09-03/muslim-youth-in-america-a-generation-shadowed-by-the-aftermath-of-9-11

Aws and his family were detained in a refugee camp in Malaysia. Aws recalls being sick for weeks in Malysia, suffering severe dehydration. Their month-long detention remains a vivid memory for Aws.



They knew no one in New York, but were determined to make a good life. Aws took ESL classes to learn English and had positive peer and social experiences. (PSR ¶ 72.)  He recalls he really enjoyed school and found acceptance even as an outsider at a vulnerable age. But shortly after they arrived in New York, the September 11 attacks occurred. (Id.)

As was true for many Muslim families in the United States, 9/11 changed life overnight for Aws and his family.[2] Classmates who were once his friends treated Aws and his siblings differently. Instead of being excited to play and laugh together, kids taunted Aws and his siblings, calling them "terrorist," "Osama," "sand n***r," and other awful names. Aws recalls that even some teachers became cold to him. Aws began to talk back and fight back and started getting into trouble at school. Feeling they were no longer welcome in New York, Aws' father decided to move the family to Dearborn, Michigan.

---

[2] See n.1 ("Young Muslims were "right in the crosshairs" after 9/11, said Sabrina Alimahomed, associate professor of sociology at Cal State Long Beach, whose research focuses on the impact the war on terrorism had on U.S. Muslims. In 2001 . . . nearly 500 anti-Muslim incidents of hate crime were documented in the U.S. — up from 28 the year before. The number has never returned to the pre-9/11 levels.")

Despite the move, Aws did not feel that the bullying subsided, and he and his siblings continued to be taunted. Aws felt middle and high school were negative and mean environments where his identity was often reduced to his religion. When he first arrived in the U.S., he liked fitting in and feeling like he could find his place among his peers, build friendships, and make people laugh. But after 9/11, everything felt different and building friendships became much harder. Ultimately, Aws' grades worsened. He dropped out of Fordson High School and got his GED instead.[3]

### b. Aws becomes a translator for the U.S. Military

Partly in search of acceptance as a Muslim in America, and partly in search of a job, Aws became a translator for a U.S. Military contractor in 2007. He was just 19 years old. He was thrown, like other American teenagers who enlisted, into battle and war zones that he could not be mentally and emotionally prepared to handle and digest. He was sent to Kuwait and Iraq with U.S. Marines, to assist ground troops with Arabic-English translation. While there, Aws found daily purpose using his language skills, but with that he encountered the inherent harm and destruction of war. Despite this, Aws references his translating job fondly as a time when he could "serve both his countries simultaneously."

In 2008, Aws was injured while on duty in Fallujah. He broke his femur and returned home via the 86th Medical Group at Ramstein Air Base in Germany. (Exhibit B – Medical Records (Sealed).)  He recalls feeling down after returning to the U.S., not

---

[3] PSR ¶ 85.

only dealing with his physical recovery but also attempting to make sense of the chaotic situation in Iraq, a place that up until his deployment he had idealized in the memories of his childhood. These feelings stacked on top of the normal untreated trauma response many service members experience when they return home from combat deployments. He felt like he was spinning his wheels, trying to figure out what he would make of his life and what he should do next. At this point, he was only 20 years old.

### c.  Aws' early adulthood & the FBI surveillance

In the years following the September 11 attacks, federal, state, and local law enforcement agencies deployed an unprecedented and far-reaching surveillance apparatus targeting Muslim-American communities, with informants and undercover agents as its primary instruments. Federal, state, and local law enforcement agencies coalesced to position undercover informants posing as Muslims to gain access to what would be labeled "terrorism enterprises," including mosques, Muslim Students Associations at universities across various states, and businesses owned or frequented by Muslims.[4] The FBI recruited more than 15,000 informants—the most ever in its history.[5] Scholars have characterized this as a system of racialized state surveillance, arguing that the FBI's revised Domestic Investigation and Operations Guidelines allowed race and ethnicity to be used as a factor in opening investigations,

---

[4] Kamali, S. (2017). "Informants, Provocateurs, and Entrapment: Examining the Histories of the FBI's PATCON and the NYPD's Muslim Surveillance Program." SURVEILLANCE AND SOCIETY 15(1): 68–78.

