

## FORENSIC PSYCHIATRIC EVALUATION REPORT

**Name: Aws Mohammed Naser**
**Date of Birth:** <span>█████████</span>
**Date of Evaluation:** N/A: Mr. Naser declined to be evaluated on advice of counsel
**Date of Report: 5 MAY 2026**
**Docket Number: 0645 2:22CR20504 - 001**

## Introduction

I was contacted by Saima Mohsin, First Assistant U.S. Attorney for that United States Attorney's Office for the Eastern District of Michigan, requesting an evaluation and review of materials relevant to the upcoming sentencing of Aws Mohammed Naser, following his conviction by a jury on 3 JUN 2025 on the following charges for conduct that had occurred between 2012 through 30 OCT 2017, constituting Class C Felonies.

**Count 1:** Attempting to Provide Material Support and Resources to a Foreign Terrorist Organization,

**Count 2**: Attempting to Provide Material Support and Resources to a Foreign Terrorist Organization,

**Count 3**: Felon in Possession of a Destructive Device,[1]

Specifically, I was asked to review the report[2] of Mubin Shaikh MPICT, CPS whose title is Interventionist, Parents4Peace and any materials relevant to the level of potential threat posed by Mr. Naser. Mr. Shaikh states that he interviewed Mr. Naser on multiple occasions totaling 6 hours. After I also requested to also interview Mr. Naser. First Assistant U.S. Attorney Saima Mohsin's request for additional material relating to Mr. Shaikh's assessment, forwarded my request to defense counsel and received the following written reply from the defense:

> I can confirm that Mr. Naser will not, on the advice of counsel, submit to an interview with any government expert. As to your other requests, we had inquired about any authority for making those requests so that we could review and discuss it.[3]

As noted, Ms. Mohsin had also requested additional information from the defense counsel regarding materials relied upon for the defense expert's report. This request included "recordings or notes from

---

[1] Presentence Investigation Report, 15 DEC 2025
[2] Parents for Peace Assessment – Aws Naser, undated
[3] Email of Defense Counsel Amanda Bashi 9 APR 2026

meetings with Mr. Naser, dates and times that the meetings were conducted [and] any statements Mr. Naser made that he relied upon in making this assessment."[4]

At the time of this submission, I requested Ms. Mohsin to inform me whether the defense counsel had ever responded to the original 31 MAR 2026 and most recent 9 APR 2026 request for the above information. Ms. Mohsin replied in a statement:

> To date, the defense has not provided the Government with the requested information, or any other information about Mr. Shaikh's interviews/meetings with Mr. Naser.[5]

## Qualifications

I am a forensic psychiatrist and Professor in the Department of Emergency Medicine with a joint appointment as Professor of Public Health Sciences in the School of Medicine at the University of Virginia. I received my undergraduate education at the University of Notre Dame, my medical training at the University of Missouri and my residency training at the University of Virginia School of Medicine, where I have served on the faculty for 38 years.

I continue to serve as the senior psychiatrist for the FBI's Behavioral Threat Assessment Center in Quantico, Virginia. Pursuant to that role, I have presented cases relating to threat assessment at national meetings, consulted on more than 1500 threat assessment cases. I have provided expert witness testimony in response to requests by the government, the defense and the Court. Since 1996 I have served as the senior psychiatrist assigned to the FBI's Behavioral Analysis and Crisis Negotiation Units and the National Center for the Analysis of Violent Crime. In this role, I provide regular consultation on cases involving questions of mental illness and violence. On the issue of incarceration and prison radicalization, I have testified before members of the U.S. House of Representatives in a closed session and before the U.S. Senate Homeland Security Committee on the topic of prisoner radicalization. To that end, I was a co-author of a monograph entitled "Out of the Shadows: Getting Ahead of Prisoner Radicalization." In the monograph, we detailed the challenge of prisoner radicalization. In addition, in response to some concerns that the practice of Islam should be limited within the prison setting through a change to the Religious Land Use And Institutionalized Persons Act, I was asked to provide testimony. In my testimony before the U.S. Commission on Civil Rights I affirmed the need to continue to prohibit religious discrimination in the administration and management of federal and state prisons. My research includes serving as Principal Investigator for an Office of Secretary of Defense grant relating to public response to weapons of mass destruction. In addition to my faculty roles listed above, I have served as the Medical Director of the Kuwait Project outlined above, and a Visiting Professor to the King Faisal Specialist Hospital in Riyadh, Saudi Arabia for their Saudi U.S. Universities Project.[6] More recently, I served as Visiting Professor at Sheffield-Hallam

---

[4] Emails of First Assistant U.S. Attorney Saima Mohsin, 31 MAR 2026 and 9 APR 2026
[5] Email of First Assistant U.S. Attorney Saima Mohsin 3 MAY 2026
[6] Joint project with Baylor University, Duke University, George Washington University, the University of Virginia and Yale University (1995).