[5] Id.

manufacturing ordinary Muslims as suspicious.[6] In the widely cited *NYU Law Review* Note "The Case of the Muslim Surveillance Program" (Vol. 90, No. 5), the author observes that post-9/11 scrutiny led some Muslims to withdraw from activities that would identify them as Muslim, Arab, or South Asian, while others became more active in civic life in an effort to dispel stereotypes and resist unfair treatment.[7] The Brennan Center for Justice has noted that much of the FBI's aggressive counterterrorism operation produced little actionable intelligence—a two-year bipartisan Senate investigation published in 2012 found that fusion centers yielded few counterterrorism benefits and instead produced reports of predominantly useless information, often singling out Muslims engaged in normal activities for suspicion.[8] Yet the surveillance programs left lasting civic and psychological damage, chilling religious practice, fracturing community trust, and a tiered citizenship rooted in the equation of Muslim identity with inherent threat.[9]

It was in this environment that Aws came of age and developed his relationship with authority – and the Authorities turned their attention to him. The indictment

---

[6] Alimahomed-Wilson, S. (2019). "When the FBI Knocks: Racialized State Surveillance of Muslims." *Critical Sociology* 45(7–8): 871–888. The coercive recruitment of informants was pervasive; the FBI also used deportation as a leveraging tool, giving individuals the ultimatum of working with the bureau or facing removal from the country, or having a family member barred from entering the United States. Kamali, supra n.4, at 74–75.

[7] Wasserman, N. (2015). "The Case of the Muslim Surveillance Program." NYU LAW REV. 90(5): 1426–1466, at 1436.

[8] Brennan Center for Justice. (2021, September 8). "The Costs of 9/11's Suspicionless Surveillance: Suppressing Communities of Color and Political Dissent." NYU School of Law. Citing U.S. Senate Permanent Subcommittee on Investigations, Federal Support for and Involvement in State and Local Fusion Centers (2012).

[9] Selod, S. (2015). "Citizenship Denied: Racialization of Muslim American Men and Women Post-9/11." Critical Sociology 41(1): 77–95.

allegations in this case begin in Aws' early 20s. At that time, he was in and out of programs at local community colleges, unsure of how he would make a living. He met and married Noor Al-Bahiya, and the two would ultimately have three children together.[10] Aws, like many other men in their early 20s, spent time online, watching videos on YouTube, conversing with others on the internet. When a Muslim peer at Henry Ford College was told she could not pray inside the library, Aws was indignant and felt the need to say something and to do something. This was the impetus for his YouTube channel, where he challenged not only Henry Ford authorities but all authority as it entertained widespread suspicion of Muslim Americans.

Indeed, HFC's FBI tip – vague and unsubstantiated[11] – thrust Naser into this existing surveillance web. Discovery produced in this case indicates that the Government sent several informants – not just the ones discussed on the record at hearings and trials before the Court, but several more – to interact with Aws. They sent them online and they sent them to the mosque. They sent them to Aws's workplace. Most of them returned with nothing notable to report. And Aws was unaware that many of them were anything other than casual encounters; others, as the Court has heard testimony about, Aws was aware of and sought to make his awareness known.

### d. The period of alleged offense conduct

---

[10] PSR ¶ 74.

[11] HFCC accused Naser of "preaching jihadi rhetoric" but no one can say what this rhetoric was. No one saved pamphlets. No one said exactly what he said. But mere mention of this rhetoric was enough for the FBI to get involved.

It was in this sociopolitical environment that Aws met Russell Dennison. Without rehashing the evidence presented at trial, the two men were ultimately very different people. Aws planned a trip back to Iraq to see the family he hadn't seen since he was 10 years old – the cousins and aunts and uncles with whom he once shared a roof. Meanwhile, Dennison planned a trip to the middle east to join a terrorist organization. While the two men spent several days together in Iraq, they ultimately parted ways. Naser chose to have fun with his cousins at the pool and visit other family members in Baghdad and then return to the U.S. a few weeks later.