University in Sheffield, U.K. in the Faculty of Arts, Computing, Engineering and Science from 2014-2017. I was appointed as a standing committee member within the National Academy of Sciences in 2019.

One of my duties within my faculty role has been to teach prison psychiatry to 3rd year and 4th year medical students as well as residents and fellows in Family Medicine, Emergency Medicine, Psychiatry, and Medical Toxicology. This teaching is done within the context of my clinical responsibilities within maximum and medium security prisons. During the past 33 years, I have taught more than 2500 of these students and trainees on site within a men's maximum security and men's medium security prison. I have presented workshops relating to prison psychiatry at the American Psychiatric Association Annual Meeting. At the direction of the Court, the government and the defense, I have assessed incarcerated individuals for serious mental illness (SMI)[7] within the Federal ADX in Florence, Colorado, and inmates charged with espionage and terrorism who were detained in extreme security conditions (Special Administrative Measures) within the Metropolitan Correctional Center in Manhattan as well as the Alexandria Detention Center, the Federal Detention Center in Honolulu, Hawaii, and Butner Federal Correctional Institution. At the request of the U.S. military, I have visited and assessed inmates at the Fort Leavenworth, KS, United States Disciplinary Barracks, which maintains a Death Row, Administrative Segregation and General Population inmates. I have visited and assessed individuals within the Virginia Department of Corrections who were maintained on Death Row at Sussex State Prison and in Restricted Housing at Red Onion State Prison during a period of transition away from more extreme restriction. Following my service during the First Gulf War as a psychiatrist in 1990 and 1991, in 1993 and 1994, I evaluated Kuwaiti citizens who had been imprisoned and tortured by the Iraqi Government. In 2008, I was in the first group of U.S. officials invited to tour and meet with repatriated Saudi Citizens who had been formerly detained at Guantanamo. Following that assessment visit to the facility, I was invited to return to conduct reassessments at that Saudi facility on two more separate occasions.

**Opinion**

Based upon my review of the defense report and all collateral information provided it is my opinion that the undated Bench Memorandum of Mr. Shaikh for the defense fails to meet the standard of practice for threat assessment. This is based upon the failure to disclose the expert's methodology, failure to assess available collateral information, over-reliance on self-report of Mr. Naser, failure to consider the index offense and other prior criminal activity and absence of reference to any supporting scientific/professional literature

---

[7] According to the National Institute of Mental Health, Serious Mental Illness is defined as a "mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities." (2016)

**Sources of Information**

1. Government's response in Opposition to defendant's motion for acquittal or new trial

2. Aws Naser's reply to Government's response to his motion for Acquittal or New Trial

3. Aws Naser's renewed motion for Judgment of Acquittal and Motion for a New Trial

4. Presentence Investigation Report

5. CV of Mubin Shaikh

6. Order Denying Defendant's Motion Pursuant to Fed. R. Crim. P. 29 and 33 (ECF No. 370)

7. Parents For Peace Report – Aws Naser

8. Government's Sentencing Memorandum Filed 30 APR 2026

9. Full Verbatim Transcription – Transcription of call between Naser and Dennison, 25 MAR 2026

10. Letter of Banishment from Henry Ford Community College: 29 MAR 2011

11. Government Exhibit 3: ECF No. 396-4, PageID.10078 Filed 04/30/26

12. Incident Report 2026-02-23-13.22.36

13. Incident Report 2026-02-23-13.23.17

14. Incident Report 2026-02-23-13.23.57

15. R.396.5 Government Exhibit 4

16. R.396 Government Exhibit 5A

17. Government Exhibit 6 (93452087K) Audio

18. R. 396-7 Government Exhibit 6A

19. R. 396-1 Index

20. Government Exhibit 5 (Tr. Ex. 16-1.42) Audio

**Review of the Parents For Peace Memorandum**

In his report, Mr. Shaikh emphasized the alignment of the P4P Organization with current standards of threat assessment and threat management:

> The P4P model aligns with national standards in Behavioral Threat Assessment and Management (BTAM) and complements judicial processes by focusing on rehabilitation and risk reduction.