The Court is familiar with the government's case; what the Court has heard less about is all of the other things Aws Naser was doing – the other aspects of his life – during that timeframe.  For example, in between the two times Aws tried to fly to the Middle East, he was actively applying for jobs in the Metro Detroit area. He submitted dozens and dozens of applications in the month of December 2012 alone. (Defendant's Trial Exhibit A.) He was talking to friends and family about getting into the real estate rentals business.

While Naser was on parole with MDOC, he again sought to make a living. He worked as an auto detailer, and researched starting a landscaping business, but ultimately returned to his aspiration to establish a passive stream of real estate rental income.

Meanwhile, his relationship with his wife grew increasingly acrimonious, and the two were separating. He asked her and her kids to move out of the home he owned so

that he could rent the bedrooms to tenants. Naser began making improvements to the home to increase its rental appeal, expending significant funds to do so. He had the landscaping and concrete patio redone, costing thousands. Trial Tr. Vol 15, pp. 135-136. He bought brand new living room furniture. Id. At 142; Trial Tr. Vol 14, pp. 165-166. He listed the rooms for rent online, interviewed prospective tenants, and secured two tenants. Trial Tr. Vol 14, pp. 162, 165. One of his tenants had been previously homeless, so did not have a bed or bedframe; nor did he have a car. Aws took the tenant to buy a mattress and bedframe and assembled it for him. Id. at 164-165. Those steps played a vital role in enabling Aws to regain financial stability and move forward at a time when his marriage was potentially coming to an end and he was facing significant life changes.



Drone footage of Aws's daughter in their backyard.

Aws also started online dating. He set up a Tinder profile and, according to one of his tenants, went on at least one date to a Redwings game. He read books on love and relationships, and spent more time with his family, helping his mother and brothers around his mother's house.  He played with drones in his backyard and at the park with his children. He was a good neighbor and became a responsible landlord. And of course, Aws' lifelong need to soak up information through books, the Internet, and any media source also consumed his time. He immersed himself in chatrooms, reading the banter, and even relished generating reactions through his online words.

## II.    Understanding radicalization

Researchers in extremism have identified many factors that drive radicalization. Surprisingly, the primary factor is not ideology or theological conviction. Instead, research shows unmet psychological needs are the key. Problems rooted in identity crisis, social marginalization, and the experience of perceived injustice are all major contributors.[12] Extremism, by contrast, falsely promises a sense of meaning and life purpose.[13] A lead researcher on the topic, Dr. Arie Kruglanski, coined the "Significance Quest Theory," which demonstrates that ideology is merely a vehicle for extremism rather than its cause; more pertinent are the psychological and social factors at play: loss of personal, economic, and social significance are the root issues.[14]

Many of Kruglanski's factors were present in Aws' life at the time of the alleged offenses. He moved to the U.S. as a child and got to really *be* a child. This changed on 9/11, after which he was no longer an American child, but an outsider and a threat. He became a military translator and felt a sense of purpose and belonging, but was sent home with a broken femur. He felt Muslim students at HFC were being mistreated for

---

[12] Jasko, K., LaFree, G., & Kruglanski, A. W. (2017). Quest for significance and violent extremism: The case of domestic radicalization. *Political Psychology*, 38(5), 815–831. https://doi.org/10.1111/pops.12376

[13] Lyons-Padilla, S., Gelfand, M. J., Mirahmadi, H., Farooq, M., & van Egmond, M. (2015). Belonging Nowhere: Marginalization and Radicalization Risk Among Muslim Immigrants. Behavioral Science & Policy, 1(2). https://www.start.umd.edu/publication/belonging-nowhere-marginalization-radicalization-risk-among-muslim-immigrants

[14] Kruglanski, A. W., Gelfand, M. J., Bélanger, J. J., Sheveland, A., Hetiarachchi, M., & Gunaratna, R. (2014). The psychology of radicalization and deradicalization: How significance quest impacts violent extremism. *Advances in Political Psychology*, 35(S1), 69–93. https://doi.org/10.1111/pops.12163. See also Kruglanski, A. W., Molinario, E., Jasko, K., Webber, D., Leander, N. P., & Pierro, A. (2022). Significance-quest theory. *Perspectives on Psychological Science,* 17(4), 1050–1071. https://doi.org/10.1177/17456916211034825

praying; when he spoke out, he was banned from the campus. He took to YouTube to vent his frustration and became an FBI target. The thing that connects these experiences is not ideology; it's a young person looking for belonging and significance.