Mr. Shaikh's defense document focuses on self-report of Mr. Naser, rather than reviewing collateral information relating to the index offenses for which he is convicted, or any other behavioral or criminal related behavior:

> I deliberately did not discuss the underlying offence with him as I did not want to go into case-related matters but rather discussed the larger context of his life while still able to discover his thoughts and beliefs. As well, legal counsel asked not to make any statements about the allegations.

> The report also does not provide significant personal background regarding Mr. Naser's social history. The report does reference that the arrest damaged his relationship with his common-law wife and children:

> He described the significant personal toll of his arrest, including divorce and the inability to maintain involvement in his children's lives due to strained family dynamics.

> These developments have clearly been emotionally difficult for him.

In his report, Mr. Shaikh indicated that Mr. Naser had substantively changed during the six hours that Mr. Shaikh spent with him.  He described an initial phase in which Mr. Naser focused on the belief that he was persecuted:

> Mr. Naser framed aspects of his legal situation as persecution connected to his religious identity and practice.

Mr. Shaikh described that in the six hours he spent, Mr. Naser demonstrated some significant change in outlook, including an idea to develop an Islamic video game:

> Over time, our discussions expanded into broader conversations about Islamic history, perspective-taking across historical eras, and the importance of not becoming emotionally over-activated by contemporary geopolitical events.

> Our conversations also moved into constructive topics, including the idea of developing educational video game content that promotes civilizational literacy within an Islamic framework—demonstrating future-oriented thinking rather than grievance fixation.

Mr. Shaikh also provided Mr. Naser's self-report on his own strengths and abilities:

Mr. Naser consistently described himself as someone who communicates effectively and who others gravitate toward. In custody, he reports advising and supporting fellow Muslim inmates and emphasizes the importance of self-improvement before attempting to guide others.

Mr. Shaikh was complimentary about the level of sophistication of thought demonstrated by Mr. Naser:

Notably, he demonstrates nuanced awareness of interpersonal dynamics within prison culture. He spoke analytically about how different categories of inmates are treated, including those with mental health challenges or those socially ostracized.

This suggests intact social cognition and the absence of the black-and-white ideological thinking often present in highly radicalized individuals.

The changes that Mr. Shaikh noted during the six hours of sessions began with a sense of persecution but evolved to openness and moderation so much so that Mr. Shaikh expressed the belief that Mr. Naser could be enlisted to support the community's interest in opposing terrorism:

current iteration of Mr. Aws Naser does not exhibit ideological radicalization that would justify concern regarding violence against the government or the public. To the contrary, he expresses clear rejection of terrorism and acknowledges its moral and theological wrongness.

In my professional assessment, he has internalized significant lessons from his period in custody and demonstrates openness to constructive engagement, lawful process, and moderate religious expression.

From a deradicalization and behavioural-risk standpoint, continued community-based intervention, not extended incarceration, is the most effective and appropriate path for Mr. Naser. He is well-positioned to succeed,

In his report, Mr. Shaikh appears to speak for P4P, providing the P4P opinion that Mr. Naser is moderate in his views and in his assessment, is at low risk for violence:

P4P assesses that Mr. Naser currently presents as relatively moderate in his religious and political views, explicitly rejecting extremism and terrorism. He has demonstrated insight into the reputational and theological harm caused by violence committed in the name of religion and does not articulate ideological justification for violence against the government or the public.

From a risk perspective, Mr. Naser does not presently exhibit indicators of ideological mobilization, grievance-fueled radicalization, or violent intent. He remains responsive to structured dialogue and demonstrates social cognition and reflective capacity consistent with low ideological risk.

He is well-positioned to succeed, and this case represents an opportunity for the Court to support public safety in his desire to prevent others from going the same path.

## Collateral Information

The amount of collateral information available in Mr. Naser's case is exceptionally large, and involves not only terrorist-related convictions, but also convictions involving criminal behavior and extreme domestic violence. This section of my report contains behavioral examples that are important in any assessment of risk or threat.

In brief, Mr. Naser is a 37-year-old Iraqi-born male who entered the U.S. as a refugee at age 12, and lived in Dearborn, MI since the age of 15.  He dropped out of high school in 11th grade, and for approximately one year, in 2007/2008, he worked as a contract linguist in Iraq for the U.S. Marine Corps as a translator, where according to him, he also received weapons training.  He has lived with his common law wife. Noor Al-Bahiya, for 8-9 years prior to his arrest in October 2017.  He is the father of three children with Ms. Al-Bahiya, who now range between ages between 9 and 15. Mr. Naser has referred to his current status as divorced. His wife has obtained a personal protective order against him and has accused him of domestic violence and sexual assault.