If the roots of extremism – Aws's or others' – lie in identity fracture, social exclusion, and the quest for significance, then a lengthy custodial sentence cannot suffice as an effective intervention. Decades in prison will not holistically address the loss of significance, identity confusion, or social isolation that produced extremism in the first place.

Evidence points clearly toward interventions that address the psychological and social substrates of radicalization directly. A systematic review of over 11,000 studies on prevention programs found that education, vocational training, and socialization were the interventions most consistently described as successful, with disengagement and social reintegration as key aspects of those interventions.[15] The effective interventions were facilitated by good therapeutic alliance, complementary psychological counseling, and involvement of pro-social family members.[16] This aligns precisely with what the research tells us drives radicalization to begin with: where the environment has failed to provide belonging, meaning, and significance, effective intervention must offer credible, legitimate alternatives to those same needs. **The most powerful response to violent extremism includes attentiveness to the human**

---

[15] Systematic Review on the Outcomes of Tertiary Prevention Programs in the Field of Violent Radicalization. Journal for Deradicalization.
https://journals.sfu.ca/jd/index.php/jd/article/view/1027
[16] Id.

**needs of involved individuals — especially needs for identity, belonging, and meaning —** *alongside* **a demand for accountability.**[17] Community-based and psychosocial approaches that rebuild social identity and strengthen family ties demonstrated measurable impact on the attitudes and networks of at-risk individuals.

In the face of the research clarity, the Court should resist the impulse to conflate length of sentence with effectiveness of prevention. The research demands a shift away from lengthy incarceration as the default response and toward structured, evidence-based interventions grounded in psychology, social reintegration, and the restoration of civic belonging.

### III.    Naser's ability to be a contributing member of society

Given the age of the allegations in this case, more recent information about Aws Naser and his character is highly relevant for sentencing.

#### a.  2020 Evaluation in MDOC

As the Court is aware, an MDOC licensed counselor evaluated Mr. Naser in February 2020, listing the reason for evaluation as to determine "the extent of antisocial thinking/behavior . . . temperament, extent of impulse control and self regulation skills." The evaluator interviewed Mr. Naser and reviewed his history and institutional conduct. The evaluator concluded that Mr. Naser did not present concerns that should delay or halt his release. He noted Mr. Naser had "no threatening, fighting or assault

---

[17] Ferguson, N., & McAuley, J. W. (2021). Dedicated to the Cause: Identity Development and Violent Extremism. European Psychologist, 26(1), 6–14. Summarized in: War Prevention Initiative. https://warpreventioninitiative.org/peace-science-digest/the-role-of-group-identity-in-initiating-sustaining-and-disengaging-from-participation-in-violent-extremism/

tickets" while in prison. He noted Mr. Naser had set realistic goals grounded in reality, his familial support, and his history. He noted Mr. Naser "didn't present with clinically significant antisocial thinking patterns" and "often presented with prosocial thinking patterns." He found Mr. Naser's "impulse control appears to be within normal limits" and that he "presents as an individual with competent self-regulation." The evaluator concluded that Mr. Naser "appears to have the cognitive capacity to make good decisions."

The MDOC's evaluator had no incentive to make these findings. They were not based on a picture that the FBI painted; instead they were based on Mr. Naser's actual recent and contemporaneous conduct and interview responses. While those findings were from six years ago, they are still a decade more recent than the earlier conduct alleged in the indictment. And there is further, more recent information that corroborates this as well.

### b. Conduct and rapport at FCI Milan

In the four years Aws has been incarcerated at FDC Milan, he has done positive things despite the circumstances. He has been entrusted with overseeing recreational activities, a role he has consistently maintained throughout his time at Milan. This sustained job assignment reflects a significant level of institutional trust, particularly in a setting where inmate management can be complex and where recreation is highly valued, often making it a source of tension among peer prisoners if not handled carefully and fairly. Aws has no adversaries at Milan. He can exist alongside any

established group in the institution, not because of any influence he holds, but because he can talk to anyone despite any differences they may have. This speaks to his capacity to navigate a highly charged, often violent and isolative environment. Individuals with fixed, entrenched beliefs, like those who truly have ideological radicalization, struggle with navigating relationships among anyone with differing opinions. They can be rigid, oppositional, and very much adopt an "us versus them" mentality, which Aws, despite the intensity with which he defends himself, does not have.