According to the PSR, Mr. Naser was expelled from HFCC for being combative and disruptive and briefly attended Schoolcraft Community College without completion of any program.  His employment history is limited, according to the PSR.  He has worked at two gas stations but was fired from each due to suspicion of theft. While on parole five years later, he committed vandalism and destruction of property, slashing the tires of a co-worker in retaliation for being fired.

### Radicalization to Salafi-Jihadism

Mr. Naser was noted to be preaching and proselytizing Salafi-Jihadism, falsely claiming to authorities that he was a current student while on-site at Henry Ford Community College (HFCC) as well as online.  His behavior was described by the Vice-President of Student Affairs in the following letter from HFCC and he was banned from the campus:

> You were informed that your conduct was a violation of College policy, particularly the Student Code of Conduct. You still refused to cease your behavior. It was not until Campus Safety informed you that Dearborn Police would be called that you left the area. On several occasions during today's incident, you were asked if you were a current student. You indicated that yes, you were. In fact, Mr. Naser, you are not a student and have not been a student since December 2010. Prior to this Incident, the Director of the College Library contacted Campus Safety because you were gathering with other individuals and were being loud and disruptive. After being asked several times to quiet down or leave, you refused to do either. When Campus Safety arrived, you were combative and made direct attempts to provoke the officers.

It is for these reasons Mr. Naser that you are banned from Henry Ford Community College effective immediately. Should you be found on campus, you will be considered to be trespassing and the Dearborn Police will be called. The College's function is to provide a quality education to individuals who seek this education and abide by the College's conduct rules. These rules are in place to ensure a quality and peaceful environment for all students. Your conduct is counterproductive to these values and goals.

**Behavior Relating to Overseas Terrorism**

Mr. Naser's travels to engage in terrorism, both planned and accomplished, are detailed in the Preinvestigation Sentencing Report as well as Government's Sentencing Memo.  They also include his purchase of warfighting materials and personal weapons (sword cane, tactical knife and rifle scope) and repeated efforts to travel overseas to terrorist areas even after being thwarted.  His time in the United States and Overseas with Russel Dennison are also documented in some detail.

Mr. Naser's interest in joining the ANF in Syria in 2012 and ISIS in Syria in 2013 is also documented, in addition to his review of terrorist propaganda with themes that were anti-Shia, anti-U.S. and anti-Jewish are documented in addition to his consumption of videos containing brutal and violent material.

**Coordination of Terrorist Activities within the United States**

In addition to his overseas coordination and communication, whether in the presence of Russell Dennison or not, Mr. Naser coordinated terrorist activities in a sophisticated manner designed to obscure his behaviors. Specifically, he maintained a secret LG phone, hidden from parole agents. He was able to conduct and support significant ISIS-related activity while utilizing web browsers Tor and Orfox in order to shield and anonymize his behavior.  This behavior involved research and review of explosives- making materials as well as poisons. He exchanged 109.267 messages between himself and the Mujahideen Secrets Channel Group (MSCG), although only 1,387 were recovered.[8]

Mr. Naser used the basement of his home to make explosives as well as drones.  In order to achieve this, he first forced his common-law wife and their three children to move out of the house and into a smaller home with his brother Osama and his family. Naser told Al-Bahiya that there was nothing that she could do to get in the way of his goals or achieving his goals and she could either help him or get out of his way. It was during this period that he again re-affirmed his oath to ISIS.

---

[8] Government Sentencing Memo, 30 APR 2026

This was the same oath he had recorded in December 2016 with a disguised voice and transferred to his bot, and it was the same oath found handwritten on index cards observed by his parole agent during home visits earlier that summer.[9]

In a later phone call, his wife spoke about that period in their life, and suggested that his efforts in support of terrorism were motivated in part by money as well as providing him with an opportunity to be unfaithful to her:

"go tell anyone with a right mind that you took your wife and kids out of the household in order for you to make extra money. see what they tell you. u made 2000 a month. your bills didn't even come out to 500 a month you don't even have a mortgage to pay. and I paid half the bills. you made me move I with your brother, that you did not come to the house but only once a week just to show your face and leave. I put up with your b.s. and your brothers b.s. go ahead and feel as honorable as you want. the man who was not faithful to his wife. the man who sold himself for money, the man who put his kids out of the house and put his wife in a shitty situation. and than asked for her help. go ahead and tell all the lies you want to yourself"[10]

Also in a phone call, his wife stated that he was a manipulator, and he responded in the affirmative and later admitted to his deception of his wife.