Importantly, post-offense conduct is "a critical part of the 'history and characteristics' of a defendant that Congress intended sentencing courts to consider." *Pepper v. United States*, 562 U.S. 476, 492 (2011). Not only does more recent conduct give the "most up-to-date picture" of Naser but it also "sheds light on the likelihood that he will engage in future criminal conduct." *Id.*

### c.   2026 Evaluation by Parents 4 Peace

Most recently, Aws Naser has been engaging with an interventionist from Parents 4 Peace (P4P), a non-profit deradicalization organization. The interventionist, Mubin Shaikh, was a former contractor with various U.S. government entities in counter-ISIS efforts and was an undercover operative with the Canadian Security Intelligence Service. He works with a multi-disciplinary team to disengage and deradicalize individuals who have been identified by family members, friends, courts or law enforcement. Using the national standards in Behavioral Threat Assessment and

14

Management (BTAM), Shaikh conducted multiple structured engagement sessions with

Mr. Naser. Through these interactions, Shaikh believes:

> Mr. Naser currently presents as relatively moderate in his religious and political views, explicitly rejecting extremism and terrorism. He has demonstrated insight into the reputational and theological harm caused by violence committed in the name of religion and does not articulate ideological justification for violence against the government or the public.
>     From a risk perspective, Mr. Naser does not presently exhibit indicators of ideological mobilization, grievance-fueled radicalization, or violent intent. He remains responsive to structured dialogue and demonstrates social cognition and reflective capacity consistent with low ideological risk.

Given Shaikh's background and training, these impressions are important indicators of

Mr. Naser's *current* state of mind, risk level, and thinking. Importantly, Shaikh was not

tasked with assessing Mr. Naser's risk or thinking in 2011, 2012, 2013, 2016 or 2017.

Although this Court must sentence Mr. Naser for the alleged conduct in those years,

the Court must *also* sentence the person before it today.

Shaikh and P4P operate understanding the research – as discussed more

thoroughly above – showing far better outcomes for individuals whose interventions

target the key social and psychological precursors to extremism:

> [E]xtremism is rarely the result of ideology alone. It is often a symptom of deeper unmet needs, emotional distress, identity conflict, perceived injustice, or social isolation. Many individuals who adopt rigid ideological positions are searching for belonging, meaning, or empowerment. Our work addresses these underlying vulnerabilities by meeting people where they are and guiding them toward self-awareness, accountability, and constructive identity formation.

(Ex. B, pp. 2-3) A sentence of 120 months will accomplish both the stated need for

accountability and the need to rehabilitate and address any underlying factors that led

15

Mr. Naser to be charged; it will also treat him as a dynamic, changing person, rather than a static, violent caricature painted by the indictment and jury verdict.

### d. Aws Naser has future potential

While in the Bureau of Prisons (BOP), Aws will be eligible for a number of programs regardless of his security level. A promising detail is that, due to his lack of history of violence and his excellent institutional adjustment during his pretrial period, these factors may impact his placement in a lower security facility. Other defendants with terrorism related charges sentenced within our district have been classified in low security facilities. At a lower security facility, he will have access to several rehabilitative, psychoeducational treatment groups, such as coping skills, criminal thinking, parenting, and cognitive behavioral therapy. Regardless of the security level, Aws will be able to avail himself of the occupational education programs within every BOP facility in order to gain skills for a variety of institutional jobs, and he will be able to continue his work during his incarceration in any of the BOP's industries program.

Additionally, Aws has the opportunity to continue working with Mubin Shaikh with P4P both while his is incarcerated, provide the BOP allows communication, and upon his release to the community. P4P eliminates barriers to support by funding all intervention and prevention efforts. As Shaikh stated about Mr. Naser in the final line of his report, "He is well-positioned to succeed, and this case represents an opportunity for the Court to support public safety in his desire to prevent others from going the same path." (Ex. B at p.8.)