NB: Listen you jerk. Listen you evil person, that all you talk about "Oh, so I'm supposed to have one pair of jeans." Look at- look at the way you think, you manipulator. Alright.
AN: I'm manipulating-[11]

AN: I decei- I deceived you, that's why. Idiot. Yeah [Unintelligible] after what you did.
NB: You piece of shit! I was scared of you.


History of Criminal Behavior

Mr. Naser's first conviction was at age 18 in April of 2006, when he was convicted of disorderly conduct on school property. The details of this incident can be found in the PSR and Government Sentencing Memo but involved repeated violent behavior and an unsuccessful diversion sentence that was later revoked. The following January, he was convicted of assault and battery of his mother and sentenced to 12 months of probation.

Following his firing at two separate Detroit-area gas stations due to suspicion of thefts, Mr. Naser engaged in retribution against each business and in addition was arrested and convicted for

---

[9] Government Sentencing Memo, 30 APR 2026
[10] 2/8/2018 phone call between wife and Aws Naser
[11] 28 MAR 2025 phone call between Aws Naser and wife

armed robbery at a Mobil gas station[12] in Bloomfield, Michigan. For that crime he was sentenced to 3-20 years in prison following a jury trial and released on parole supervision in 2016.

Repeated Violations of Parole

In the 18 months of parole supervision following his release from prison for armed robbery, 50 parole violations were recorded, and as detailed in the PSR, was found guilty of engaging in a number of serious violations including:

> new criminal behavior, assaultive, abusive, threatening and/or intimidating behavior; failure to notify his parole agent that he had police contact on several dates, submitting a false and inaccurate report by failing to notify his parole agent of a violation of a Personal Protection Order (PPO); and possessing weapons and ammunition (BB's and pellets), firearm components (CO2 cartridges, a magazine and BBs), a stun gun, a knife, a concealed sword, and a firearm.

Also, while he was on parole, his common-law wife obtained a PPO against Mr. Nasser, alleging that he had punched her, choked her and threatened to kill her and her daughter before takin his son.  As the parole revocation hearing drew closer, Mr. Naser asked her as well as his brother to lie on his behalf.

In an email sent by his wife, she wrote the following:

> Now as for my testimony. you wanted me to lie and say that the BB gun was mine. You wanted to get out of trouble at the sake of getting me in trouble. There I apologize but I didn't help them against you. nor did I help you against them.[13]

Telephone calls between Mr. Naser and his common-law wife included multiple exchanges in which she accused him of being manipulative, dishonest and violent. Below are some of the statements that she made when speaking to him:

> "beat the crap out of me the same day, or the second day you found out that I was pregnant? Yeah, remember?" Gov't Ex. 6 & 6A at 08:55.

> "you hit me…you fucking threatened me. You attempted to fucking kill me. On top of all that – on top of all that you used to force yourself inside me." Gov't Ex. 6 & 6A at 11:04-11:20

> Aws you left a bruise on my face for a week and a half. one side of my face was swollen." Gov't Ex. 4, line 10

---

[12] Naser pepper-sprayed and assaulted the store clerk when he took money from the cash register.
[13] 5 SEP 2019 Email from Noor Al Bahiya Noor email to Aws Naser

"No I don't even want revenge. I just want to be free from your evil….you're an evil man…you are an evil man." Gov't Ex. 6 & 6A at 02:38-02:50.

"Yeah, you don't remember Aws, alright. And remember how you like wanted to drag me to that room and kill me? Remember?" Gov't Ex. 6 & 6A at 09:02.

In phone calls with him, his common law wife expressed fear of him. In an 18 FEB call to his mother, Mr. Naser relayed his feelings about his wife's refusal to testify at the parole revocation hearing on his behalf.

"She better pray and fast; and wish that I don't get out of jail. I will not live in injustice. She has to go and testify." And "She wants to run from the truth mom. I will not let her escape from this reality. The reality she put me in by not coming to testify. She will not escape this reality. I am not going anywhere, even for another five years. She can't escape me."