Overall, risk for violence and criminal behavior decreases with age. The age-crime relationship is apparent over numerous studies indicating that people are most at-risk for committing crime in their teens to early twenties.[18] Further, a review of studies on managing individuals charged with crimes related to violent extremism, while in prison and in the community on supervision, recommend utilizing interventions that focus on building trust and resilience, and activating prosocial engagement.[19] Mr. Naser is already engaging in prosocial behaviors within the prison through his relationships with others, his work, his continued connection to family and his engagement with Mubin Shaikh with P4P.

Mr. Naser will continue to benefit from strong family support upon his release. His mother, siblings, and extended family remain committed to him and stand by his side. (Exhibit F – Family Support Letters.) He will also have a safe and stable place to live, providing a solid foundation for a fresh start.

## IV.    Just Punishment, Deterrence, and Protection of the Public

Aws Naser faces punishments that will extend far beyond his time in custody. His name has already been plastered all over digital news media labeling him as a terrorist. His family has already had to deal with the consequences of that reality, and what awaits Aws will be more difficult. Regardless of the sentence imposed, Aws will

---

[18] Farringston, D.P., Loeber, R., & Howell, J.C. (2012). Young adult offenders: The need for more effective legislative options and justice processing. *Criminology & Public Policy, 11(4)*, 729-750.
[19] Johan Axelsson, Leni Eriksson & Lina Grip (2024). Managing Violent Extremist Clients in Prison and Probation Services: A Scoping Review. *Terrorism and Political Violence, 36(4),* 488-511.

need to surmount additional challenges upon release: finding a job, finding a place to live, and rebuilding his life and familial relationships.

When it comes to avoiding unwarranted disparities, JSIN data can be of limited utility in terrorism cases because such cases are both relatively rare (resulting in a limited sample size) and also differ greatly in the underlying conduct. The Commission's JSIN tool aggregates data based on primary guideline, offense level, and criminal history category, but terrorism-related offenses frequently involve enhancements under §3A1.4, which automatically elevates defendants to Criminal History Category VI and skews outcomes. As a result, many terrorism cases are either excluded from JSIN due to low volume or reflected in statistically thin and unrepresentative data. Where data does exist, it often overstates sentence severity, as JSIN excludes probationary sentences and cooperation-based reductions while including mandatory minimums and above-guideline sentences.

In this case, the JSIN data provides an average sentence of 214 months, which appears to overstate the conduct in this case. Here, Mr. Naser never acted on the statements he made online, nor was he intercepted on the verge of carrying out any planned attack. Under these circumstances, a sentence of 10 years is sufficient to satisfy the purposes of sentencing.

## V.   Adjusting Naser's Sentence for Time Served in MDOC

Aws Naser was arrested on for armed robbery on January 4, 2013, after he was prevented from boarding a flight to Lebanon. According to the Government, Naser

18

was traveling to Lebanon to join Al-Nusra Front, a designated foreign terrorist organization. As fully briefed and argued in Mr. Naser's objections to the presentence report, this armed robbery offense is relevant conduct for Mr. Naser's first count of conviction for material support of terrorism.  Relevant conduct of an offense is defined to include conduct that occurred "in preparation for that offense[.]" U.S.S.G. § 1B1.3.

When an undischarged term of imprisonment is attributable to relevant conduct and it will not be credited to a defendant's sentence by the Bureau of Prisons, the guidelines instruct courts to "adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment" and impose the sentence for the instate offense to "run concurrently to the remainder of the undischarged term of imprisonment." U.S.S.G. § 5G1.3(b)(1) and (2).

Mr. Naser will not receive credit for his time spent in state custody, nor will he receive credit for the time spent in Milan after his indictment. "A federal sentence does not begin to run when a federal defendant is produced for prosecution by federal writ of habeas corpus ad prosequendum from state custody." (Exhibit D, *Interaction of Federal and State Sentences When the Federal Defendant is Under State Primary Jurisdiction*, Henry Sadowski, Regional Counsel, Northeast Region, Federal Bureau of Prisons, at p. 2 (internal citations omitted).) "[F]ederal custody does not commence until state authorities relinquish the prisoner on satisfaction of the state obligation." Id.