Disciplinary Infractions while Incarcerated

While incarcerated, Mr. Naser has been noted to have a significant number of violations. These have included serious offense, including possession of dangerous contraband, fighting, creating a disturbance, destruction/misuse of property disobeying a direct order, interference with administration rules and possessing stolen property/theft as well as forged documents/forgery. Naser's violence and refusal to follow the rules continued during his incarceration. He accrued nearly 40 violations while in state custody. *See* Gov't Ex. 4, MDOC Misconducts. He received citations for, among other things, fighting; creating a disturbance; possession of dangerous contraband (three citations); destruction/misuse of property (two citations); disobeying a direct order (eight citations); interference with administration rules (eleven citations); possessing stolen property/theft; and forged documents/forgery, as well as possession of a dangerous weapon.

Present and Longstanding Support of ISIS

As noted earlier, Mr. Naser has repeatedly affirmed his loyalty to ISIS through verbally recorded and written oaths that he has made up until the time of his arrest. Even after his arrest, Mr. Naser has voiced his support for ISIS and rejection of the United States and does this by reciting "Islamic States of America" rather than "United States of America."

Discussion

In his conclusions in his Bench Memorandum, based upon Mr. Naser's self-report, Mr. Shaikh opines that Mr. Naser's ideological risk level is low and that at present Mr. Naser does not "exhibit indicators of ideological mobilization, grievance-fueled radicalization, or violent intent" and that he "demonstrates social cognition and reflective capacity consistent with low ideological risk." Mr. Shaikh also stated that on the advice of counsel he was asked "not to make any statements about the allegations.

Self-report bias is a central problem in an individual who is incentivized to portray himself in a favorable light. Threat assessments that rely predominantly or exclusively on the subject's own statements are inherently compromised. An incarcerated individual facing sentencing has an overwhelming incentive to minimize, deny, or rationalize.  This is especially acute in terrorism cases, where ideological commitment may coexist with sophisticated strategic self-presentation.

Absence of collateral information is a major methodological flaw by any recognized standard for any assessment that should strive for validity and reliability.  This is why structured professional judgment instruments such as the HCR-20v3, the WAVR-21, or the Violent Extremism Risk Assessment (VERA-2R), which are specifically designed for terrorism cases — all require corroborating data sources.  Phone records from incarceration, disciplinary history, communications with associates, and behavioral observations in custody are not supplementary; they are essential. According to established practices, the original offense conduct is arguably the single most informative data point in any violence risk assessment and therefore its omission is indefensible.

The lack of specificity regarding methodology leaves the reader in a difficult position to know how much weight, if any, should be given to such a report.  Mr. Shaikh's attorneys declined to provide any information regarding methodology, other than the report's statement that the amount of time spent with Mr. Naser was six hours in multiple sessions.  The absence of disclosure regarding instruments used, dates, duration, and format raise serious questions about whether this constitutes a threat assessment in any professionally recognized sense or is instead a structured interview shaped by the defense framing.  Were the sessions in person, on a video platform or via phone calls.  How long were the sessions? Was anyone present other than Mr. Shaikh and Mr. Naser?

Mr. Shaikh did not disclose whether others were present at the time of the multiple assessments. If defense attorneys were present, this is arguably the most serious concern because defense attorney presence during the assessment creates multiple distorting forces:

• Implicit cueing. Even without overt coaching, the subject knows the attorneys are present and monitoring the interaction. This powerfully shapes responses toward self-serving presentation.

• Chilling of candor. The evaluator cannot explore sensitive areas — ideological commitment, ongoing grievances, network affiliations — with any confidence that responses reflect genuine thinking rather than rehearsed or attorney-approved narrative.

• Role confusion. The evaluator's independence is structurally compromised. A threat assessment conducted in this context functions more as a defense-directed clinical interview than an independent professional evaluation.

• Inability to detect deception. Effective threat assessment requires freedom to probe inconsistencies, present contradictory information, and observe unguarded responses. Attorney presence forecloses this.

No comparable forensic evaluation — competency, criminal responsibility, sentencing mitigation — would be considered methodologically sound if conducted with counsel present and monitoring responses in real time.

The Remote Format

Mr. Shaikh did not divulge whether the format was remote or in person.  If the format was remote, this would be important for the reader to know for a number of reasons:

• Behavioral observation is severely limited or impossible
• Verification of the subject's environment and whether anyone else is present with the subject cannot be confirmed
• Nonverbal cues central to clinical assessment are degraded or absent

And if the format is determined by counsel, the format itself may reflect a negotiated compromise that served the defense's interest in controlling conditions

Mr. Shaikh wrote in his report that "The P4P model aligns with national standards in Behavioral Threat Assessment and Management (BTAM) and complements judicial processes by focusing on rehabilitation and risk reduction."