Mr. Naser was arrested for an armed robbery that the Government alleged was his activation to violence, a robbery whose proceeds they allege he would use to travel

to the middle east to join a terrorist organization. He was in custody for 38 months, from January 4, 2013, to March 18, 2016. (PSR ¶ 63.) After being released on parole he was returned to custody on November 9, 2017, as this Court is aware, that arrest stemmed from the FBI's involvement in searching Mr. Naser's home on October 30, 2017.[20] Mr. Naser has remained in custody for the last 102 months. Mr. Naser has spent a total of 140 months in custody and should be credited with that time.

Even if this Court does not find that the armed robbery was relevant conduct to the material support offense in count 1 of the indictment, this case contains the unusual factual scenario in which the FBI and the MDOC conspired to deprive Mr. Naser of his due process rights by revoking his parole, which had just previously been granted, without advising him of the reason for the revocation.

On January 2, 2020, Mr. Naser was granted release to a 24-month parole term without a hearing, effective February 6, 2020.  (Ex. A, to Defendant's Motion for Bond, ECF 190-2.) Though this decision was signed by two members of the Michigan Parole Board, Anthony King and Brian Shipman, Mr. Naser was not released. On January 21, 2020, Michael Eagen, then Chairperson of the Michigan Parole Board sent a memo to Mr. Naser's file indicating that a psychological evaluation was required before his release. (Ex. B, to Defendant's Motion for Bond, ECF 190-3.) On January 24, 2020, the decision to release Mr. Naser was officially suspended by a Notice of Decision. The

---

[20] In addition to the evidence produced at the suppression hearing in this case, after that hearing, the Government produced records that show that MDOC PO/FBI TFA Wright was briefed by SA O'Donnell, who was then leading the investigation into Mr. Naser before he took over supervision of Mr. Naser. (Exhibit E – O'Donnell Interview.)

Notice of Decision indicated the Parole Board had received new information regarding Mr. Naser and that information was attached to the document. (Ex. C, to Defendant's Motion for Bond, ECF 190-4.)

The true reason Mr. Naser was not released was unknown to him until Mr. Naser subpoenaed communications between the MDOC and the Federal Bureau of Investigations in connection with litigating a suppression motion in this case. In response to that subpoena, the MDOC revealed that on January 23, 2020, SA Jeffrey O'Donnell of the FBI emailed Chairperson Eagen a PDF presentation of what appeared to be a PowerPoint presentation of the type generally prepared for a grand jury. The PowerPoint outlined the evidence the FBI believed showed Mr. Naser was a terrorist. (Sealed Ex. L, to Defendant's Motion for Bond.)

But for the actions of the FBI, Mr. Naser would have been released on parole on February 6, 2020. Even if this Court decides that the armed robbery offense is not relevant conduct for the material support charges in count 1 of the indictment, it should credit Mr. Naser with his time in the MDOC that is directly attributable to the FBI's interference with the parole process, the time from February 6, 2020, to sentencing, or 75 months.

This Court should also ensure that Mr. Naser receives credit for any time spent in custody after sentencing by imposing his federal sentence concurrent with his state sentence for armed robbery.

## VI.    CONCLUSION

A sentence of 120 months, minus the time Naser has spent in state custody, is

sufficient in this case.

Respectfully submitted,

/s James R. Gerometta
Mogill, Lemanski & Gerometta, PLLC
27 E. Flint St., Suite 2
Lake Orion, MI 48362
313-530-9505

s/ Amanda Bashi
**FEDERAL COMMUNITY DEFENDER**
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5542

Dated:  April 30, 2026

## Exhibit List

Exhibit A – Military Medical Records (SEALED)

Exhibit B – P4P Report

Exhibit C – Mubin Shaikh CV

Exhibit D – BOP Regional Counsel Memo

Exhibit E – O'Donnell Interview Regarding TFO Wright

Exhibit F – Family Support Letters

# CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the parties of record.

Signed,

s/Amanda N. Bashi

Dated:  April 30, 2026