A model is not a report, but in the case of a report, Mr. Shaikh's assessment does not meet the standard of care for forensic threat assessment in any recognized professional framework.  To be specific, heavy reliance on subject self-report in a serious criminal proceeding such as sentencing, without collateral verification, renders the conclusions unreliable.
If there was attorney presence during the assessment is an undisclosed but material confound that invalidates claims of independent professional judgment.

In this case, in addition to the index offense, there are myriad examples of violence dating back to convictions from the age of 18.  Within the forensic assessment domain, a long established and accepted principal is that prior violence is consistently among the strongest predictors of future violence.  This is a national standard in Behavioral Threat Assessment and Management (BTAM), which Mr. Shaikh purports to follow. His omission of consideration of the myriad examples of prior violence clearly does not comport with acceptable standards, despite its claim to the contrary.

The non-disclosure of dates and time periods, instruments, and methodology prevents peer review or meaningful replication.  We do not know if the multiple sessions spread over six hours consisted of two sessions of three hours each or twelve sessions of a half hour each.  This is especially important to know in a correctional setting, as it is a difficult environment in which a short half hour session is difficult if not impossible to establish the rapport needed to fully assess an individual.

Mr. Shaikh's assertion that in six hours Mr. Naser showed notable change, going from a sense of persecution to openness, is surprising, especially in an individual with such a lengthy criminal and radicalization background that has occurred over almost two decades.

The appropriate role of a forensic threat assessment in this context is to inform the Court — not to advocate for either party. If this was an assessment conducted under conditions designed and controlled by the defense, with counsel monitoring in real time, and without access to the full evidentiary record, then advocacy is baked into its structure regardless of the evaluator's intentions. The conclusions of such a report are therefore inherently unreliable.

Collateral Information is Required in Forensic Assessment

The importance of relevant collateral information cannot be overemphasized.
Third-party information must be gathered from a variety of sources that include police reports, official criminal records, and contact with law enforcement and legal officials.[14]
Mr. Naser's self-report of his own communication style and positive influence on other inmates can be tested through contacting other sources such as the cell block's unit manager or counselor. The large number of disciplinary charges, including the possession of a dangerous weapon, theft, forgery and fighting, raise questions about Mr. Naser's self-characterization, but more collateral information could be sought. In this case, we are provided with no collateral information.

Accepted standards for the importance of collateral information are supported in other authoritative texts. Specifically, there is a guideline that again stresses the importance of collateral information. This guideline states that "forensic practitioners ordinarily avoid relying solely on one source of data, and corroborate important data whenever feasible," and specifies that a comprehensive forensic mental health assessment requires multiple sources of information.[15]

Third-party information as particularly critical in forensic assessment for a number of reasons: it facilitates the assessment of response style and hypothesis testing, it is required by recently developed assessment instruments, and it promotes the credibility of communicated findings.[16]

Forming and testing hypotheses through multiple methods such as interviews, file reviews, psychological testing — and from multiple sources is a core principle of forensic evaluation, with third-party data specifically applicable to appraisals of "mental state, functional-legal capacities, adaptive behavior, and risk of violence" in the criminal realm.[17]

It is particularly important to obtain collateral information in terrorism cases. The VERA-2R is the recognized gold-standard instrument for individual terrorism risk assessment and its requirements directly indict the defense assessment. The VERA-2R documentation states explicitly that collateral information from different sources is necessary because "violent

---

[14] AAPL Practice Guideline for the Forensic Assessment (2015)
Journal of the American Academy of Psychiatry and the Law, 43(2 Suppl), S3–S53
[15] APA Specialty Guidelines for Forensic Psychology (2013), Guideline 9.02
[16] Heilbrun, K., Warren, J., & Picarello, K. (2003)
"Use of Third-Party Information in Forensic Assessment." In Goldstein (Ed.), Forensic Psychology, Vol. 11. Wiley.
[17] Goldenson, Brodsky & Heilbrun (2023) "Collateral Consequences for Third-Party Interviewees in Forensic Contexts." JAAPL

extremists and terrorists often withhold information and deny and camouflage their actions," and that if a professional does not use collateral information and relies only on interviewing the subject, "this often leads to a professional 'error.'" Particularly relevant to a consideration of Mr. Shaikh's report, the VERA-2R additionally notes that clinicians and therapists who do not integrate collateral sources may have a bias toward lower risk scores, and that consensus with another trained professional leads to a more objective risk analysis.[18]

Structured professional judgment approach used for common violence should be applied to terrorism — but the substantive content of any instrument must account for terrorism-specific risk factors that differ significantly from those for ordinary violence. An assessment relying almost entirely on the defendant's own narrative cannot meet these methodological standards.[19]

Although Mr. Shaikh on the advice of counsel chose not to address index offense, or what he termed "allegations" that decision is not supported by the testing vehicles that have been proven to be valid and reliable.  In fact, the HCR-20's first and most heavily weighted historical item (H1) is "History of Violence."  The HCR manual cites Monahan (1981): "if there is one finding that overshadows all others in the area of prediction, it is that the probability of future crime increases with each prior criminal act." The manual further states that "virtually any measure of past offending can be expected to predict future violence." An assessment that fails to analyze the index offense — the terrorism conviction itself — violates the most fundamental item of the field's most widely used structured professional judgment instrument.[20]

The Parents for Peace website emphasizes the issue of Safety & Wellbeing, with the specific statement that "We do not tolerate harassment, bullying, intimidation, or any form of violence.[21] It would then seem important to at least weigh the domestic violence history of Mr. Naser in the P4P document, which included a conviction for assault and battery of his mother, domestic violence perpetrated against his common law wife, and the serious assault of the gas station clerk during the armed robbery which resulted in a conviction for armed robbery.  The violence perpetrated against the clerk was justifiable according to Mr. Naser, because the clerk had resisted.

According to Mr. Shaikh, Mr. Naser appears to attribute his family disruption and divorce to his arrest.  Perhaps this illustrates why collateral materials are so important for an objective assessment.  Review of collateral materials in fact reveals that Mr. Naser's insistence that his wife who had just delivered their third child should leave the home so that he could manufacture explosives and create drones for terroristic purposes provides an alternate perspective regarding the dissolution of the marriage. This was exacerbated following the arrest by Mr. Naser's repeated demand that his wife and brother lie in order to prevent revocation of his parole.

---

[18] Pressman, D.E. et al. The VERA-2R: Collateral Information as a Non-Negotiable Requirement in Terrorism Cases, VERA-2R: Violent Extremism Risk Assessment – Version 2 Revised (2019)
[19] Monahan, J. (2012) "The Individual Risk Assessment of Terrorism." Psychology, Public Policy, and Law, 18(2), 167–205.
[20]  The HCR-20v3: Prior Violence as the Cornerstone Historical Factor
Douglas, K.S., Hart, S.D., Webster, C.D., & Belfrage, H. (2013)
HCR-20V3: Assessing Risk of Violence — User Guide. Mental Health, Law, and Policy Institute.
[21] Our Code of Conduct | P4P

Collateral information provides a more complex picture based upon decades of predatory violent behavior, motivated in part by money rather than ideology. Any assessment of Mr. Naser should include not only ideological concerns but also clear instances of criminality. The collateral information that reveals that Mr. Naser continues to refer to the United States of America as "the Islamic States of America" when asked to repeat the former. This does not seem to align with Mr. Shaikh's characterization that Mr. Shaikh is low risk and "relatively moderate in his religious and political views."

**Conclusion**

In conclusion, and with a reasonable degree of medical and psychiatric certainty, it is my opinion that Mr. Naser's evaluation by Mr. Shaikh does not conform with any accepted standards for threat assessment. Scientific peer-reviewed articles in threat assessment do not support Mr. Shaikh's complete reliance on Mr. Naser's self-report and failure to include the serious index offense, collateral sources, and accepted assessment vehicles provide conclusions that are wholly unreliable. His use of the term "allegations" on the advice of counsel rather than acknowledge that the index offense resulted in a conviction for three felony counts by a jury, raises questions of not only advocacy but also Mr. Shaikh's and Mr. Naser's understanding or acceptance of the rule of law. Proffering such a report with the above noted serious inadequacies while at the same time refusing to allow an independent evaluation consistent with accepted practice also appears to reflect bias and advocacy. In the hundreds of reports of defense and prosecution reports that I have reviewed over the last three decades in criminal matters including terrorism, I have never encountered a similar threat or risk assessment defense report that fails to disclose basic methodology of assessment and is without evidence of scientific peer review, ignores even minimal aforementioned accepted professional standards rather than self-report, and has not ever been shown to be generally accepted within the scientific community.

The above impressions and opinions are based on information available at the time of the submission of this report. Should other information become available, an amendment to these opinions may be required.

Gregory Saathoff MD
Professor of Emergency Medicine
Professor of Public Health Sciences
University of Virginia School of Medicine